DENNIS J. HERRERA, State Bar #139669
City Attorney
DANNY CHOU, State Bar #180240
Chief of Complex and Special Litigation
OWEN J. CLEMENTS, State Bar #141805
JAMES M. EMERY, State Bar #153630
VIRGINIA DARIO ELIZONDO, State Bar #134771
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY
1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone:     (415) 554-4261
Facsimile:     (415) 554-3985
E-Mail:        jim.emery @sfgov.org

NOSSAMAN LLP
PAUL S. WEILAND, State Bar # 237058
pweiland@nossaman.com
ROBERT C. HORTON, State Bar # 235187
rhorton@nossaman.com
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612-0177
Telephone: (949) 833-7800
Facsimile: (949) 833-7878

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
MAYOR LEE, and RECPARK GENERAL MANAGER
GINSBURG, in their official capacities

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILD EQUITY INSTITUTE, et al.<br><br>        Plaintiffs,<br><br>    vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.<br><br>        Defendants. | Case No. 3:11-cv-00958 SI<br><br>**SAN FRANCISCO'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**<br><br>Date: November 18, 2011<br>Time: 9:00 a.m.<br>Courtroom 10, 19th Floor<br>Judge: Hon. Susan Illston |
| SAN FRANCISCO PUBLIC GOLF ALLIANCE,<br><br>        Defendant-Intervenor. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 2

ARGUMENT .................................................................................................................. 8

I.      THE ENDANGERED SPECIES ACT ................................................................ 8

II.     LEGAL STANDARD FOR PRELIMINARY INJUNCTION ................................ 9

III.    PLAINTIFFS HAVE FAILED TO ESTABLISH LIKELIHOOD OF SUCCESS
        ON THE MERITS ............................................................................................ 10

        A.      Plaintiffs Have Not Established That San Francisco "Takes" SFGS ......... 10

                1.      Mowing Does Not Cause "Take" Of The SFGS ............................ 11

                2.      Golf Cart Use At Sharp Park Does Not Cause "Take" Of The
                        SFGS ........................................................................................... 12

        B.      Plaintiffs Have Not Established That San Francisco "Takes" CRLF ........ 13

                1.      Pumping Does Not Take The CRLF .............................................. 13

                        a.      San Francisco's Management Of Water Levels At Horse
                                Stable Pond Enhances CRLF Survival ............................. 13

                        b.      Plaintiffs Have Not Demonstrated That The Pumps At
                                Horse Stable Pond Cause "Take" By Entraining CRLF
                                Tadpoles Or Juvenile Frogs ............................................. 16

                        c.      Plaintiffs Have Not Established That Any Incidental Take
                                Exceeds The Scope Of Existing FWS Authorization ........ 16

                2.      Plaintiffs Have Not Shown That Mowing Or Golf Cart Use At
                        Sharp Park Causes Take Of CRLF ............................................... 18

IV.     PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM ........ 18

V.      THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
        DISFAVOR PLAINTIFFS' REQUESTED INJUNCTION ................................ 20

VI.     ANY INJUNCTION MUST BE NARROWLY CRAFTED TO ADDRESS
        ANY IRREPARABLE HARM WHILE IMPOSING MINIMAL BURDEN ON
        THE PARTIES ................................................................................................ 21

CONCLUSION ............................................................................................................ 23

## **TABLE OF AUTHORITIES**

**Cases**

*Alliance For The Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ...................................................................................10

*Am. Trucking Ass'n v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009) ...............................................................................9, 10

*Animal Welfare Inst. v. Martin*
588 F.Supp.2d 70 (D. Me. 2008) ...............................................12, 18, 19, 20, 21

*Center for Biological Diversity v. Fish and Wildlife Service*
450 F.3d 930 (9th Cir. 2006) ..................................................................................... 8

*Ctr. for Biological Diversity v. Marina Point Dev. Co.*
535 F.3d 1026 (9th Cir. 2008) .............................................................................11, 12

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*
484 U.S. 49 (1987)....................................................................................................11

*In re Consol. Delta Smelt Cases*
2011 U.S. Dist. LEXIS 98300 (E.D. Cal. Aug. 31, 2011).........................................10

*Marbled Murrelet v. Pacific Lumber Co.*
83 F.3d 1060 (9th Cir. 1996) ...............................................................................8, 10

*Nat'l Wildlife Fed'n v. Burlington N R.R., Inc.*
23 F.3d 1508 (9th Cir. 1994) ..............................................10, 14, 15, 18, 19

*Strahan v. Coxe*
127 F.3d 155 (1st Cir. 1997)...................................................................12, 19, 20

*TVA v. Hill*
37 U.S.153 (1978)....................................................................................................20

*Water Keeper Alliance v. United States Dept. of Defense*
271 F.3d 21 (1st Cir. 2001)......................................................................................19

*Winter v. Natural Resources Defense Council*
555 U.S. 7 (2008)........................................................................................9, 10, 19, 20

**Statutes**

16 U.S.C. § 1344 ................................................................................................5

16 U.S.C. § 1531(b) ...........................................................................................8

16 U.S.C. § 1532(19) ..........................................................................................8

16 U.S.C. § 1536(a)(2) .................................................................................8

16 U.S.C. § 1536(b)(3)(A) .............................................................................8

16 U.S.C. § 1536(b)(4) .............................................................................9, 18

16 U.S.C. § 1536(o) .................................................................................9

16 U.S.C. § 1538(a)(1)(B) .......................................................................8, 10

16 U.S.C. § 1538(g) ................................................................................10

16 U.S.C. § 1539(a)(1)(A) ...........................................................................9

16 U.S.C. § 1539(a)(1)(B) ...........................................................................9

16 U.S.C. § 1539(a)(2)(A) ...........................................................................9

16 U.S.C. § 1539(a)(2)(B) ...........................................................................9

**Regulations**

50 C.F.R. § 17.31(a) ................................................................................8

50 C.F.R. § 402.02 .................................................................................17

50 C.F.R. § 402.14(g)(3) .......................................................................8, 18

50 C.F.R. § 402.14(i)(1) ...........................................................................18

**Other Authority**

61 Fed. Reg. 25,813
   (May 23, 1996). ...................................................................................3

## INTRODUCTION

San Francisco's active and innovative management of the golf course at Sharp Park has caused the local population of California red-legged frogs to boom.  The 2010-2011 surveys in Sharp Park identified more red-legged frog egg masses than any previous year over the past decade, when systematic surveys began.  The most recent winter breeding season was a "banner year" for red-legged frogs at Sharp Park.  Sharp Park also provides an favorable and sustainable habitat for the elusive San Francisco Garter Snake, offering both an ample food supply and the necessary upland environment for basking and hibernation.  The injunction that plaintiff advocacy groups seek would harm the species, not help them, by causing uncontrolled seasonal flooding of prime upland habitat and creating temporary seasonal isolated pools where all frog eggs would be doomed.

The flooding that plaintiff advocacy groups are demanding would destroy the golf course, but would not return the site to any condition approaching its natural state.  As its name demonstrates, Laguna Salada was originally a salty, tidal lagoon.  Only after the seawall was constructed in the 1940s, creating a barrier between Laguna Salada and the Pacific Ocean, did Laguna Salada transform to the fresh water wetland it is today.  Stable breeding populations of red-legged frogs can survive only in fresh water.  Before construction of the sea wall, Laguna Salada could not sustain a stable breeding population of red-legged frogs.  San Francisco garter snakes, in turn, require stable populations of red legggued frogs, an important prey species.  Accordingly, in its natural condition, the Laguna Salada wetlands area could not sustain a stable population of San Francisco garter snakes either.

San Franciso's operation of the pumps at Horse Stable Pond *stabilizes* water levels.  Pumping protocols in place since 2005 avoid water draw-downs that would potentially harm red-legged frog egg masses.  The United States Fish And Wildlife Service recently determined that efficient pump operation at Horse Stable Pond is essential to control water levels for the benefit of the CRLF.  San Francisco's active management of the Laguna Salada wetlands complex at Sharp Park includes not only stabilization of water levels, but also sediment removal (to combat silt buildup in the wetlands) and control of fast-growing vegetation, including tule and cat tails, which, if left unchecked, would overrun the frogs' preferred shoreline egg-laying areas.

Thus, the requested injunction would achieve the advocacy groups' political goals, *i.e.*, closing Sharp Park golf course, but would do nothing to promote the red-legged frog population or the San Francisco garter snake at Sharp Park.

### FACTUAL BACKGROUND

San Francisco owns and operates Sharp Park, which is a public park located in the City of Pacifica in San Mateo County.  The Park is approximately 417 acres, and it contains an 18-hole golf course constructed in 1930.  The western border of the Park is the Pacific Ocean.  A seawall constructed between 1941 and 1952, eliminated the hydrologic connection between the Pacific Ocean and the principal surface water body in Sharp Park, Laguna Salada.  Prior to the construction of the seawall, Laguna Salada was brackish to saline.

The Pacific Coast Highway ("PCH" or "State Route 1") runs through Sharp Park.  Residential development abuts portions of the north and south boundaries of Sharp Park.  To the south and east, Golden Gate National Recreation Area, managed by the National Park Service, borders the Park. Sharp Park is part of a 980 acre watershed that includes both developed and undeveloped areas.  Most of the watershed is neither owned nor controlled by San Francisco.  Runoff from the watershed – including runoff from PCH –flows to the wetlands complex at Sharp Park.[1]  The wetlands complex includes Laguna Salada, Horse Stable Pond, a channel that connects the two water bodies, and adjacent wetlands.  When the surface water level in the wetlands complex is high enough, the connector channel allows for hydraulic exchange between Laguna Salada and Horse Stable Pond.  The rate of that hydraulic exchange, however, is limited by the size of the channel and the dense vegetation in the channel.

Surface water inflow due to winter rains in the 980 acre watershed provides the primary source of water to Sharp Park, including the wetlands complex.  The sea wall greatly reduced both tidal exchange and outflow to the Pacific Ocean.  In 1941, a pump system was installed to control the water level in Horse Stable Pond.  Declaration of Virginia Elizondo, filed herewith, Exh. 1 (Laguna Salada Resource Enhancement Plan 6 (June 1992).)  As of 1992, the pump system consisted of two pumps

---

[1]  Some of the rain runoff in the watershed is captured at a small reservoir east of Sharp Park, and some percolates into the ground.

with maximum capacities of 3,800 gallons per minute (gpm) and 1,000 gpm. *Id.* A two-foot diameter gravity flow culvert also was in place as of 1992 that used to allow water to flow from Horse Stable Pond through the seawall into the Pacific Ocean. *Id.* The culvert has since collapsed and the pumps have been replaced. The Natural Areas Program Director of San Francisco's Recreation and Parks Department now controls water levels at Horse Stable Pond with two pumps. The primary pump has a capacity of 1,500 gallons per minute. The backup pump has a capacity of 10,000 gallons per minute. Declaration of Lisa Wayne, filed herewith, ¶ 16. The pump water exits the Park in pipes through the seawall to an outfall on the beach.

The San Francisco garter snake ("SFGS") was listed as endangered in 1967 under a predecessor to the ESA, and it retains that status today. Plaintiffs' Exhibit 20, filed Sept. 23, 2011 (U.S. Fish and Wildlife Service, San Francisco Garter Snake (*Thamnophis sirtalis tetrataenia*): Five Year Review (Sept. 2006)). In 1996, the California red-legged frog ("CRLF") was listed as threatened under the ESA. 61 Fed. Reg. 25,813 (May 23, 1996). Neither species can survive and reproduce without access to fresh water bodies; neither species can tolerate aquatic environments that are brackish. Declaration of Dennis Murphy, filed herewith, ¶ 9.

The Sharp Park golf course has been in continuous operation since 1932. Over the last several decades, both SFGS and CRLF have been sighted at Sharp Park and adjoining properties. However, in 1986, following the breach of the seawall at Sharp Park due to winter storms in both 1983 and 1986, extensive surveys failed to reveal either species. Elizondo Decl., Ex. 2 (The Status of the San Francisco Garter Snake at Sharp Park Golf Course 2, 4 (Aug. 1, 1986)). Since that time, SFGS sightings have been infrequent. The authors of a 1992 report on the Laguna Salada wetlands complex stated that "[n]o SFGS were found on site" and went on to conclude that if they do occur on site, "their numbers are extremely limited." *Id.*, Exh. 1 (Laguna Salada Resource Enhancement Plan at 1). In recent years, there were very few sightings. In 2004, four SFGS were captured and released at Horse Stable Pond. *Id.*, Exh. 3 (Sharp Park Conceptual Restoration Alternatives Report, App. C 10 (Nov. 2009)). In 2008, two SFGS were observed in Sharp Park near Horse Stable Pond. *Id.* In addition, in May 2005, an individual reported to the Golden Gate National Parks Conservancy that he had located the remains of one SFGS on the Sharp Park golf course. Declaration of Karen Swaim, filed herewith,

Exh. 2 (E-mail from K. Swaim to M. Brown (Nov. 13, 2006)).  It is unclear how long the remains had been there and whether they had been moved onto the golf course from another location.  Since 2008, no one has reported seeing an SFGS at Sharp Park.

In contrast, CRLF have been a consistent and growing presence in Sharp Park since the early 1990s.  San Francisco, in collaboration with GGNRA, has surveyed CRLF eggs masses in Sharp Park during the winter breeding season (December-March) each year over the past decade.  The number of egg masses has steadily increased from year to year.  During the most recent breeding season (December 2010-March 2011), surveys identified 159 CRLF egg masses on Sharp Park property.[2]

In 2005, FWS sent a letter to San Francisco regarding pump operation at Horse Stable Pond.  FWS expressed its concern that pumping operations may have "lowered the water level at Horse Stable Pond and resulted in the stranding and exposure of a number of [CRLF] egg masses . . ."  Plaintiffs' Exh. 30 (Letter from S. Heard to S. Sweeney (Feb. 1, 2005)).  In response, San Francisco confirmed it is "making every effort to protect [CRLF] egg masses" and expressed its desire to work with federal and state officials to define the problem at Sharp Park, identify data gaps and studies, and devise a solution that alleviates flooding while enhancing SFGS and CRLF habitat.  Elizondo Decl., Exh. 4 (Letter from Y. Agunbiade to S. Heard (March 24, 2005)).  The City also initiated discussions with FWS and the California Department of Fish and Game.  Furthermore, San Francisco instituted a new pumping protocol, specifically to address FWS' concerns.  Wayne Decl., ¶ 20.  This pumping protocol expressly empowers the Director of San Francisco's Natural Areas Program to direct pump operations at Horse Stable Pond and to give highest priority to protection of federally listed species when managing such operations.  Wayne Decl., ¶¶ 20-21.

Shortly thereafter, San Francisco published a final draft Significant Natural Resource Areas Management Plan (SNRAMP).  Elizondo Decl., Exh. 5 (Significant Natural Resource Areas Management Plan (Feb. 2006)).  The SNRAMP contains detailed information on the biology, geology and trails within 32 Natural Areas owned by San Francisco, including Sharp Park.  The SNRAMP

---

[2]  Because each reproductively active female CRLF produces only a single clutch of eggs each year, survey data regarding egg masses is a reasonable proxy for data regarding sexually mature females.

guides natural resource protection, habitat restoration, trail and access improvements, other capital projects, and maintenance activities within these Natural Areas – including Sharp Park – in a comprehensive and coordinated manner over the next 20 years.  *Id.*

In April 2009, pursuant to the California Environmental Quality Act ("CEQA"), San Francisco published a notice that provided the public with information regarding San Francisco's intent to evaluate the impacts associated with implementation of the SNRAMP.  In August 2011, San Francisco published a Draft Environmental Impact Report ("DEIR") that "evaluates environmental impacts associated with [implementation of the SNRAMP], identifies feasible mitigation measures to reduce the impacts to a less than significant level, and includes improvement measures to further reduce impacts identified as less than significant."  Elizondo Decl., Ex. 6 (SNRAMP DEIR 71 (Aug. 2011)).  In the DEIR, San Francisco describes, in detail, its long-term management plansa for Sharp Park.  *Id.* at 97-104, 143-146.  In addition, Appendix I to the DEIR is the Laguna Salada Conceptual Restoration Alternatives Report, a 64-page analysis of restoration alternatives dated November 2009.  *Id.*, Ex. 7.

Parallel with this planning and environmental permitting process for long-term management of Sharp Park and other Natural Areas, San Francisco undertook further steps, in addition to instituting a new pumping protocol in 2005, to assure that current operations of the Sharp Park golf course in the complied with applicable environmental laws.  In 2008, San Francisco sought and secured a permit from the U.S. Army Corps of Engineers ("Corps") under section 404 of the Clean Water Act, 33 U.S.C. § 1344, for repair work to the outfall to allow for continued operation of the pumps at Horse Stable Pond and eliminate the potential for erosion of the seawall.  After receiving the permit application from San Francisco, the Corps initiated consultation with FWS under section 7(a)(2) of the ESA.  In October 2008, FWS issued a biological opinion and incidental take statement for the storm drain repair project.  Wayne Decl., Ex. 5.  (Biological Opinion for the Proposed Sharp Park Golf Course Storm Drain Repair Project, Pacifica, San Mateo County, California (October 7, 2008).)  In its biological opinion, FWS examined the direct, indirect, and cumulative effects of the project, *i.e.*, upgrading the pump system.  *Id.* at 11-13.

In 2009, San Francisco completed an Endangered Species Compliance Plan for Sharp Park Golf Course ("Compliance Plan").  Plaintiffs' Ex. 8.  The purpose of the Plan is "to direct Park

operations and maintenance activities during the period before implementation of a comprehensive site restoration plan," as set forth in the DEIR, described above.  *Id.*, at 1.

The Compliance Plan includes measures to address potential effects of course management and operation, flood control and drainage operations, integrated pest management, and application of recycled water on SFGC and CRLF.  Plaintiffs' Exh. 8 at 9-15.  San Francisco consulted outside experts in the course of developing the Compliance Plan.  In addition, the City solicited input on the draft Compliance Plan from the California Department of Fish and Game and FWS as well as the Center for Biological Diversity.  The Compliance Plan is intended to inform management of Sharp Park golf course and, thereby, assure that San Francisco does not violate the take prohibition in section 9 of the ESA through the operation of the golf course.  At the same time, it was not intended to preclude the City from further (i) refining management of golf course operations in response to new information and changing conditions or (ii) engaging in activities that may result in incidental take that is authorized by the FWS (under, for example, section 7(a)(2) or section 10(a)(1)(A) of the ESA).

In November 2010, San Francisco contacted the Corps and FWS to request reinitiation of consultation under section 7(a)(2) of the ESA in order to secure approval to remove accumulated sediment from the entrance to the pump house at Horse Stable Pond and to repair the weir system.  Wayne Decl., Exh. 7.  The purpose of this project was to ensure proper functioning of the pumps.  That same month, FWS amended its 2008 biological opinion and incidental take statement for the storm drain repair project.  *Id.*, Exh. 6.  (Amendment to Biological Opinion for the Proposed Sharp Park Golf Course Storm Drain Repair Project, Pacifica, San Mateo County, California (Nov. 18, 2010).)  FWS' amended project description expressly recognizes that controlling water levels through the pumps is "crucial" to protect CRLF egg masses.

> Build up of sediment at the concrete intake at Horsestable Pond (HSP), prohibits the proper functioning of the pumps that convey storm flows from the lagoon area to the ocean.  If sediment from HSP enters the pump system, it will damage the pumps.  The potential consequences of clogged pumps at this location are flooding of winter retreats of the San Francisco garter snake in the upland areas of HSP and flooding in nearby Pacifica due to overtopping of the swales surrounding the lagoon.  In addition, *efficient operation of the pumps is crucial to maintaining water level fluctuation to minimize and avoid stranding of egg masses of the California red-legged frog.*

*Id*. at 1-2 (emphasis added).

During winter 2011, City personnel surveyed for and observed 159 CRLF egg masses at Sharp Park.  Plaintiffs' Exh. 9 (Campo Depo. at 104:5.)  Jon Campo, a City employee who holds a permit under section 10(a)(1)(A) of the ESA, relocated 128 of those egg masses.[3]  *Id.* at 104:9; Plaintiffs' Exh. 34.  All but one of these egg masses were found in seasonal pools adjacent to Laguna Salada but without any surface water connection to that water body.  Plaintiffs' Exh. 9, at 118:13-119:9.  All save that one egg mass were submerged at the time they were collected and relocated.  *Id.* at 132:4-12.  A single egg mass was found stranded (*i.e.*, not submerged in water) near Horse Stable Pond.  *Id.* at 119:4-9, 131:12-14.  Like the other 127 egg masses, that egg mass was collected and relocated.  *Id.* at 104:9, 119:4-9, 131:4-17.  In each instance, Jon Campo obtained advanced approval from David Kelly with FWS before he collected and relocated CRLF egg masses.  *Id.* at 55:2-13.  In addition to authorizing the relocation of CRLF egg masses, Mr. Kelly expressed his gratitude to the City for its efforts to promote the survival and recovery of the species.  *E.g.*, Plaintiffs'' Exh. 37 (E-mail from D. Kelly to L. Wayne (Jan. 7, 2011) (authorizing egg mass relocation and stating, "[t]hank you for your effort and cooperation to help recover this species")).

In May 2011, San Francisco contacted the Corps to request reinitiation of consultation under section 7(a)(2) of the ESA "to include the operation of water pumps and periodic maintenance of sediments in the adjoining wetlands at Sharp Park."  Wayne Decl., Exh. 8. (Letter from L. Wayne to C. Johnson (May 10, 2011).)  Following further communications with the Corps, San Francisco submitted a section 404 application to the Corps in August 2011, for proposed improvements to the Sharp Park pump house.  The City noted in the application the need to reinitiate consultation with FWS.  Plaintiffs' Exh. 12 (Letter from L. Wayne to C. Johnson (Aug. 24, 2011)).  The City also indicated its desire to obtain the permit in time to undertake the work between October 15 and November 15, 2011, before the onset of the CRLF breeding season, which coincides with the onset of the next rainy season.  (*Id.*)  The City has diligently followed up with the Corps to ascertain the status of its application.  Wayne Decl., ¶¶ 48-52.

---

[3] Mr. Campo is among several individuals authorized to independently conduct activities with the CRLF on a permit issued by FWS on May 13, 2008.  The permit expires on May 12, 2012. Plaintiffs' Exh. 34.

**ARGUMENT**

**I.      THE ENDANGERED SPECIES ACT**

The Endangered Species Act ("ESA") is intended to conserve species and the ecosystems upon which they depend.  16 U.S.C. § 1531(b).  Section 9 of the ESA states that it is unlawful for any person to "take" any species listed as endangered.  *Id.* § 1538(a)(1)(B).  Federal regulations have expanded the "take" prohibition to protect species that are listed as threatened.  50 C.F.R. § 17.31(a).  "Take" is defined to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The Ninth Circuit has interpreted the take prohibition to make unlawful "[a] reasonably certain threat of imminent harm to a protected species . . ."  *Marbled Murrelet v. Pacific Lumber Co*., 83 F.3d 1060 (9th Cir. 1996).

An entity that intends to engage in otherwise lawful activity that it anticipates will result in incidental take of threatened or endangered species may seek authorization for such activity under section 7(a)(2) or section 10(a)(1) or section 10(a)(2) of the ESA.[4]  Section 7(a)(2) requires each Federal agency, in consultation with FWS, to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designed critical habitat of such species.  16 U.S.C. § 1536(a)(2).  Any action with a federal nexus, such as issuance of permits by the Army Corps of Engineers or provision of funding by the Federal Highway Administration, can trigger the duty to consult under section 7(a)(2).

When determining whether the agency action is likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat, FWS is responsible to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat"  50 C.F.R. § 402.14(g)(3).

Promptly after the conclusion of consultation under section 7(a)(2), FWS must issue a biological opinion.  16 U.S.C. § 1536(b)(3)(A).  If FWS determines that the proposed action is not

_____

[4] Plaintiffs' assertion, that "the only lawful way RPD can engage in this ongoing take is to obtain an Incidental Take Permit ("ITP") pursuant to Section 10 of the ESA," is inaccurate.  Plaintiffs' counsel should be aware that the statement is inaccurate, having litigated cases involving issuance of incidental take statements under section 7 of the ESA.  *E.g.*, *Center for Biological Diversity v. Fish and Wildlife Service*, 450 F.3d 930 (9th Cir. 2006).

1  likely to jeopardize the species but may result in incidental take of individuals, FWS must issue an

2  incidental take statement.  *Id*. § 1536(b)(4).  Any taking in compliance with the terms and conditions

3  of an incidental take statement is not considered an unlawful taking of the listed species for the

4  purpose of the ESA.  *Id*. § 1536(o).

5         Section 10(a)(1)(B) of the ESA allows non-Federal entities to seek an incidental take permit

6  from FWS.  16 U.S.C. § 1539(a)(1)(B).  This provision was added to the ESA in 1982, and it provides

7  a comparable opportunity to non-Federal entities to seek take authority absent a federal nexus that

8  would trigger consultation under section 7(a)(2).  The applicant must submit a conservation plan to

9  FWS that specifies the impacts of the proposed action on the listed species, the steps the applicant will

10 take to minimize and mitigate such impacts, the funding that will be available to implement such steps,

11 and alternatives to the proposed action the applicant considered.  *Id*. § 1539(a)(2)(A).  FWS must issue

12 an incidental take permit if it finds, with respect to the application and conservation plan, that the

13 taking will be incidental, the applicant will, to the maximum extent practicable, minimize and mitigate

14 the impacts of such taking, the applicant will ensure that adequate funding for the plan will be

15 provided, the taking will not appreciably reduce the likelihood of the survival and recovery of the

16 species in the wild, and it has received assurances that the plan will be implemented.  *Id*.

17 § 1539(a)(2)(B).

18        The ESA includes one additional provision that authorizes the incidental take of listed species

19 under certain circumstances.  Section 10(a)(1)(A) authorizes FWS to permit "any act otherwise

20 prohibited by section 9 for scientific purposes or to enhance the propagation or survival of the affected

21 species."  *Id*. § 1539(a)(1)(A).

## II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION

23        Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded

24 as of right."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).  The standard test

25 for injunctive relief requires establishment of four factors by a preponderance of the evidence: (i)

26 likelihood of success on the merits; (ii) likelihood the moving party will suffer irreparable harm absent

27 injunctive relief; (iii) the balance of equities tips in the moving parties' favor; and (iv) an injunction is

28 in the public interest.  *Winter*, 555 U.S. at 20; *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d

1   1046, 1052 (9th Cir. 2009).  "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not

2   just possible, in order to obtain a preliminary injunction."  *Alliance For The Wild Rockies v. Cottrell*,

3   632 F.3d 1127 (9th Cir. 2011).[5]

4          In ESA cases, Congress limited the weight of economic interests when balancing hardships.

5   *Marbled Murrelet v. Babbitt*, 83 F.3d at 1073 ("Congress has determined that under the ESA the

6   balance of hardships always tips sharply in favor of endangered or threatened species."); *see also Nat'l*

7   *Wildlife Fed'n v. Burlington N.R.R., Inc*., 23 F.3d 1508, 1511 (9th Cir. 1994).  Proper balancing in

8   ESA cases must, however, consider the overall impact on the populations of all listed species that may

9   be affected by the proposed action.  "[B]efore any injunctive relief can issue, Plaintiffs must also show

10  that the relief they seek is 'narrowly tailored' to remedy the specific violations at issue and is not

11  likely to result in irreparable harm to an ESA-listed species."  *In re Consol. Delta Smelt Cases*, 2011

12  U.S. Dist. LEXIS 98300 (E.D. Cal. Aug. 31, 2011).

13  **III.   PLAINTIFFS HAVE FAILED TO ESTABLISH LIKELIHOOD OF SUCCESS ON THE
    MERITS**

14

15         To succeed on the merits of their claims, plaintiffs must show that San Francisco is taking or

16  causing the take of ESA-listed species, and that the take has not been authorized under section 7 or

17  section 10 of the ESA.  16 U.S.C. § 1538(a)(1)(B), (g).  More specifically, plaintiffs must demonstrate

18  that San Francisco's conduct poses a "reasonably certain threat of imminent harm" to CRLF or SFGS

19  that is not otherwise authorized by FWS.  *Marbled Murrelet v. Pacific Lumber Co*., 83 F.3d at 1066.

    Plaintiffs cannot meet their burden.

20         **A.      Plaintiffs Have Not Established That San Francisco "Takes" SFGS**

21

22         Plaintiffs assert that lawnmowers on the golf course and golf carts travelling off the designated

23  paved cart paths at Sharp Park cause take of the SFGS.[6]

24         [5]  *Winter*, which explicitly requires a showing of irreparable harm and a balancing of hardships
    in an environemntal case, undermines plaintiffs' reliance on contrary Ninth Circuit authority that

25  predates *Winter*.  See Plaintiffs' MPA, at 12-13.

26         [6]  In addition, plaintiffs argue that the pumps at Horse Stable Pond cause "take" of the SFGS
    indirectly, by reducing the availability of the important prey species, CRLF.  See Pl. Br. at 15:22-25.

27  The record count of CRLF egg masses at Sharp Park during the most recent breeding season defeats
    this theory.  The evidence does not support plaintiffs' assertion that San Francisco has "remov[ed] a

28  significant prey source for the SFGS."

For these assertions, plaintiffs rely exclusively on unsupported conjecture.  They present no evidence of take.  Plaintiffs rely on Ms. Dexter, who asserts in her declaration she is "very familiar with Sharp Park" and has "visited Sharp Park."  She has never seen a single SFGS at Sharp Park. Plaintiffs' Exh. 7 (Dexter Decl. ¶ 13).  Likewise, Plaintiffs' expert Dr. Hayes, who is "very familiar with Sharp Park" and has "visited Sharp Park on several occasions," has never seen a single SFGS at Sharp Park.  Plaintiffs' Exh. 6 (Hayes Decl. ¶ 11).  Ms. Dexter does provide a recitation of SFGS sightings at Sharp Park: two SFGS for the decade of the 1980s, zero SFGS for the decade of the 1990s, and seven SFGS for the decade of the 2000s.  Plaintiffs' Exh. 7 (Dexter Decl. ¶ 15).  No SFGS has been seen at Sharp Park in the past three years.  Wayne Decl., ¶¶ 7-10.  If SFGS is present at all in Sharp Park today, it is present in very small numbers.  Needless to say, for take of any sort to occur, the species must be present at Sharp Park.

### 1.       Mowing Does Not Cause "Take" Of The SFGS

Plaintiffs contend that mowing and golf cart use at Sharp Park are causing take of SFGS. (Plaintiffs' Motion for a Preliminary Injunction and Supporting Memorandum ("Pl. Br.") at 19-21 (Sept. 23, 2011).)  They rely on the fact that a single dead snake has been recovered at Sharp Park, six years ago.  (*Id*. at 19:17.)  Although plaintiffs insist that single snake was killed by a lawnmower, the actual cause and location of that single snake death are uncertain.  The snake was found by an individual "on the golf course near the frog pond at Mori."  Swaim Decl., Exh. 2 (E-mail from S. Gardner to H. McQuillen and S. Larsen (May 20, 2005)).  Karen Swaim exchanged voicemail with the individual, Steve Salisbury, who indicated "that he had found it at the golf course near Laguna Salada and that it appeared to have been killed by a lawn mower."  *Id.* (E-mail from K. Swaim to M. Brown (Nov. 13, 2006)).  But there is no evidence what time of day the snake died or where it died. Likewise, the cause of death is inconclusive.  Even if the Court accepts plaintiffs' speculation that the 2005 snake fatality was caused by a lawnmower, it does not support an inference that San Francisco's current lawnmowing practices are now causing take of the snake.[7]

---

[7] The citizen suit provisions of the ESA address only current conduct, not past conduct.  *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64 (1987) (Clean Water Act citizen suit provisions, which track ESA's citizen suit provisions, prohibit a citizen suit for "wholly past violations.").  *Cf. Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 535 F.3d 1026,

Neither Ms. Dexter nor any of plaintiffs' experts demonstrate any familiarity with actual mowing operations at Sharp Park.  Mowing begins around 5:30 a.m.  Mowing at the back nine holes, which includes the portion of the course within plaintiffs' proposed 200 meter "buffer zone," takes place between 7:00am, and 9:00am, after the sun is up.  Staff who operate the mowers are trained to identify and avoid both snakes and frogs.  The mowers run at only 3 miles per hour.  The greens are kept at 1/8 inch, so any snakes on the greens would be readily apparent.  Likewise, the tees and surrounds are kept at ½ inch, so any animals in those areas would also be readily apparent.  Declaration of Wayne Kappelman, filed herewith, ¶¶ 6-10.  Snakes are not active in the early morning hours when mowing occurs.  Declaration of Karen Swaim, filed herewith, ¶ 7.  Inded, the snakes hibernate during the wet, relatively cold rainy season.  *Id.* ¶ 8.  In any event, the ground vibration caused by approaching mowers would alert snakes to flee long before the mower could pose any harm.  Even plaintiffs' declarant, Ms. Dexter, acknowledges that SFGS is "fast and wary."  Plaintiffs' Exh. 7 (Dexter Decl. ¶ 31).  The careful mowing precautions, in view of the snake's actual habits, coupled with the abence of any physicial evidence of mowing encounters with snakes, require the Court to reject plaintiffs' inference that mowing is reasonably certain to cause take of SFGS at Sharp Park during the upcoming rainy season.

### 2.    Golf Cart Use At Sharp Park Does Not Cause "Take" Of The SFGS

Plaintiffs have zero evidence that golf cart use at Sharp Park harms the SFGS in any way.  They present zero physical evidence of any death or injury.  Plaintiffs fail to acknowledge that Sharp Park management prohibits golf carts off the designated paved cart paths.  Plaintiffs erroneously assert it is "indisputable that golfers regularly use golf carts on golf course fairways and off the paved trails."  Plaintiffs' MPA (Docket #53), at 19:24-25.  The evidence however shows only that individual golfers sometimes flout the course rules, the posted signs, and the instructions they are given orally when they are issued a cart.  Occasionally, a few scofflaw golfers drive golf carts off the paths.  San Francisco is not iable under the ESA for the unauthorized, expressly prohbited, conduct of individual golfers who visit a public park.  *Compare Strahan v. Coxe,* 127 F.3d 155, 163-64 (1ˢᵗ Cir. 1997).

---

1035 (9th Cir. 2008) (an injunction under the ESA "is forward looking, and is intended to prevent a defendant from taking an endangered or threatened species").

1    Golf carts have been used for years at Sharp Park golf course and there has not been a single

2    reported instance of harm to SFGS due to golf cart use.  Plaintiffs' reliance on observations from

3    another golf course, involving different species of snakes, under different environmental conditions, is

4    inappropriate.  Murphy Decl., ¶¶ 32-33.

5    **B.    Plaintiffs Have Not Established That San Francisco "Takes" CRLF**

6    Plaintiffs assert that golf course operations are responsible for "take" of the CRLF.  Plaintiffs'

7    principal assertion is that the water pumps in Horse Stable Pond cause "take" by "stranding" CRLF

8    egg masses and by "entraining" tadpoles and juvenile frogs in the pumps.  Plaintiffs' MPA, at 10:3-4.

9    Plaintiffs also assert that mowing and golf cart use off the designated paths causes take of the CRLF.

10   **1.    Pumping Does Not Take The CRLF**

11   **a.    San Francisco's Management Of Water Levels At Horse Stable Pond Enhances CRLF Survival**

12   The need to operate pumps at Horse Stable Pond is a consequence of hydrologic conditions at

13   Sharp Park that differ substantially from historic conditions.[8]  Certain of these differences are due to

14   the construction of the golf course in 1930 and the sea wall between 1941 and 1952.  These two

15   actions eliminated the prior hydrologic connection to the Pacific Ocean and created the Laguna Salada

16   wetlands complex, a freshwater system.  By eliminating the hydrologic connection to the Pacific, the

17   seawall obstructs natural drainage.  At the same time, construction of the PCH and commercial and

18   residential development within the watershed increased runoff and the amount of inflow to Sharp Park.

19   Storms in 1983 and 1986 demonstrated that in its historic condition the Laguna Salada wetlands

20   complex at Sharp Park likely did not support CRLF or SFGS (McGinnis 1986).

21   To avoid flooding Sharp Park and nearby residences and businesses, for decades San Francisco

22   has controlled water levels in the Laguna Salada wetlands complex.  In the past, a gravity flow culvert

23

24   [8] Plaintiffs' "expert", Dr. Vredenburg, demonstrates a surprising lack of knowledge of the
25   history of Sharp Park when he states that the pumps at Horse Stable Pond have cause "unnatural
     draining of what would otherwise by a naturally functioning wetlands complex. . ." (Vredenburg
     Decl. ¶ 18.)  Historically, the sea wall was not present so that the wetlands complex would drain to the
26   Pacific Ocean and routinely be inundated by saltwater from the ocean (making it uninhabitable by the
     SFGS and CRLF).  Plaintiffs themselves acknowledge that the combination of the presence of the sea
27   wall and no means to drain the area poses a flood control risk to the region. (Pl. Br. at 24:24-27.)  Dr.
     Vredenburg's argument that the site will revert to a "natural" state if the pumps at Horse Stable Pond
28   are no longer operated is false on its face.

allowed water to flow from Horse Stable Pond through the seawall into the Pacific Ocean.  The culvert has since collapsed.  Presently, a pump system controls the water level in Horse Stable Pond.

In 2005, Ms. Lisa Wayne, Director of San Francisco's Natural Areas Program and a trained conservation biologist, developed and implements a new pumping protocol, which gives highest priority to protection of federally listed species when managing pump operations at Horse Stable Pond. As the Compliance Plan explains, "water levels will not be manipulated by [City] personnel such that egg masses would be exposed to air by active water management actions" and "pumping will be halted if tadpoles are deemed at risk."  Plaintiffs' Exh. 8, at §§ 6.3.2, 6.3.7.  Ms Wayne has full authority to set pump levels to prevent stranding of CLRF egg masses.  After every rain, trained biologists from the Natural Areas Program survey the shores of the Laguna Salada wetlands complex for CRLF egg masses, focusing on the CRLF's preferred egg laying locations.  Ms. Wayne sets the water levels at the pumps to to provide a minimum of 6" of coverage for the most exposed or vulnerable egg mass.  Egg masses are then checked daily, and water levels will not be drawn down until Ms. Wayne confirms that all vulnerable egg masses have hatched.  Wayne Decl., ¶¶ 19-33.

Just before the most recent winter breeding season, in November 2010, the Fish and Wildlife Service, which is responsible for enforcing the ESA at Sharp Park, concluded that "efficient operation of the pumps is crucial to maintaining water level fluctuation to minimize and avoid stranding of egg masses of the California red-legged frog."  Wayne Decl., Exh.6.  (Amendment to Biological Opinion for the Proposed Sharp Park Golf Course Storm Drain Repair Project, Pacifica, San Mateo County, California at 2 (Nov. 18, 2010).)  This conclusion by the expert agency responsible for enforcing the ESA at Sharp Park affirms that pump operations benefit rather than harm CRLF.  It also discredits the testimony of plaintiffs' so-called experts.

To support their assertion of "take," plaintiffs' fundamentally misinterpret the egg mass surveys and relocations at Sharp Park.  Specifically, plaintiffs erroneously assert that water drawdown from the pumps at Horse Stable Pond is responsible for stranding the 125 CRLF egg masses that trained biologists from San Francisco's Natural Areas Program relocated within Sharp Park last year.[9]

---

[9]  Any evidence of egg mass strandings prior to San Francisco's implementation of its current pumping protocol after the 2005 breeding season is irrelevant, because such evidence will not support any inference that *current* pumping protocols cause any take.  *See Nat'l Wildlife Fed'n v. Burlington*

Plaintiffs' deposition of Jon Campo directly repudiates their claim.  Contrary to plaintiffs' assertion, all but one of the egg masses Mr. Campo moved last year were at risk for reasons entirely independent of pumping.  These egg masses were in shallow pools formed by rains and surface runoff that have no surface connection to Laguna Salada or Horse Stable Pond.  These egg masses were fully submerged when Mr. Campo found them, and the eggs would have hatched normally in these shallow pools.  However, these pools would most likely shrink and dry up during the dry summer months, exposing the tadpoles to predation and ultimately dessication before they would have a chance to metamorphose, grow legs and navagate the dry land that separated them from Laguna Salada itself.  Plaintiffs' Exh. 9 (Campo Depo., 90:18-91:12, 91:20-92:4, 92:11-93:7); Wayne Decl, ¶¶ 34-40.  The risks that Mr. Campo averted by relocating these egg masses were not caused by the pumps at Horse Stable Pond.

Plaintiffs focus on a single egg mass that they saw "stranded" at Horse Stable Pond in February 2011.  However, the circumstances of this lone "stranding" are vague and uncertain.  See Declaration of Mark Jennings, filed herewith, ¶ 39.

In the absence of any actual evidence of substantial egg mass stranding due to pumping, plaintiffs infer that undetetected egg masses are stranded because San Francisco's survey methods don't detect each and every egg mass.  Plaintiffs' inference is unfounded.  The egg mass survey focuses on areas where CRLF egg masses have been observed in the past, *i.e.*, areas that are known to be preferred egg laying sites.  Wayne Decl., ¶¶ 22-23.  If a single egg mass is found that may be at risk of stranding in view of current water levels, the water levels are adjusted by immediate cessation of pumping to allow continued water flow from the watershed into the Laguna Salada wetlands complex to raise the water level.  This action will protect not only the specific egg mass that has been detected by the survey, but will simultaneously protect any additional undetected egg masses that have been layed at the same water level within the wetlands complex.  The current survey technique that detects a proportion of egg masses serves to protect all the egg masses that are layed in the wetlands complex that can be affected by water levels controlled by the pumps in Horse Stable Pond.

*N. R.R., Inc.,* 23 F.3d at 1512 ("The fact that no bears have been killed by BN trains in three years [since the cleanup] supports an inference that the cleanup was effective.").

          **b.**     **Plaintiffs Have Not Demonstrated That The Pumps At Horse Stable Pond Cause "Take" By Entraining CRLF Tadpoles Or Juvenile Frogs**

Plaintiffs further allege that pump operations cause the take of CRLF due to entrainment of tadpoles or other mobile life stages of the species.  (Pl. Br. at 18:4-5.)  Plaintiffs provide no physical evidence of a single CLRF that has been entrained by the pumps.  RecPark staff, responsible for operating the pump and clearing the screen in front of the pump, routinely clear vegetable matter from the screen but have never seen evidence of a frog or tadpole entrained on the screen, or anywhere in Horse Stable pond in proximity to the screen.  Declaration of John Ascariz, filed herewith, ¶¶ 5-6.

Once again, in the absence of any actual evidence, plaintiffs invite the Court to infer an imminent threat of entrainment.  Plaintiffs though, have failed to consider the specifics of actual pump operations at Horse Stable Pond.  In fact, maintaining water levels pursuant to the current pumping protocols typically requires only the smaller of the two pumps at Horse Stable Pond, *i.e.*, the pump with the capacity of 1,500 gallons per minute.[10]  The larger pump (having a capacity of 10,000 gallons per minute) is employed only when necessary in response to extreme rain events and operates for relatively short periods of time.  Wayne Decl., ¶¶ 16-17.  The smaller pump, when operated alone, does not produce any substantial current in the intake area adjacent the screen, reducing the likelihood that tadpoles or juvenile frogs would be pulled into the pumps.  *Id.*  Finally, when egg masses are relocated to Horse Stable Pond, they are placed at least 75 feet from the pump intake, to avoid any risk of entrainment.  Wayne Decl., ¶ 44.

In view of these facts, which plaintiffs have completely failed to consider, the Court must reject plaintiffs' invitation to infer an imminent risk of CRLF entrainment in the pumps at Horse Stable Pond.

          **c.**     **Plaintiffs Have Not Established That Any Incidental Take Exceeds The Scope Of Existing FWS Authorization**

Any impact on CRLF and SFGS arising from operation of the water pumps at Horse Stable Pond are effects of the actions analyzed by FWS in its 2008 biological opinion and 2010 amendment.

---

[10]  The smaller pump actually operates at a lower rate than its rated capacity, approximately 800 gallons per minute.  Wayne Decl., ¶ 16.

The proposed action analyzed in the 2008 biological opinion was the Sharp Park golf course storm drain repair project.  Wayne Decl., Exh. 5.  (Biological Opinion for the Proposed Sharp Park Golf Course Storm Drain Repair Project, Pacifica, San Mateo County, California (October 7, 2008)).  The repair was necessary because the discharge pipes were damaged and causing erosion of the seawall.  Elizondo Decl., Exh. 8.  (Application for Department of the Army Permit (May 9, 2008).)  The proposed action analyzed in the 2010 amendment was the removal of accumulated sediment at the entrance to the pump house at Horse Stable Pond and repair of the weir system.  Wayne, Decl., Exh. 6.  (Amendment to Biological Opinion for the Proposed Sharp Park Golf Course Storm Drain Repair Project, Pacifica, San Mateo County, California (Nov. 18, 2010)).  The purpose of the project is "to ensure the proper functioning of the pumps." *Id.* Exh. 7.  (Letter from L. Wayne to R. Olah (Nov. 3, 2010).)

Under section 7(a)(2), the Corps and FWS were required to consult regarding the "effects" of the action on the CRLF and SFGS.  The Joint Consultation Regulations, which implement section 7(a)(2) of the ESA, define the "effects" of an action as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline."  50 C.F.R. § 402.02.  The regulations go on to define indirect, interrelated, and interdependent effects.  "Indirect effects are those that are caused by the proposed action and are later in time, but still are reasonably certain to occur.  Interrelated actions are those that are part of a larger action and depend on the larger action for their justification.  Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

Here, the purpose of the actions was to facilitate continued operation of the pumps at Horse Stable Pond.  Therefore, continued operation of the pumps is an effect of the action for the purpose of consultation.  Stated another way, continued operation of the pumps could not occur but for issuance of permits by the Corps.  The Joint Consultation Regulations require FWS to evaluate "the effects of the action and cumulative effects on the listed species or critical habitat" and formulate "its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical

habitat." 50 C.F.R. § 402.14(g)(3)-(4).  Section 7(b)(4) of the ESA provides that where FWS concludes that an action and the resultant incidental take of listed species will not violate section 7(a)(2), FWS must provide with the biological opinion an incidental take statement.  16 U.S.C. § 1536(b)(4); *see also* 50 C.F.R. § 402.14(i)(1).  Therefore, any take incidental to pump operations at Horse Stable Pond is covered by the 2008 biological opinion and incidental take statement as well as the 2010 amendment.

### 2.    Plaintiffs Have Not Shown That Mowing Or Golf Cart Use At Sharp Park Causes Take Of CRLF

Plaintiffs have presented zero physical evidence that a single CRLF has been injured or killed by a mower or golf cart at Sharp Park.  Yet plaintiffs ask the Court to infer that such deaths are frequent and are never detected because the bodies are always scavenged by animals before any human has ever had a chance to detect a single injured or dead CRLF.

For the same reasons that mowing is unlikely to harm the SFGS, the mowing regime at Sharp Park is unlikely to harm the CRLF.  The mowing staff are vigilent as they mow the back nine holes during the early morning daylight hours.  Any frogs would be easily visible on the short grass of the tees, greens and surrounds.  Kappelman Decl. ¶¶ 6-10.   Finally, any accidental encounter between a vehicle, such as a mower or golf cart, and a CLRF would be "singularly messy" and would not happen unnoticed.  Murphy Decl., ¶ 14.

## IV.    PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM

Even if the Court accepts one of plaintiffs' theories that take has occurred, then still plaintiffs are not entitled to the injunction they seek.  Plaintiffs mistakenly assert that proof of "take" of a single individual of a listed species entitles them to an injunction.  To the contrary, "even though any taking and every taking . . . invokes the authority of the [ESA], it does not follow that any taking and every taking, even those that do not cause actual harm, constitutes irreparable injury within the criterion for the issuance of injunctive relief." *Animal Welfare Inst. v. Martin,* 588 F.Supp.2d 70, 101-02 (D. Me. 2008) (internal quotation omitted).  "Federal courts are not obligated to grant an injunction for every violation of the law." *National Wildlife Fed. v. Burlington N.R.R.*, 23 F.3d at 1511 (9th Cir. 1994).  *See*

*also Strahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997) (rejecting contention that injunctive relief is mandatory upon a finding of a violation of the ESA).

Under the EPA, a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008) (emphasis in original; interpreting Marine Mammal Protection Act); *Animal Welfare Inst. v. Martin*, 588 F.Supp.2d 70, 101-02 (D. Me. 2008) (applying *Winter* standard to ESA). Plaintiffs must demonstrate "a definitive threat of future harm to protected species, not mere speculation." *National Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d at 1512 n.8.

In *Water Keeper Alliance v. United States Dept. of Defense*, 271 F.3d 21 (1st Cir. 2001), the Court of Appeal affirmed the district court's denial of an injunction under the ESA, notwithstanding proof that the defendant had caused the death of individuals of a listed species.

> [T]he court did not abuse its discretion when it determined that Water Keeper's assertions concerning irreparable harm stemming from the "death of even a single member of an endangered species" were insufficient to justify granting injunctive relief. In support of its position of irreparable harm, Water Keeper can only point to vague concerns as to long-term damage to the endangered species . . . . In the absence of a more concrete showing of probable deaths during the interim period and of *how these deaths may impact the species*, the district court's conclusion that Water Keeper has failed to show potential for irreparable harm was not an abuse of discretion.

*Id.* 271 F.3d at 34 (emphasis supplied; record citations omitted). Where a plaintiff fails to demonstrate that deaths of individuals will have a negative impact on the species, the Court should weigh all relevant factors before granting injunctive relief. "The degree to which there is irreparable injury is a factor to be balanced against the other injunction criteria." *Animal Welfare Inst. v. Martin*, 588 F.Supp.2d 70, 106 (D. Me. 2008).

In this case, plaintiffs cannot establish irreparable harm, even if the Court accepts that San Francisco's management of water levels at Horse Stable Pond is responsible for the loss of a limited number of CRLF egg masses. It is irrefutable that the CRLF population is booming at Sharp Park. There were more CRLF egg masses at Sharp Park last season than were ever seen before. An adult female lays 2000-6000 eggs each year for approximately five years. Jennings Decl., ¶ 41. A survival rate much higher than 0.01% (one in ten thousand) would soon lead to a local overpopulation

catastrophe.  Current management practices at Sharp Park cannot fairly be construed as inflicting irreparable harm on the CRLF.

## V.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST DISFAVOR PLAINTIFFS' REQUESTED INJUNCTION

In *Winter*, the Supreme Court recently reemphasized that courts of equity should pay particular regard for public consequences before issuing an injunction. 129 S.Ct. at 376.  Plaintiffs in this case readily acknowledge that the public interest weighs heavily in favor of the protected species.  Plaintiffs' MPA, at 4.  *See also TVA v. Hill*, 437 U.S.153, 174 (1978); *Coxe*, 127 F.3d at 160.  In considering the public interest, the Court must focus on the health of the species as a whole.

The protected species in *Martin* was the Canadian lynx, with a population of approximately 500 individuals in the state of Maine.  588 F.Supp. 2d at 106.  The court held that the capture of ten lynx in leghold traps constituted "take" under the ESA.  *Id.* at 98.  Expert testimony, though, indicated that a complete ban on leghold traps would increase the population of coyote, bobcat and fisher, which compete with the lynx for food, and in the case of fisher and coyote, prey upon the lynx.  *Id.* at 107.  After balancing the "relevant impositions and the public interest," the court held that the plaintiffs had failed to justify any further restriction on leghold traps.  *Id.* at 107-08.  The court denied all injunctive relief with respect to the leghold traps.  *Id.*

In this case, if the Court were to issue plaintiffs' proposed injunction, there would be no effective means to manage water levels at Sharp Park.  The proposed injunction would drastically alter the habitat in Sharp Park, with unpredictable consequences.  Murphy Decl, ¶ 13, 17-18.  The increase in temporary seasonal pools lacking any surface connection to Laguna Salada would put large quantities of CRLF egg masses at risk.  Swaim Decl., ¶¶ 12-14; Wayne Decl., ¶¶ 53-54.  Flooding of upland areas would disturb the winter habitat of any SFGS that may be present in Sharp Park.  Swaim Decl., ¶ 11; Vandivere Decln., Exh. 2.  Uncontrolled flooding risks damage to the homes at the southern boundary of Sharp Park, and to the homes and commercial establishments to the North – none of whom are before this Court.  Vandivere Decln, ¶¶ 5-7.  Finally, plaintiffs' proposed ban on pumping and on mowing holes 9-18 risks irreparable damage to the golf course.  Declaration of Robert Jones, filed herewith, ¶¶ 2-3.

FWS has already recognized that efficient operation of the pumps at Horse Stable Pond is essential to control water levels for the benefit of the CRLF.  Wayne Decl., Exh. 6.  (Nov. 18, 2010 Amendment to Biological Opinion.)  San Francisco has submitted additional permit applications to the Army Corps of Engineers and sought further consulation with FWS regarding its ongoing pump operations.  Wayne Decl., ¶¶ 45-52.  As in *Martin*, "the relatively brief interval before the USFWS acts," 588 F.Supp.2d at 109, militates further against injunctive relief in this case.

## VI.  ANY INJUNCTION MUST BE NARROWLY CRAFTED TO ADDRESS ANY IRREPARABLE HARM WHILE IMPOSING MINIMAL BURDEN ON THE PARTIES

Where a plaintiff has established irreparable harm through ESA violations and that the balance of hardships and public interest support an injunction, the court should "exercise[ ] its equitable powers as narrowly as possible only to assure [compliance with the ESA]."  *Martin*, 588 F.Supp.2d at 110.  Thus, in *Martin*, the plaintiffs had shown that a Conibear trap had caused the death of one individual Canadian lynx.  The state had acknowledged the need to amend the existing regulations governing Conibear traps.  The state, though, refused to invoke its its emergency rulemaking authority or to take any immediate action to prevent further lynx deaths by Conibear traps.

Having balanced the relevant hardships and the public interest, the court concluded that an injunction was warranted to prevent further lynx deaths by Conibear traps.  The court though still refused plaintiffs' request to ban the traps.  Instead of banning the traps or imposing any specific new regulations itself, the court "order[ed] the state of Maine to immediately take all action necessary to avoid the trapping of Canada lynx in Conibear traps, including the promulgation of emergency regulations, if necessary, to assure that Canada lynx do not have access to Conibear traps either by way of the structure upon which the Conibear trap is placed or by way of adjacent structures."  588 F.Supp.2d at 110.  The court denied all further relief with respect to Conibear traps, and denied any relief whatsoever with respect to the leghold traps.  *Id.*

As the court did in *Martin*, this Court should consider separately each area of challenged conduct.  The Court should determine whether plaintiffs have established that conduct is likely to cause take during the interim preliminary injunction period.  If so, the Court should consider whether plaintiffs have established that the nature and degree of likely take amounts to irreparable harm.  Then,

the Court should balance the relative hardships and consider the public interest before issuing the narrowest possible injunction necessary to prevent irreparable harm.

Accordingly, *if* this Court determines that pumping causes take of CRLF by entraining individuals, that the nature and extent of likely take during the interim preliminary injunction period amounts to irreparable harm, and that the balance of hardships and the public interest favor an injunction, then the relief should be limited to whatever additional measures, such as modifications to the pumping station, will be effective to prevent or reduce entrainment.  The answer is not the complete ban on pumping that plaintiffs have requested.

Likewise, *if* this Court determines that pumping causes take of CRLF by stranding egg masses, that the nature and extent of likely take during the interim preliminary injunction period amounts to irreparable harm, and that the balance of hardships and the public interest favor an injunction, then the relief should be limited to whatever additional measures, such as modifications to the pumping protocol or enhancements of the egg mass survey procedures, will be effective to prevent or reduce egg mass strandings.  The answer is not the complete ban on pumping that plaintifffs have requested.

Similarly, *if* this Court determines that mowing or golf cart use causes take of CRLF or SFGS, that the nature and extent of likely take during the interim preliminary injunction period amounts to irreparable harm, and that the balance of hardships and the public interest favor an injunction, then the relief should be limited to whatever additional measures, such as modifications to the mowing protocols or enhanced enforcement of the existing prohibition against golf carts straying off the designated paved golf cart paths, will be effective to prevent or reduce loss of the species from mowing or golf carts.  The answer is not the complete ban on mowing and golf carts within 200 meters of the wetland area, as plaintiffs have requested.

//

//

1

**CONCLUSION**

2     For the foregoing reasons, the Court should deny plaintiffs' motion for a preliminary

3  injunction.

4  Dated:  October 21, 2011                    DENNIS J. HERRERA
                                               City Attorney
5                                              DANNY CHOU
                                               Chief of Complex and Special Litigation
6                                              OWEN J. CLEMENTS
                                               JAMES M. EMERY
7                                              VIRGINIA DARIO ELIZONDO
                                               Deputy City Attorneys
8

9                                      By:_____/s/_____
10                                             JAMES M. EMERY

11                                             NOSSAMAN LLP
12                                             PAUL S. WEILAND
                                               ROBERT C. HORTON
13
                                               Attorneys for Defendants CITY AND COUNTY
14                                             OF SAN FRANCISCO, et al.

15

16

17

18

19

20

21

22

23

24

25

26

27

28