1   EDGAR B. WASHBURN (BAR NO. 34038)
    EWashburn@mofo.com
2   CHRISTOPHER J. CARR (BAR NO. 184076)
    CCarr@mofo.com
3   WILLIAM M. SLOAN (BAR NO. 203583)
    WSloan@mofo.com
4   JENNIFER R. JEFFERS (BAR NO. 273461)
    JJeffers@mofo.com
5   MORRISON & FOERSTER LLP
    425 Market Street
6   San Francisco, California  94105-2482
    Telephone:    415.268.7000
7   Facsimile:    415.268.7522

8   Attorneys for Defendant-Intervenor
    SAN FRANCISCO PUBLIC GOLF ALLIANCE
9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14  WILD EQUITY INSTITUTE, a non-profit          Case No. 3:11-cv-00958 SI
    corporation, CENTER FOR BIOLOGICAL
15  DIVERSITY, a non-profit corporation,
    NATIONAL PARKS CONSERVATION
16  ASSOCIATION, a non-profit corporation,       **DEFENDANT-INTERVENOR**
    SURFRIDER FOUNDATION, a non-profit           **SAN FRANCISCO PUBLIC**
17  corporation, SEQUOIA AUDUBON, a non-profit   **GOLF ALLIANCE'S ("SFPGA")**
    corporation, and SIERRA CLUB, a non-profit   **OPPOSITION TO PLAINTIFFS'**
18  corporation,                                 **MOTION FOR PRELIMINARY**
                                                 **INJUNCTION**
19                  Plaintiffs,
                                                 Date:       November 18, 2011
20         v.                                    Time:       9:00 a.m.
                                                 Courtroom:  10, 19th Floor
21  CITY AND COUNTY OF SAN FRANCISCO, ED         Judge:      Hon. Susan Illston
    LEE, Mayor of the City and County of San
22  Francisco, PHIL GINSBURG, Director, City and
    County of San Francisco Recreation and Park
23  Department,

24                  Defendants,

25
    SAN FRANCISCO PUBLIC GOLF ALLIANCE,
26
                    Defendant-Intervenor.
27

28

1

# TABLE OF CONTENTS

2

Page

3    I.      INTRODUCTION ................................................................................................. 1

4    II.     STATEMENT OF FACTS ................................................................................... 6

     III.    ARGUMENT ...................................................................................................... 10

5            A.     The Court Need Not Decide Whether Take is Likely in Order to Deny

6                   Injunctive Relief ...................................................................................... 10

             B.     The Relief Sought Will Harm the Sharp Park Frog and Snake Populations,

7                   Result in Flooding That Harms Human Health And Safety and Subjects the
                    City to Liability, and Harm Sharp Park's Diverse Golfers ...................... 11

8                   1.      The Sharp Park Frog and Snake Populations Will Be Harmed if the

9                           Relief Sought is Granted .............................................................. 11

                    2.      Turning Pumps Off Would Flood Adjacent Pacifica Neighborhoods

10                          and Expose the City to Potential Liability.................................... 12

11                  3.      Granting the Relief Sought Will Destroy the Golf Course and Have
                            Far-Reaching Impacts on Players and Neighboring Communities .......... 14

12           C.     The Court Need Not Reach the Vexing Question of Whether Take Has
                    Occurred or is Likely to Occur.................................................................. 15

13   IV.     CONCLUSION .................................................................................................... 17

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Am. Trucking Ass'n v. City of L. A.*,
    559 F.3d 1046 (9th Cir. 2009) .......................................................................................... 10

*Amoco Prod. Co. v. Gambel*,
    480 U.S. 531, 542 (1987) ............................................................................................... 10

*Berryessa for All v. U.S. Bureau of Reclamation*,
    No. C 07-259 SI, 2007 WL 4209551 (N.D. Cal. Nov. 27, 2007) .......................................... 10

*Defenders of Wildlife v. Salazar*,
    No. CV 09-77-M-DWM, CV 09-82-M-DWM (Consol.),
    2009 U.S. Dist. LEXIS 131058 (D. Mont. Sept. 8, 2009) ............................................. 15, 16

*Hoffman v. Bank of Am., N.A.*,
    No. C 10-2171 SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010) .......................................... 10

*Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*,
    606 F.Supp.2d 1195 (E.D. Cal. 2008) .............................................................................. 15

*Public Citizen v. U. S. Dep't of Justice*,
    491 U.S. 440 (1989) ....................................................................................................... 15

*Tenn. Valley Auth. v. Hill*,
    437 U. S. 153 (1978) ...................................................................................................... 16

*Water Keeper Alliance v. U.S. Dep't of Def.*,
    271 F.3d 21 (1st Cir. 2001) ............................................................................................ 15

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) .......................................................................................................... 10

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.    INTRODUCTION

3       This case will surely head the parade of horribles the next time legislation is introduced in

4  Congress to gut the federal Endangered Species Act ("ESA"). And Plaintiffs will have only

5  themselves to blame. Their radical vision and message—that the ESA places the preservation of

6  individual specimens (including *a single egg*) of a listed species above all other values and

7  considerations—is neither required by the statute, nor what Congress intended by authorizing

8  citizen suits.

9       As Defendant-Intervenor San Francisco Public Golf Alliance ("SFPGA") established by

10  the numerous declarations filed last May in support of its motion to intervene, Sharp Park Golf

11  Course ("Sharp Park") provides affordable, public golf to thousands of players of all genders,

12  ages, income levels, and ethnic, economic and social backgrounds from all over the Bay Area,

13  and has done so for nearly 80 years. SFPGA's Motion to Intervene (ECF No. 19) ("SFPGA Mot.

14  to Intervene") 9:3-9. Moreover, Sharp Park is recognized as an historic resource in the Draft

15  Environmental Impact Report ("DEIR") for the City of San Francisco's ("City") Significant

16  Natural Resource Areas Management Plan[1] ("SNRAMP") precisely because of its uniqueness and

17  significance as an Alister MacKenzie-designed golf course. SNRAMP at 2, 4-2, 4-6-4.7, 5-4. The

18  course's design and architectural values are rare and distinctive, further enhancing the experience

19  of its many diverse users and making it all the more important that the course continue to exist for

20  public use. SFPGA Mot. to Intervene 4:10; Links Decl. (ECF No. 29); Jones Decl. (ECF No. 25);

21  Venturi Decl. (ECF No. 30).

22       The injunctive relief requested by Plaintiffs would shut down more than half of the course

23  (10 of the 18 holes)[2] to all golf cart use and mowing activities within 200 meters of the golf

24

25       [1] Historical Resources Evaluation Report For the Sharp Park Golf Course Part of the
   Natural Areas City and County of San Francisco, Pacifica, San Mateo County, *available at*
26  http://sfmea.sfplanning.org/2005.1912E_DEIR4.pdf.

27       [2] 10 of the 14 holes that are West of the freeway would be closed as part of this relief.

28

course's water bodies, and enjoin pumping in Horse Stable Pond for the foreseeable future. Plaintiffs' Motion for Preliminary Injunction (ECF No. 53) ("Pls.' PI Mot.") 22:5-11. As set forth in the declarations of Dr. Mark Jennings, Pacifica Mayor Mary Ann Nihart, Robert Trent Jones, Jr., and Jason Blasi, filed concurrently with this opposition, the relief requested would destroy a historically significant golf course—a course utilized (and often considered a second home) by tens of thousands of diverse, working-class players each year. *See* Declaration of Dr. Mark Jennings ("Jennings Decl."), Declaration of Honorable Mary Ann Nihart ("Nihart Decl."), Declaration of Robert Trent Jones, Jr. ("Jones Decl."), and Declaration of Jason Blasi ("Blasi Decl.). In addition, it would result in the flooding of nearby residences (Nihart Decl. ¶¶ 11-13, 16; Declaration of William Vandivere ("Vandivere Decl."), filed with Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Defs' PI Opp'n"), cause "undeniable economic hardship" to the City of Pacifica, increase the threat of fire danger, with vagrants, result in urban blight, and create potential health risks from increased mosquitoes and ticks, all of which will not only imperil human health and safety, but will potentially expose the City to untold liability for property damage and other injuries. Lancelle Decl. (ECF No. 27); Nihart Decl. ¶¶ 11-19. Moreover, the mismanagement of Sharp Park that Plaintiffs ask this Court to order would also only serve to *harm* the California red-legged frog ("Frog") and San Francisco garter snake ("Snake") populations at Sharp Park. Jennings Decl. ¶¶ 59-61. If the golf course were to close, or be managed as Plaintiffs request, the Frog and Snake populations at Sharp Park would steeply decline due to inundation of habitat, uncontrolled growth of invasive vegetation, and degraded Frog habitat, as well as threats from trespassing, increased predator populations, fire danger, and pollution. *Id.*

The City has, for many years, responsibly managed Sharp Park to provide both affordable public golf *and* suitable aquatic and terrestrial habitat for the protected species. Jennings ¶¶ 32-35. Indeed, the City's actions go far and above what is required by the ESA. For years, its staff has consulted with U.S. Fish and Wildlife ("FWS") officials about actions to conserve protected species at Sharp Park. The extent of the City's supererogatory conduct reached a new level this past winter, when Mr. Jon Campo, a gardener/biologist with the City's Recreation and Park

1    Department, relocated 128 egg masses from shallow swales near a golf course fairway to Horse

2    Stable Pond in order to reduce the risk that they would dry out when water receded from the

3    fairway. *See* Plaintiffs' Ex. 9 (ECF No. 54-5) (Campo Dep. 104:9, Sept. 13, 2011.)

4            It is critical to the context of this case to appreciate that Sharp Park's robust Frog

5    population, and the Snake population that depends upon it, would not exist but for the creation

6    and continued operation of the golf course. Prior to construction of unarmored earthen

7    embankments between 1941 and 1952 and a seawall in 1989, the areas where Frogs are currently

8    found in and around Laguna Salada (meaning "Salt Lake") and Horse Stable Pond were regularly

9    subject to inundation by the ocean. Links Decl. (ECF No. 29); Philip Williams & Associates Ltd.,

10   Laguna Salada Resource Enhancement Plan, pp. 2, 7 (June 1992) ("PWA Rpt"), *available at*

11   http://www.biologicaldiversity.org/campaigns/restoring_sharp_park_california/pdfs/PWALaguna

12   SaladaResourceEnhancementPlan.pdf. Frogs have very low tolerances to salinity, and thus, it is

13   likely that Frog and Snake populations would not even be present at Sharp Park today had the

14   historically brackish and saline wetland not been transformed into suitable freshwater habitat.

15   Jennings Decl. ¶ 35. The City's current management and operation of the golf course continues to

16   preserve this freshwater environment, in addition to controlling invasive vegetation which, if not

17   managed, will choke out the golf course ponds and displace optimal Frog breeding habitat. *Id.* at

18   ¶ 33. In addition, an active and regular human presence on the course (including that of the

19   golfers) helps to limit threats posed to the Frog and Snake by other predatory species, such as

20   cats, dog, raccoons, and human-introduced aquatic predators. Jennings Decl. ¶ 59; Nihart ¶ 11.

21   Although the City's plans for Sharp Park as part of its Endangered Species Compliance Plan

22   ("Compliance Plan")[3] would improve the habitat for the Frog and Snake, the ESA most assuredly

23   does not require the City to do so.

24           In their focus on individual Frog eggs, Plaintiffs have lost sight of the Frog population as

25   a whole. Plaintiffs' obsession with individual Frog eggs makes little sense from a biological and

26

27           [3] Pls.' Ex. 8.

28

species conservation perspective, particularly given that the species is highly prolific, laying between 2,000 and 6,000 eggs each year. Jennings Decl. ¶ 40. And, happily, the Frog population at Sharp Park is robust and thriving; in fact, last year's egg mass count numbers were exceptionally high. ¶¶ 32, 43 & Pls.' Ex. 9 (ECF No. 54-5) (Campo Dep. Ex. 6, Sept. 13, 2011.)  .

But Plaintiffs' focus on individual Frog eggs also places the ESA's take prohibition under unnecessary stress, calling its proper application into question. This is not a case where only a handful of long-lived mammals that give birth to only one or a few live offspring every few years are threatened by human mismanagement. In such an instance, it might make biological sense to focus on an individual specimen of the species. Not so here. As explained in the declaration of Dr. Jennings, the Frog population at Sharp Park has grown over the last two decades; in fact, it has been common over the past couple of years at Sharp Park to find hundreds of juvenile and adult Frogs, as well over a hundred egg masses during each breeding season alone. Jennings Decl. ¶¶ 32-33, 42. Moreover, whether a Frog egg has been or is likely to be "taken" presents a difficult, technical question. Was the egg viable?  Was it fertilized? Was the egg mass exposed to air due to the Frogs' indiscriminate egg laying habits, rather than as a result of pumping operations? As explained in Dr. Jennings' declaration, egg masses do not immediately die when water recedes from them. Jennings Decl. ¶¶ 43-48. There are a myriad on-the-ground, in-the-water, and in-the-air facts that affect egg survival that must be considered.

While at least some of Plaintiffs' experts are highly credentialed and have experience in the field of herpetology, none are as familiar with the Frog and Snake populations at Sharp Park as Dr. Jennings and the City's expert, Ms. Karen Swaim. Dr. Jennings is widely-recognized as one of the world's leading experts on both the Frog and the Snake. Jennings Decl. ¶¶ 4-25. Moreover, he has spent a considerable amount of time at Sharp Park over the past 21 years conducting Frog and Snake observations. Jennings Decl. ¶¶ 26-31. Ms. Swaim, a highly-regarded biologist, has surely spent more time working with the Frog and Snake populations at Sharp Park than any other scientist on the planet. In stark contrast, Plaintiffs' expert, Dr. Marc Hayes, who has lived and worked in Washington and Oregon for the last 19 years and now works for the Washington Department of Fish and Wildlife (among other jobs in the Pacific Northwest), has,

understandably, spent very little time at Sharp Park. Jennings Decl. ¶¶ 22, 65. So, too, for Dr. Vance Vredenburg. Jennings Decl. ¶¶ 23, 65. Although a resident of the Bay Area, it is not apparent that Dr. Vredenburg has spent much time at Sharp Park, nor is it evident that he is familiar with the City's management of the golf course or interactions with agency personnel. *Id.* The same can be said for Ms. Dexter, who claims she is "familiar" with Sharp Park but then proceeds to base her opinions of Sharp Park on conditions she has experienced at other golf course projects. Jennings Decl. ¶¶ 65-66. Wholly apart from Plaintiffs' experts' relative lack of familiarity with the species and the Sharp Park populations in particular, each of their declarations, particularly on the points most critical to the ability of Plaintiffs' to carry their burden in this proceeding, border on the incredible because they consistently overreach. For example, Dr. Hayes erroneously asserts that Sharp Park's Frog and Snake populations are immediately facing extinction and that the Snakes' "entire species" is in jeopardy of being eliminated. Declaration of Dr. Marc Hayes, ¶ 21 (ECF No. 62-1) ("Hayes Decl."). And yet, Dr. Hayes fails to provide any evidence to support this claim, much less to address the fact that Sharp Park Frog numbers are thriving and increasing. Jennings Decl. ¶¶ 62-63.

As detailed in the City's opposition papers, FWS has worked with City staff year after year to address how best to conserve the species at Sharp Park. And the City currently has permit applications before the agency. The City and its scientists, DFG and its scientists, and FWS and its scientists are, and have been, all over Sharp Park. Respectfully, judicial intervention is not needed.

In addition to the robust scientific dialogue about species conservation at Sharp Park that has been going on for years, the management of Sharp Park has been the subject of a multi-jurisdictional, multi-agency stakeholder process that has been under way for the better part of a decade. Most recently, on August 31, 2011, the City published its Draft EIR for the Significant Natural Areas Management Plan, which includes a chapter on Sharp Park that calls for its

1   continued use as a public golf course, despite the comments made by Plaintiffs advocating that it

2   be shut down.[4] By this suit, Plaintiffs are seeking to bypass the public decision-making process.

3        SFPGA respectfully requests that this Court deny the injunction based on irreparable

4   harm, the balance of the hardships and the public interest; there is no need for the Court to reach

5   the question of whether take is likely to occur. The Court appropriately can, and should, conclude

6   that even if take were likely to occur, harm to the species, the balance of the equities and public

7   interest commend denial of the relief sought. Granting the relief sought by Plaintiffs will harm the

8   Frog and Snake (to say nothing of the tens of thousands of demographically diverse citizens and

9   community groups who utilize Sharp Park each year), result in flooding that will imperil human

10  health and safety and expose the City to liability, and unnecessarily short-circuit the public

11  decision-making process regarding the management of the golf course and Sharp Park's future.

12  Denying the injunction will not negatively impact the populations of the Frog and Snake.

13       This approach to disposing of Plaintiffs' motion would obviate the need for the court to

14  decide the question whether the taking of an *individual Frog egg* constitutes take under section 9

15  of the ESA and, thereby, spare the ESA unnecessary scrutiny that could undermine its effective

16  administration and possibly its very survival.

17      **II.    STATEMENT OF FACTS**

18       Sharp Park has been a significant recreational amenity for the Bay Area for nearly 80

19  years. The City retained Dr. Alastair MacKenzie, one of history's most renowned golf course

20  architects, to construct Sharp Park in 1928 and the site has been continuously operated as a public

21  golf course since 1932. SFPGA Mot. to Intervene at 2:8-9; 3:15-17 (and declarations cited

22  therein). Sharp Park is officially designated as an "historical resource" under CEQA by the San

23  Francisco Planning Department,[5] designated as an historic site by the Pacifica General Plan,[6]

24

25       [4] "Planning Department Releases Draft Environmental Impact Report On Sharp Park
    Plan," *available at* http://www.sfpublicgolf.com/AnnouncementRetrieve.aspx?ID=77097.

26

27       [5] San Francisco Planning Department, Historic Resource Evaluation Response, signed
    February 15, 2011 by Senior Preservation Planner Tina Tam, at Page 2. *See*
    http://www.sfpublicgolf.com/LiteratureRetrieve.aspx?ID=92666.

28

recognized as a significant cultural and historical resource by the Pacifica Historical Society,[7] and identified as one of America's most threatened significant cultural landscapes by the Washington, D.C.-based Cultural Landscape Foundation.[8]

Sharp Park is not only a beautiful, historic and artistically significant golf course—it is also a critical recreational asset for Bay Area working-class people, school children, and retirees and the single most affordable public 18-hole golf course in the Bay Area. SFPGA Mot. to Intervene at 3:22-24, 5:15-20, 8:20-28, 9:1-9 (and declarations cited therein).[9] The course has a devoted, racially and culturally diverse clientele of men, women, junior, and senior citizen golfers. *Id.* at 3:22-28, 4:1-24, 9:3-9 (and declarations cited therein).

The continued operation of Sharp Park is supported by resolutions from the San Mateo County Board of Supervisors,[10] the Pacifica City Council,[11] the Pacifica Chamber of Commerce,[12] organized labor,[13] Congresswoman Jackie Speier,[14] the California Alliance for Golf

---

(Footnote continued from previous page.)

[6] The "historic site" designation is found in the Historic Preservation Element and Historic Sites Map of the Pacifica General Plan, at pages 95 and 95a. *See* http://www.cityofpacifica.org/civica/filebank/blobdload.asp?BlobID=3443

[7] Resolution of Pacifica Historical Society Recognizing Sharp Park Golf Course As An Historical Resource, June 14, 2011, together with cover letter of the same date to Pacifica Mayor Mary Ann Nihart, San Francisco Mayor Ed Lee, and San Mateo County Board of Supervisors' President Carole Groom. *See* http://www.sfpublicgolf.com/LiteratureRetrieve.aspx?ID=88128.

[8]  Cultural Landscape Foundation, "*Landslide,*" July 10, 2009, "Alister MacKenzie's Sharp Park," *see* http://tclf.org/landslides/sharp-park-golf-course-threatened-closure.

[9] As stated in SFPGA's Motion to Intervene, Sharp Park is one of only two public 18-hole golf courses in San Mateo County with prime weekend greens fees under $55.00. Mot. to Intervene at 8:25-27.

[10] County of San Mateo, Resolution of Board of Supervisors, December 18, 2007. *See* http://sharppark.savegolf.net/data/smbos res.pdf.

[11] City of Pacifica, Resolution of City Council, December 10, 2007. *See* http://sharppark.savegolf.net/data/cop res.pdf.

[12] Pacifica Chamber of Commerce, undated letter from Don Eagleston, CEO. *See* http://sharppark.savegolf.net/data/ChamberSupportSP.pdf.

(including both the Northern and Southern California Golf Associations),[15] and the World Golf Foundation.[16] In addition, since 2009, the San Francisco Recreation and Park Department,[17] its citizens' advisory committee,[18] and the Budget and Finance Committee of the San Francisco Board of Supervisors[19] have all conducted public hearings and rejected Plaintiffs' efforts to close the course. Plaintiffs have sought to close down Sharp Park for a number of years through the political process and now attempt to trump the legitimate multi-year process by bringing this suit under the ESA.

It is not a little ironic that the creation and ongoing operation of Sharp Park Golf Course has enabled the Frog and Snake to inhabit the area. As explained in Dr. Jennings's declaration, before the existence of the golf course, the naturally brackish and saline wetland was not

---

(Footnote continued from previous page.)

[13] Laborers' Union Local 261, Testimony of Zac Salem, Chair, Golf Committee, to Board of Supervisors' Govt. Audit & Oversight Committee, Dec. 16, 2009, S.F. Govt. TV, at 2:17:30. *See* http://sanfrancisco.granicus.com/Viewpublisher.php?view id=ll.

[14] Congresswoman Jackie Speier, 12th U.S. Congressional District, Press Release, November 9, 2009. *See* http://speier.house.gov/index.cfm?sectionid=48&parentid=46&sectiontree=46,48&itemid=330

[15] California Alliance for Golf, letter, September 28, 2009. *See* http://sfpublicgolf.com/LiteratureRetrieve.aspx?ID=43245

[16] World Golf Foundation, letter, July 23, 2009: http://sfpublicgolf.com/LiteratureRetrieve.aspx?ID=43233

[17] San Francisco Recreation and Park Commission Resolution No. 0912-018, Agenda Item No. 11, adopted by unanimous 6-0 vote, December 17, 2009: http://sf-recpark.org/index.aspx?page=965

[18] PROSAC, Resolutions [Nos. 1 and 2], adopted by votes of 14-1 and 13-2 on Dec. 1, 2009, submitted to Rec & Park Commission on Dec. 3, 2009: (a) http://sfpublicgolf.com/LiteratureRetrieve.aspx?ID=44912, (b) http://sfrecpark.

org/ftp/uploadedfiles/meetings/Park Recreation and Open Space Advisory Committee (PROSAC)/minutes/2009/PROSAC minutes Decl 2009.doc

[19] Pacifica Riptide, July 21, 2010, "SF Supervisors Spare Sharp Park Golf Course": http://www.pacificariptide.com/pacifica riptide/2010/07/sfsupervisors- spare-sharp-park-golf-course.html

conducive to the inhabitation of either species. Jennings Decl. ¶ 35. However, the development of Sharp Park and the subsequent construction of the seawall transformed the site into an ideal freshwater habitat for the Frog and Snake. *Id.* In the late 1980s, before the seawall was built, the site was considered inhospitable to both species due to high salinity levels in Laguna Salada from salt water intrusion after heavy rainstorms. *Id.* at ¶ 27. A subsequent 1990 Sharp Park survey by Dr. Jennings and Dr. Hayes recorded the existence of five Frogs. Two decades later, current observations paint an incredibly different picture. Today, the Frog population is healthy and robust and "all available scientific evidence shows that the Frog population at Sharp Park has dramatically increased." *Id.* at ¶¶ 32-33. This conclusion bodes equally well for the Snake, given that the Frog is one of its primary food sources. *Id.* The sizeable adult and juvenile Frog population and the approximately one hundred egg masses recorded for each of the last few years, is quite rare. *Id.* at 33. Only a few sites within the Frog's current geographic range exhibit such large populations of adult Frogs. *Id.*

As described by Dr. Jennings in his declaration, Frogs are indiscriminate in choosing their egg laying sites and naturally, and often, deposit their eggs in unsuitable areas. *Id.* at ¶¶ 43-45. Frogs lay an average of 2,000-6,000 eggs per year and many of these are laid near the surface of water bodies; however, the Frog has often been observed depositing its eggs in harsh and inhospitable locations that all but ensure the eventual death of its embryos. *Id.* at ¶ 44. Frogs also regularly lay egg masses in locations that are subjected to periods of natural desiccation. *Id.* at ¶ 45. Although exposed to air, the eggs may still survive depending on how long they are out of water. *Id.* at ¶ 47. At Sharp Park, the vast majority of egg masses identified by Mr. Campo were located in low-lying shallow areas of vegetation (i.e., swales) next to Laguna Salada—habitats that were formed as a result of rising water levels due to the collection of water during heavy periods of rainfall and subsequent flooding on the golf course. *Id.* at ¶ 46.

III.    **ARGUMENT**

A.    **The Court Need Not Decide Whether Take is Likely in Order to Deny Injunctive Relief**

Injunctive relief, whether temporary or permanent, is an "extraordinary remedy, never awarded as of right" and "only awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 24 (2008); *see also Hoffman v. Bank of Am., N.A.*, No. C 10-2171 SI, 2010 WL 2635773, *2 (N.D. Cal. June 30, 2010) (citing *Winter*). The movant must, "by a preponderance of the evidence": (1) establish a strong likelihood of success on the merits; (2) show the possibility of irreparable injury to it if the preliminary relief is not granted; (3) show the balance of hardships favors it; and (4) show that granting the injunction favors the public interest  *See Winter*, 555 U.S. at 20; *Am. Trucking Ass'n  v. City of L. A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Thus, courts "'must balance the competing claims of injury . . . [and] should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

If, as Plaintiffs argue (Pls.' PI Mot. 12:23-24; 13:1-7), the balance of hardships and public interest factors do not apply in ESA cases, SFPGA submits that the unique facts of this case support a more nuanced approach to consideration of the request for injunctive relief here. This is supported by the grave harms that granting the relief sought would impose on the public *and* the Sharp Park Frog and Snake *populations*; to borrow a phrase, the ESA is not a suicide pact, either for humans or species. This is also supported by the need to avoid interpreting and applying the ESA in ways that call the Act's legitimacy into question. Moreover, as the "Court has the authority to grant a preliminary injunction in the exercise of its equitable powers, …  the decision to enter a preliminary injunction is largely left to its discretion." *Berryessa for All v. U.S. Bureau of Reclamation*, No. C 07-259 SI, 2007 WL 4209551, *2 (N.D. Cal. Nov. 27, 2007). This discretion extends to the order in which the Court not only considers the preliminary injunction factors, but to whether it deems it necessary to consider all of them in deciding the motion. For

1   reasons explained in more detail below, the Court need not, and should not, adjudicate Plaintiffs'

2   claim that take has occurred and is likely to occur.

3       **B.    The Relief Sought Will Harm the Sharp Park Frog and Snake**
        **Populations, Result in Flooding That Harms Human Health And**
4       **Safety and Subjects the City to Liability, and Harm Sharp Park's**
        **Diverse Golfers**

5       The on-the-ground facts preclude Plaintiffs from showing: the possibility they will suffer

6   irreparable injury if the preliminary relief is not granted; the balance of hardships favors granting

7   their motion; and that granting the injunction favors the public interest.

8       **1.    The Sharp Park Frog and Snake Populations Will Be Harmed**
        **if the Relief Sought is Granted**

9

10      Given all this, Plaintiffs cannot justify their claims that golf operations are threatening the

11  very existence of such species when the available data confirms otherwise. Moreover, Plaintiffs

12  have not provided any evidence supporting their allegations of take (Jennings Decl. at ¶¶ 37-38),

13  which further raises doubts as to the credibility of such assertions. The sole photograph of a

14  Snake killed in 2005, allegedly due to "mowing" operations, suffers from chain of custody

15  evidentiary issues and raises more questions than it answers. *See id.* at ¶ 37. Likewise, Plaintiffs'

16  information concerning a lone stranded Frog egg mass, the ultimate fate of which is not even

17  known, is also suspect, for Plaintiffs' own declarants provide inconsistent identifications and

18  observations. *Id.* Moreover, that Plaintiffs allegedly identified an exposed egg mass and were

19  certain it would perish begs the question as to why no efforts were made to contact the FWS or

20  City officials and make certain that measures were taken to move the eggs to an appropriate water

21  depth to ensure survival. *Id.* at ¶ 38. Pumping is crucial to the basic operation and functioning of

22  the golf course—not only does it prevent flooding of neighboring Pacifica communities, but it

23  also ensures that the course operates properly. *Id.* at ¶ 39. Contrary to Plaintiffs' allegations,

24  pumping at Horse Stable Pond does not necessarily cause the stranding of Frog egg masses. *Id.* at

25  ¶¶ 43-46.

26      Plaintiffs' concerns about mowing and golf cart use are also unfounded and without

27  evidence or support. Frogs are most active during the night hours on golf courses so they can

28  avoid predators, feed, and hydrate during periods of sprinkler use. *Id.* at ¶ 55. Frogs most often

1  stay close to water bodies or the vegetation edge where the fairways and rough intersect. *Id.*

2  Snakes, on the other hand, rely on the sun to regulate their body temperature and thus, are most

3  commonly found outside of their burrows during mid-day. *Id.* The fact that mowing takes place in

4  the morning (between 5:30 and 9 a.m.), and examining the basic behavioral characteristics of the

5  animals described above, undermines Plaintiffs' claims that somehow the species are continually

6  placed in jeopardy by golf course operations and golf activities. *Id.* at ¶¶ 57-58.

7        Should the Plaintiffs' prevail on their request to enjoin golf maintenance and operations

8  on more than half of the course and entirely halt pumping activities, there is good reason to

9  believe that the Frog and Snake populations will sharply decline. *Id.* at ¶¶ 59-61. First, pumping

10  averts seasonal flooding and the creation of non-viable shallow swale habitat, as well as the total

11  inundation of existing Frog habitat. *Id.* at ¶ 59. Second, pumping prevents the expansion of

12  harmful reeds and vegetative growth, such as cattails and tule, which choke out patches of open

13  water in and around Laguna Salada and Horse Stable Pond and displace Frog breeding habitats.

14  *Id.* Third, a continual human presence on the golf course, by City workers, Sharp Park staff and

15  the golfers alike, promotes the observation and protection of the species. *Id.* It also helps prevent

16  against detrimental urban effects, such as threats due to trespassing, the introduction of invasive

17  and introduced aquatic species, an increase in predatory populations, amplified fire danger, and

18  pollution from refuse and urban runoff. *Id.* It is only with active management of the golf course

19  that Frog and Snake habitat can be maintained to benefit the species. By all available accounts,

20  the current golf course operations are working in the species' favor.

21        **2.**    **Turning Pumps Off Would Flood Adjacent Pacifica Neighborhoods and Expose the City to Potential Liability**

22

23        Flooding of the Sharp Park golf course and adjacent Pacifica neighborhoods has been a

24  recurrent problem since the 1940s. PWA Rpt at 3. Plaintiffs and Mr. Kamman insist that the City

25  maintain a water level at Sharp Park at or below 12.0-feet NAVD[20] and refrain from any pumping

26        [20] As explained in Mr. Blasi's declaration (¶ 3), "the acronym NAVD stands for 'North

27  American Vertical Datum' and is a common measurement on topographical maps to mark elevation points."

28

1    until water levels exceed this level; however, they do not provide any data to demonstrate how a

2    water level of 12 feet will impact neighboring homes or areas beyond the boundaries of Sharp

3    Park. Pls.' PI Mot. 22:8-9; Kamman Decl. ¶ 3. Rather, Plaintiffs and Mr. Kamman simply

4    anticipate that "mobile pumps"[21] will sufficiently avert the risk of any potential property damage.

5    Pls.' PI Mot. 24: fn 18; Kamman Decl. ¶¶ 4-5.

6         As explained in Mayor Nihart's declaration (and clearly evidenced in Exhibit A of Mr.

7    Blasi's declaration and Exhibits of Mr. Vandivere's declaration), flooding beyond the golf course

8    is virtually assured if the relief sought is granted. Enjoining pumping operations until water levels

9    reach 12-feet NAVD will cause irreparable harm to the City of Pacifica and its citizens, not least

10   of which includes the certain flooding of the Fairway Park and West Sharp Park communities.

11   Nihart Decl. ¶¶ 2, 12-13, 16. Homes closest to the beach on the northwestern side of the golf

12   course are below sea level by as much as five feet; during heavy winter rains, pumping is

13   mandatory if residents wish to keep their homes safe from flooding. *Id.* at ¶ 16. Pacifica Mayor

14   Nihart has been a resident of Pacifica's West Sharp Park neighborhood for the past 30 years and

15   she has witnessed the flooding of Pacifica public streets just north of the golf course on several

16   occasions every year when the Horse Stable Pond pumps are not operating. *Id.* at ¶ 12.

17        Requiring the City to "maintain" a water level at Sharp Park of up to 12.0-feet NAVD is

18   nonsensical, as demonstrated in Exhibit A of Mr. Blasi's Declaration and Exhibits of Mr.

19   Vandivere's declaration. Not only is it evident that much of the golf course will be under water,

20   but so, too, will prime Frog and Snake habitat. Blasi Decl. Ex. A; Vandivere Decl. Moreover,

21   even a brief examination of the maps depicting the consequences of this proposed "remedy"

22   contradicts Plaintiffs' arguments that converting Sharp Park to a preserve will create more

23   recreational opportunities for humans—in reality, the Plaintiffs' proposal will severely reduce

24   pedestrian access and walk-way space.

25

26        [21] Plaintiffs' state that pumps should be placed at the "eastern side of the Laguna Salada
     wetlands complex" (24: n. 18), but Mr. Kamman recommends pump placement at the intersection
27   of Clarendon Road and Lakeside Avenue, at the far north end of the golf course (¶ 4).

28

3.      **Granting the Relief Sought Will Destroy the Golf Course and Have Far-Reaching Impacts on Players and Neighboring Communities**

Plaintiffs' request that the City cease all pumping operations in Horse Stable Pond and terminate the use of all mowing equipment and motorized golf carts on 10 of the golf course's 18 holes will not only be detrimental to the Frog and the Snake and flood neighboring Pacifica communities, it will also bring about the demise of an historically significant and unique 18-hole golf course.

A prohibition on pumping will lead to the inundation of fairways and make many holes unplayable. Jones Decl. ¶ 3. Additionally, the resultant standing water will increase the risk of bacterial disease and consequent death to surrounding turfgrass (*Id.*) and expanded mosquito breeding grounds may amplify health risks caused by West Nile Virus (Nihart Decl. ¶¶ 17-18).

Mowing of the fairways, easily the most fundamental management practice on thousands of golf courses worldwide, allows the City to properly maintain the course so that players can use it. Jones Decl. ¶ 2. Moreover, on an ecological level, active management of the vegetation prevents non-native Kikuyu grass—a very thick, aggressive and invasive species—from invading significant portions of the course. *Id.* In the event mowing operations were to cease, Kikuyu grass will spread uncontrolled; eradicating it in the future will be "physically impossible, or at a minimum, extremely difficult and very expensive." *Id.* In addition to the proliferation of invasive vegetation, leaving the grass unmowed for months at a time will increase the risk of fire danger, both to the golf course itself and also to adjacent Pacifica neighborhoods. Nihart Decl. ¶ 14. Golf courses serve as fire breaks to surrounding communities and have sprinkler systems that can easily be triggered should they need to be.

As Mr. Jones explained in his declaration, Plaintiffs' demands go too far—golf courses are traditionally shared spaces that must balance a diverse array of competing interests. It is not only possible to successfully establish design aspects to protect sensitive species and the needs of golfers (Jones Decl. ¶¶ 4-5), but Defendants' opposition papers evidence that such work is already well underway at Sharp Park. The destruction of Sharp Park as a golf course will have far reaching impacts. Many of the diverse array of players who use Sharp Park, whether they travel

from around the world, country or the Bay Area to visit, or arrive from neighboring Pacifica, San Francisco, or Daly City, or San Bruno, will lose a vital and irreplaceable aspect of their daily lives, history, culture, and social outlets. Nihart ¶¶ 5-6, 8-9. The City of Pacifica will also particularly suffer "an undeniable economic hardship" since local business and a significant portion of the city's tax revenue depend upon visitors to the golf course. *Id.* at ¶¶ 7-8.

### C. The Court Need Not Reach the Vexing Question of Whether Take Has Occurred or is Likely to Occur

Plaintiffs' fundamental position that the mortality of a single Frog egg is a take pushes the ESA past the breaking point. If the Court does find it necessary to reach the take question, SFPGA, for the record, opposes Plaintiffs' motion on the grounds, *inter alia*, that on the particular facts of this case, mortality of an individual Frog egg caused by the actions or omissions of the City at Sharp Park is not "take" as proscribed by section 9 of the ESA and its implementing regulations.

Even assuming Plaintiffs could show the City caused the demise of a viable fertilized egg, that showing would not constitute the "take" prohibited by section 9. First, the canons of statutory construction counsel against interpreting a law so as to produce absurd results. *See Public Citizen v. U. S. Dep't of Justice*, 491 U.S. 440, 454 (1989). Second, the ESA as a whole can only be understood as being concerned with preventing species endangerment and extinction. *Defenders of Wildlife v. Salazar*, No. CV 09-77-M-DWM, CV 09-82-M-DWM (Consol.), 2009 U.S. Dist. LEXIS 131058, *15 (D. Mont. Sept. 8, 2009), *accord Water Keeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) (to make showing of cognizable "irreparable harm," plaintiff must make showing of probable take of listed species and species-level impact). Because of this, although some courts have held that the death of a few individuals may constitute "irreparable harm, [] this situation exists when the 'loss of those individuals would be significant for the species as a whole.'" *Id.* (citing *Pacific Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1195, 1210 n.12 (E.D. Cal. 2008)). Although the court made this observation in course of determining that take of individual wolves did not constitute the "irreparable harm" needed for the issuance of an injunction, the same reasoning should be applied to the take question here. This

1    past wet season some 130 egg masses were carefully relocated—that equates to 260,000 to

2    780,000 individual eggs, which have the potential to produce 318-954 adult frogs.[22] Jennings

3    Decl. ¶ 43. The Court should be loathe to declare that the take of a single frog egg is a violation

4    of section 9 of the ESA. Fortunately, it need not do so.[23]

5         And even if the Court is of the view that *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 193-95

6    (1978), forecloses consideration of the balance of the hardships and the public interest, it can

7    deny Plaintiffs' motion without reaching the likelihood of success on the merits (i.e., the take)

8    question based on the complete lack of evidence that the injunction is necessary to avoid

9    irreparable harm to the Frog and Snake populations, and overwhelming evidence showing just the

10   contrary—that the relief sought will harm the Frog and Snake populations at Sharp Park. As

11   Judge Malloy recently explained in the wolf case, *Defenders of Wildlife v. Salazar*, "the measure

12   of irreparable harm is taken in relation to the health of the overall species rather than individual

13   members." *Defenders of Wildlife,* 2009 U.S. Dist. LEXIS 131058 at *16.[24]

---

14         [22] This assumes a very high 99.9 percent mortality rate from egg to adult.

15

16         [23] Even if the Court were to declare the take of a single frog egg is a prohibited take, as set
     forth in the declaration of Dr. Jennings, Plaintiffs have failed to establish egg viability,
17   fertilization, and the mortality of any such eggs. *See* Jennings Decl. ¶¶ 38 (Plaintiffs' declarations
     are inconsistent with respect to the details of identification and the condition of the single egg
18   mass and no evidence is presented to prove that some or all of the eggs perished), 40 (Frog egg
     masses experience an approximate five percent natural mortality in the embryo to larvae stage
19   and a 90 percent mortality from the hatchling to metamorphosis stage), 43-48 (Frogs are known
     to deposit their eggs in unsustainable and unviable habitats, such that they naturally perish before
20   hatching or metamorphosing).

21         [24] Beyond these reasons not to adjudicate the take question, the stark reality is that
22   *Plaintiffs have provided no evidence of take and have failed to demonstrate the cause and effect
     relationships between (1) pumping and the killing of Frogs, and (2) mowing and golf cart use and
23   the take of Snakes and Frogs. See* Jennings Decl. ¶ 37 (the sole 2005 photograph of a "mowed"
     Snake has no chain of custody and doubts exist as to where the Snake was even found), ¶ 38
24   (Plaintiffs' declarations are inconsistent with respect to the details of identification and the
     condition of the single egg mass and no evidence is presented to prove some or all of the eggs, in
25   fact, did perish), ¶¶ 43-48 (Frogs are known to deposit their eggs in unsustainable and unviable
     habitats, such that they naturally perish before hatching or metamorphosing and not as a result of
26   Defendants' pumping operations), ¶¶ 49-53 (Mr. Campo's translocation of egg masses likely did
     not result in mortality), ¶¶ 55-58 (the behavioral characteristics of the Frog and Snake are
27   inconsistent with Plaintiffs' claims that they are regularly subjected to take by mowing and golf
28                                                                          (Footnote continues on next page.)

1

**IV.   CONCLUSION**

2

The simple fact is that the City is responsibly managing Sharp Park to conserve the Frog

3

and the Snake, while providing a diverse public a unique and affordable golfing experience on an

4

historically important golf course. Plaintiffs should not be indulged in their effort to convert the

5

ESA into a law for the destruction of myriad human values and the public interest. SFPGA

6

respectfully submits that this Court should deny the injunction.

7

8

9

10

Dated: October 21, 2011                         **MORRISON & FOERSTER LLP**

11

12                                              By:   _/s/ Christopher J.Carr_

13                                                     CHRISTOPHER J. CARR

14                                              Attorneys for Defendant-Intervenor
                                                SAN FRANCISCO PUBLIC GOLF
15                                              ALLIANCE

16

17

18

19

20

21

22

23

24

25   _____
     (Footnote continued from previous page.)

26   cart use), and  ¶¶  62-66 (Plaintiffs' experts consistently overreach on the issue of take and rely
     upon unsubstantiated claims without any evidentiary support).

27

28