1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILD EQUITY INSTITUTE, *et al.*,

        Plaintiffs,

  v.

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

        Defendants.

_____/

No. C 11-00958 SI

**ORDER DENYING PLAINTIFFS'
MOTION FOR A PRELIMINARY
INJUNCTION**

On September 23, 2011, plaintiffs filed a motion requesting a preliminary injunction to halt defendants' water pumping activities at Sharp Park, as well as its lawn mower and golf cart usage on holes 9 through 18 of the Sharp Park Golf Course. Defendant City and County of San Francisco (the "City") and defendant-intervenor San Francisco Public Golf Alliance ("SFPGA") filed separate oppositions on October 21, 2011, and the plaintiffs replied on November 4, 2011. A hearing was held on this motion on November 18, 2011. Having considered the papers submitted and the arguments of counsel, the Court hereby DENIES plaintiffs' motion.

**BACKGROUND**

Plaintiffs, a collection of non-profit conservation groups, filed suit against the City and its officials for violation of the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531-1544. Plaintiffs allege that defendants' operations and activities at Sharp Park Golf Course have caused the "taking" of the threatened Californian red-legged frog (the "Frog") and the endangered San Francisco garter snake

**United States District Court**
For the Northern District of California

1  (the "Snake"), and that therefore, defendants should have obtained an Incidental Take Permit ("ITP")

2  pursuant to Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B).  Compl. at ¶ 1.  Specifically, plaintiffs

3  contend that defendants' water management at Sharp Park has exposed frog egg masses to the air,

4  causing fatal desiccation of the egg masses, thereby reducing the frog population.  *Id.* at ¶¶ 54-60.

5  Plaintiffs also claim that other golf course operation  activities -- lawn mowing and golf cart usage --

6  harm the Snake and Frog by running them over.  *Id.* at ¶¶ 54-62.  Along with other relief, plaintiffs seek

7  a declaration that defendants are violating the ESA by illegally taking the Frog and the Snake without

8  an ITP, and an injunction against defendants to prevent ongoing activities allegedly causing take.  *Id.*

9  at 16.  Defendant City owns and operates the park; the Court allowed the SFPGA to intervene as a

10  defendant in this action as well.  Doc. 44.

11

12  

13  

14         1.         **The Endangered Species Act**

15         The Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531, contains a variety of

16  protections designed to save from extinction species that the Secretary of the Interior designates as

17  endangered or threatened.  *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515

18  U.S. 687, 690 (1995).  Section 9 of the Act makes it unlawful for any person to "take" any endangered

19  or threatened species.  16 U.S.C. § 1538(a)(1)(B).  "Take" is defined to mean "harass, harm, pursue,

20  hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct."  16 U.S.C.

21  § 1532(19).  The U.S. Fish and Wildlife Service's ("FWS") regulations further define "harm" to include

22  any "significant habitat modification or degradation where it actually kills or injures fish or wildlife by

23  significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50

24  C.F.R. § 17.3; see also *Sweet Home*, 515 U.S 687 (upholding FWS' definition of "harm").  The

25  prohibition on take extends to both endangered and threatened species, and includes any "egg or

26  

27  

28

offspring" thereof.   16 U.S.C.   § 1532(8); *see also* 50 C.F.R. § 17.31(a).   The Ninth Circuit has interpreted the take prohibition to make unlawful "[a] reasonably certain threat of imminent harm to a protected species."   *Marbeled Murrelet v. Pacific Lumber Co.*, 83 F.3d 1060 (9th Cir. 1996).

The fact that an activity is likely to "take" a listed species does not necessarily proscribe that activity altogether.   Instead, the ESA allows the FWS to authorize certain types of incidental take. Section 7(a)(2) requires each Federal agency, in consultation with FWS, to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any listed species; such action requires consultation with the FWS.   16 U.S.C. § 1536(a)(2).   Non-federal entities can pursue a Section 10(a)(1)(B) Incidental Take Permit ("ITP"), which requires the submission of a conservation plan to the FWS.   16 U.S.C. § 1539(a)(1)(B).   The conservation plan requires, *inter alia*, a description of the impact resulting from any take, the reasons why alternatives are not being utilized, and what steps the applicant will take to minimize and mitigate impacts of its actions. *Id.*

### 2.    The Protected Animals

#### A.    The California Red-Legged Frog

The California Red-Legged Frog, *Rana draytonii*, the largest frog native to the western United States, has been lost from over 70% of its historic range, and has suffered a population decline of 90%. See Recovery Plan for the Frog (FWS 2002) (Pl. Ex. 17 at 1).   According to one of plaintiffs' experts, the Frog is one of many amphibian species that have endured massive declines in recent decades, and is "currently only found in select coastal drainages from Marin County south to Baja California, with a few isolated populations in the Sierra Nevada and the Transverse ranges."   Pl.'s Mot. at 5 (citing Vrendenberg Decl. ¶ 9).   In 1996, the FWS listed the Frog as a "threatened" species -- i.e., "likely to

become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20); *see* 61 Fed. Reg. 25,813 (1996).

The Frog breeds in aquatic habitats from November to April. Vrendenberg Decl. ¶ 8. "In recent years, the egg masses have been found in Sharp Park beginning in late December." Pl.'s Mot. at 6; *see, e.g.*, Dec., 2010 Data Sheets (Pl. Ex. 18). The Frog's breeding involves females laying eggs while being fertilized by males, and attaching the eggs to emergent vegetation near the water surface. *Id.*; Vrendenberg Dec. ¶ 8. The egg masses can contain between 2,000-5,000 eggs. Pl.'s Mot. at 6. The Frogs lay their eggs near the water surface to "maximiz[e] growth potential [through] high water temperatures" and to "minimize[e] exposure to aquatic predators." If left undisturbed, the Frog's eggs hatch within 6 to 14 days, and the tadpoles typically metamorphose into frogs between July and September. Pl.'s Mot. at 6 (citing Vredenberg Dec. ¶ 8). According to plaintiffs, "there is a significant breeding population of the Frog at Sharp Park, part of a larger population that includes the Frog in the adjacent Mori Point National Park." *Id.*

**B. The San Francisco Garter Snake**

The Snake, *Thamnophis sirtalis tetrataenia*, "is a harmless and fantastically colored serpent identified by its reddish-orange head with red, black, and turquoise blue racing stripes on its sides and back." Pl.'s Mot. at 7. Unlike the threatened Frog, the Snake is listed as endangered, and, according to the plaintiffs, is the most endangered serpent in North America; Snake populations remain in only a few fragmented locations. Pl.'s Mot. at 7. The Snake typically eats frogs, including the California red-legged frog. *Id.* In 2004, four Snakes were captured and released at Horse Stable Pond in Sharp Park. Def.'s Opp. at 3 (*citing* Sharp Park Conceptual Restoration Alternatives Report, App. C. 10 (Nov. 2009)). In 2008, two Snakes were observed in Sharp Park near Horse Stable Pond. *Id.* Since that time,

4

there have been no reported sightings of the Snake in Sharp Park.  Def.'s Opp. at 5.

### 3.  Sharp Park

The City owns and operates Sharp Park, which is a public park located in the City of Pacifica in San Mateo County.  The Park is approximately 417 acres, and it contains an 18-hole golf course constructed in 1930.  The western border of the Park is the Pacific Ocean.  A seawall constructed between 1941 and 1952 eliminated the hydrologic connection between the Pacific Ocean and the principal surface water body in Sharp Park, Laguna Salada.  The parties dispute whether the water in Laguna Salada was fresh or brackish prior to the construction of the seawall, a pertinent question as to whether the protected animals (which cannot live in brackish water) inhabited the area prior to the construction of the golf course.

Sharp Park and its golf course are divided by Highway 1.  Residential development abuts portions of the north and south boundaries of the park.  Two portions of the National Park Service's Golden Gate National Recreation Area ("GGNRA") -- Mori Point and Sweeney Ridge -- border Sharp Park to the South and East.  Pl.'s Mot. at 8.  The park includes a wetlands complex, made up of Laguna Salada, Horse Stable Pond, a channel that connects the two water bodies, and adjacent wetlands.

### 4.  Defendant's Allegedly Harmful Activities

#### A.  Water Pumping

During winter rains, large volumes of water drain into Sharp Park, raising the water levels in Park water bodies and flooding portions of the golf course.  Pl.'s Mot. at 8 (*citing* Kamman Hydrology Report, Pl. Ex. 25).  In 1941, a pump system was installed to control the water level in Horse Stable Pond.  Decl. Virginia Elizondo, Ex. 1 (Laguna Salada Resource Enhancement Plan).  Currently, two pumps exist in the pond, a primary pump with the capacity of 1,500 gallons per minute, and a backup

pump with a capacity of 10,000 gallons per minute.  The pumped water leaves the Park in pipes through the seawall to an outfall on the beach.  The primary issue in this case is whether the pumping of water lowers water levels from Horse Stable Pond such that it "strands" egg masses laid by the Frog, leaving them to dessicate and die.  A secondary issue with respect to the pumps is whether Frog tadpoles become "entrained" in the pumps and die.

Concerns over the effect of the water pumping at Horse Stable Pond on the Frog egg masses have existed for years.  A 1992 letter from an Earth Island Institute  biologist encouraging listing the Frog as "threatened" warned, "Present water management practices at Sharp Park to reduce flooding of the golf course is killing the red-legged frog eggs, probably in violation of the Endangered Species Act."  Pl.'s Ex. 27 at 1.  The biologist concluded that pumping led to the desiccation of 50 egg masses in Sharp Park.  *Id.*  In the Federal Regulation listing the Frog as threatened, the FWS specifically relied on the 1992 letter, noting that "poorly timed releases of storm water from Horse Stable Pond at Sharp Park in February 1992 resulted in exposure and desiccation of 62 California red-legged frog egg masses."  61 Fed. Reg. at 25,825.

In 2005, FWS sent a letter to San Francisco Recreation and Parks Department ("RPD") regarding the effects of the pump operation at Horse Stable Pond.  The letter stated that:

> It is our understanding that beginning in early 2003 through 2004 and presently, the operation of a water pump that is controlled by the City and County of San Francisco Recreation and Parks Department (during the winter rainfall events) lowered the water level at Horse Stable Pond and resulted in the stranding and exposure of a number of egg masses of the California red-legged frog.  This action apparently caused the death of an unknown quantity of embryonic tadpoles of the completely aquatic early stage of this animal's lifecycle.

Pl.'s Ex. 30 (February 1, 2005 Letter from FWS) at 1.  The letter went on to describe the definition of take under the ESA, stating that the Frog is protected from actions that damage or destroy its habitat.

The FWS then recommended that "in order to avoid further potential violations of the [ESA], we recommend that you obtain authorization for incidental take through either Section 7 or 10(a)(1)(B), as appropriate for the California red legged frog, and also the San Francisco garter snake which also has been documented to inhabit the area." *Id.*

The City never applied for an ITP for water pumping, but did commence other measures designed to mitigate harm to the Frog.  According to the City's Natural Areas Program Director Lisa Wayne, toward the end of 2005, the City instituted a new protocol for monitoring for Frog during the rainy season, including "modulating operation of the pumps at Horse Stable Pond to further reduce risk of egg mass strandings due to water level fluctuations."  Wayne Decl. ¶ 20.  Accordingly, since that time, every time there is significant rainfall, according to defendants, a staffmember of the City surveys the Laguna Salada wetlands complex for any Frog egg masses recently deposited.  Id. at ¶ 21.  Whenever egg masses are observed, information on their location, size, and vulnerability to stranding is recorded.  *Id.* at ¶ 22.

In 2008 and 2010, San Francisco applied for and received permits from the FWS for localized improvements to the pump system and removal of accumulated sediment from the pump house, respectively.  In October 2008, FWS issued a biological opinion and incidental take statement for the storm drain repair project, and in 2010, amended its 2008 biological opinion to account for the 2010 project.  Def.'s Opp. at 6.

In 2009, San Francisco completed an Endangered Species Compliance Plan for Sharp Park Golf Course ("Compliance Plan").  Pl.'s Ex. 8.  The Compliance Plan is a 17-page document that purports to set forth measures to protect the Frog and the Snake in Sharp Park.  It enumerates a number of self-imposed regulations, such as requiring that "once egg masses are detected [by qualified staff], water levels will not be manipulated by Department personnel such that egg masses would be exposed to air

United States District Court
For the Northern District of California

by active water management actions." *Id.* at 12.  In a regulation regarding the risk of entrainment, the Compliance Plan requires that staff immediately halt pumping if tadpoles are deemed at risk of being drawn into the pumps.  *Id.*

Another recent solution implemented by the City has been to move vulnerable egg masses with FWS's permission, a process known as translocation.  *See* Pl.'s Ex. 5.  Plaintiffs provide a series of emails between the City's National Areas Program employee Jon Campo and FWS over the course of the 2010-2011 winter season, wherein Campo requests permission to move egg masses at risk of dessication on a case-by-case basis.  *Id.*  The FWS authorized the movement of the egg masses as a way to mitigate the "emergency" facing the egg masses.  *Id.* at 2.  During the winter of 2010-2011, Campo found 159 egg masses; he requested and received permission to move 128 of them.  Campo Dep. at 104. The parties dispute the efficacy of translocating the egg masses, particularly whether surveys can reveal all of the vulnerable egg masses and whether translocation even allows the eggs to survive.

Experts for both sides agree that the overall Frog population has increased over the last 20 years. Hayes Supp. Decl. ¶ 11 (for Plaintiffs); Jennings Decl. at 16 (for Defendants).  Plaintiffs argue, however, that the increase is due to habitat improvements in adjacent Mori Park, while defendants contend that it is due, at least in part, to the management of Sharp Park.  Neither side disputes that the number of egg masses found last winter in Sharp Park was the highest ever recorded.

**B.     Mowing and Golf Cart Use**

The presence of the golf course in Sharp Park necessarily brings the use of lawn mowers and golf carts.  Plaintiffs argue that the City mows the course near Park water bodies that are "particularly important habitat for the Frog and Snake."  Pl.'s Mot. at 12.  Plaintiff also provides evidence that golf carts are used both on cart paths and off of them, in violation of the City's own 2009 Compliance Plan.

*See* Pl.'s Ex. 11.  Plaintiffs argue that use of the vehicles is "certain to cause ongoing take of the Frog and the Snake."  Pl.'s Mot. at 12.  In support, it provides evidence that in 2005, a Snake was found "after it had been run over by a lawn mower."  *Id.*  Defendants contend that the cause of death of that snake is inconclusive, and, more generally, that neither mowing nor golf cart usage causes take of the Snake or Frog.[1]  Def.'s Opp. at 11.

## LEGAL STANDARD

The parties dispute the legal standard the Court should apply to the plaintiffs' motion.  The standard test for preliminary injunctive relief requires establishment of four factors by a preponderance of the evidence: (I) likelihood of success on the merits; (ii) likelihood the moving party will suffer irreparable harm absent injunctive relief; (iii) that the balance of equities tips in the moving parties' favor; and (iv) that an injunction is in the public interest.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).  The Court in *Winter* clarified that plaintiffs must establish that "irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."  *Alliance For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1311 (9th Cir. 2011).  A preliminary injunction is an extraordinary remedy, never awarded as of right.  *Winter*, 555 U.S. at 9.

The traditional preliminary injunction analysis, however, "does not apply to injunctions issued pursuant to the ESA."  *National Wildlife Fed. v. Nat'l Marine Fisheries Svc.*, 422 F.3d 782, 793 (9th Cir. 2005).  "Instead, in cases involving the ESA, Congress removed from the courts their traditional

---

[1]On November 2, 2011, defendants filed objections to certain portions of plaintiffs' experts' testimony.  Because this case is at the preliminary injunction stage, the Court makes no ruling on the merits of defendants' arguments  and  OVERRULES defendants' objections.  *See Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)("The urgency of obtaining a preliminary injunction necessitates a prompt determination . . . The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.") Defendants can re-raise their objections before trial.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 794. The reason for this is that in passing the ESA, Congress determined that "the balance of hardships always tips sharply in favor of endangered species." *Marbled Murrelet v. Babbit*, 83 F.3d 1068, 1073 (9th Cir. 1996).

Plaintiffs argue that this means that in the context of the ESA, "under Supreme Court and Circuit precedent, so long as it is likely that ongoing, illegal -- and especially, as here, lethal -- take will occur, injunctive relief to address that take must be crafted, because Congress has afforded listed species the 'highest of priorities,' and has eliminated the equitable balancing otherwise required." Pl.'s Mot. at 21 (*citing TVA v. Hill*, 437 U.S. 153, 194 (1978)).  In other words, according to plaintiffs, they need only show that defendants' activities are likely to cause take of a listed species.  Pls.' Mot. at 21.  Plaintiffs make no mention of the requirement of showing irreparable harm absent injunctive relief in their moving papers.

However, "even in the Ninth Circuit, plaintiffs 'must establish the likelihood of irreparable harm in the future.'" *ABA Section of Environment, Energy, and Resources*, "Endangered Species Act," 172 (Donald Baur et al., eds., 2nd ed. 2010) (citing *National Wildlife Federation v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir. 1994)); *see also Defenders of Wildlife v. Salazar*, 2009 U.S. Dist. Lexis 131058, *6 (D. Mt. 2009) (although plaintiffs likely to succeed on the merits that delisting wolves violated the ESA, they failed to show irreparable harm to the wolf population, instead of individual wolves).  In support of their proposed legal standard, plaintiffs rely on a variety of cases that grant *permanent* injunctive relief, not preliminary injunctive relief.  *See* Pls.' Mot. at 21; *citing Marbled Murrulet*, 83 F.3d at 1067 (affirming permanent injunction upon finding that "implementation of Pacific Lumber's harvesting plan would likely harm marbled murrelets"); *Ctr. for Biological Diversity v. Marina Point Development Associates*, 434 F. Supp. 2d. 789, 795 (C.D. Cal. 2006) (granting permanent

injunction against developer); *Animal Protection Institute v. Holsten*, 541 F.Supp. 2d 1073, 1081 (D. Minn. 2008) (issuing injunction on summary judgment where the "Court finds it likely that additional takings may occur unless further regulations are implemented.")  Plaintiffs might be correct that at the final judgment stage, they need only show the likelihood of future take of a protected species to warrant injunctive relief.   However, that question is not before the Court; instead, plaintiffs seek the extraordinary remedy of a preliminary injunction.  Plaintiffs provide no support that the issuance of a *preliminary* relief should occur absent a showing of irreparable harm.

The plaintiff may be simply assuming that the death of any listed animal, or any of its eggs, constitutes irreparable harm for purposes of issuing a preliminary injunction.  However, the law does not go quite so far.  No court has held that as a matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes irreparable harm.  *See Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 109 (D. Me. 2008); *Alabama v. U.S. Army Corps of Engineers*, 441 F. Supp. 2d 1123, 1135-36 (N.D. Al. 2006) (collecting opinions); *Defenders of Wildlife*, 2009 U.S. Dist. LEXIS 131058 at *14 ("[T]o consider any taking of a listed species as irreparable harm would produce an irrational result" because the ESA allows for incidental take permits.)   The court in *Pacific Coast Federation of Fisherman's Association v. Gutierrez*, 606 F. Supp. 2d 1195 (E.D. Ca. 2008) (Wanger, J.), considered the types of harms that a plaintiff must show to demonstrate a reasonable likelihood of irreparable harm in the Ninth Circuit.  The *Gutierrez* court noted that the standard does not require a showing of likely "extirpation" of the species, *id*. at 1207, but rather considers whether the action sought to be enjoined "will reduce appreciably [the species'] likelihood of survival or recovery or appreciably diminish the value of their critical habitat."  *Id. (citing National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 931 (9th Cir. 2007)).  The court accepted the FWS' definition of "appreciably diminish" to mean "considerably reduce." *Id.* at 1208 *(citing* USFWS/NMFS, ESA Section 7

11

**United States District Court**
For the Northern District of California

1   Consultation Handbook (March 1998), at 4-34).

2   In sum, the plaintiffs must demonstrate both that they are likely to succeed on the merits of their

3   claim, and demonstrate that there will be a reasonable likelihood of irreparable harm absent injunctive

4

5   relief.

6

7                                    **DISCUSSION**

8   The Court need not engage in an analysis of whether plaintiffs are likely to succeed on the merits

9   because the Court finds that regardless of the outcome of that inquiry, the plaintiffs have failed to show

10  a likelihood of irreparable harm absent injunctive relief.

11

12

13  **1.      Water Pumping Activities**

14  At this preliminary injunction stage, the Court must examine the context of defendant's activities

15  and their effect on the local Frog and Snake populations. Experts for both sides agree that the overall

16  Sharp Park Frog population has increased during the last 20 years.  Hayes Supp. Decl. ¶ 11 (for

17  Plaintiffs); Jennings Decl. at 16 (for Defendants).  The Court finds persuasive the testimony of

18  defendant's expert Dr. Mark Jennings, a Herpetologist/Fisheries Biologist who, along with plaintiffs'

19  expert Dr. Marc Hayes, was one of the scientists to originally petition the FWS to list the Frog under

20  the ESA.  Dr. Jennings states, and it is undisputed, that:

21

22

23          Over the course of the past two decades, all available scientific evidence
24          shows that the Frog population at Sharp Park has dramatically increased.
            When I first surveyed Sharp Park in 1990, my co-scientists and I received
25          recommendations to study the Sharp Park area precisely because earlier
            studies had shown that the Frog was not present and scientists were very
26          concerned about its survival.  However, I was highly encouraged to find
            Frogs at Sharp Park during our survey work at night at Laguna Salada and
27          Horse Stable Pond . . .

28

**United States District Court**
For the Northern District of California

> Examining the Sharp Park area today, it is evident that the Frog population has dramatically increased in size. For example, I see that it has been common for the past couple of years at Sharp Park to find dozens and dozens of juvenile and adult Frogs, as well over [sic] a hundred egg masses during each breeding season alone (and that number includes just the egg masses that are readily available to the surveyors). This is evidenced from even a simple examination of Frog survey documents provided by the City. To put this in perspective, finding a site that can sustain hundreds of adult Frogs is a rare occurrence -- there are relatively few sites within the current geographic range of the species that have such large populations of adult Frogs.

Jennings Decl. ¶ 32. Jon Campo, the City's National Areas Program employee and the person with perhaps the most "on the ground" experience with the Frog in Sharp Park, wrote to the FWS on January 21, 2011, stating, "I have some good news in regards to the Frogs at Sharp Park golf course. The egg masses we have moved appear to be healthy as they approach Gosner stage 15-21. Also, we seem to be having a banner year for breeding. I have been documenting the Frog egg masses at Sharp Park for over 8 years and this year I have recorded more than 3 times the egg masses than any other year." Pls.' Ex. 5. The Court finds persuasive the testimony that the Frog population is increasing each year and is, in fact, "thriving." Jennings Decl. ¶¶ 39-40.

Plaintiffs, perhaps relying on their theory that they need only show the existence of take and not irreparable harm, provided no arguments in their initial motion regarding the population trends of the Frog in Sharp Park. Along with their reply, plaintiffs provided a supplemental declaration from Dr. Hayes and a new theory: that "any increase in population is due to improved habitat conditions at [adjacent] Mori Point, which is part of the contiguous habitat for the one overall Frog population that inhabits both areas. Thus, while the improved conditions at Mori Point are assisting the Frog population, conditions at Sharp Park remain a 'population sink' that is adversely affecting the overall population." Pls.' Reply at 20 (citing Hayes Supp. Decl. ¶¶ 11-14).

The Court need not decide whether plaintiffs' Mori Point theory is correct, because even if

13

United States District Court
For the Northern District of California

1    accepted as true, it simply does not meet plaintiffs' burden of demonstrating irreparable harm in the

2    absence of a preliminary injunction.   A preliminary injunction is an extraordinary remedy, never

3    awarded as of right.   *Winter*, 555 U.S. At 9.   Here, the circumstances do not warrant the exceptional act

4    of prohibiting activity that has gone on for decades before the case can be decided on its merits.   It is

5    uncontroverted that the local Frog population is increasing.   The Court finds persuasive defendants'

6    assertions that they will continue careful monitoring of water levels, and continue to seek authorization

7    from FWS for the movement of any vulnerable egg masses.   There may be other circumstances where

8    even if a listed population is increasing, preliminary injunctive relief is warranted because despite the

9    increase, a defendant's actions will, "reduce appreciably [the animal's] likelihood of survival or recovery

10   or appreciably diminish the value of their critical habitat."   *Gutierrez*, 606 F. Supp. 2d. at 1207.

11   However, this is not that case.[2]  The expansion of the Frog population, coupled with defendants' careful

12   attention to moving any vulnerable egg masses and their continuing interactions with FWS seeking

13   authorization to do so, make this a situation that does not warrant the temporary, immediate, and drastic

14   relief afforded by a preliminary injunction.

15          Therefore, because plaintiffs failed to meet their burden with respect to the second prong, the

16   Court DENIES plaintiffs' motion for a preliminary injunction to stop pumping water at Horse Stable

17   Pond.

18   **2.       Lawn Mower and Golf Cart Usage**

19          The Court also finds that the plaintiffs have failed to establish the likelihood of irreparable harm

---

[2]  Importantly, this is not a case where a preliminary injunction is sought to preserve the status quo. Instead, plaintiffs are seeking to halt activities that have gone on for years. *See Save Strawberry Canyon v. Dep't of Energy*, No. C 08-3494 WHA, at *1-3 (N.D.Ca. 2009) (analyzing whether the Supreme Court in *Winter* meant to deprive district judges of the power to preserve the status quo when clear irreparable injury would otherwise result).

1  to the Snake or the Frog absent an injunction prohibiting the use of Golf Carts and Lawn Mowers on

2  Holes 9-18 of the Sharp Park Golf Course.  The only evidence that plaintiffs provide that take is

3  occurring with respect to the use of these vehicles was a single Snake that died six years ago.  However,

4  since that time, defendants have implemented the 2009 Compliance Plan, which self-imposes protective

5  regulations regarding use of the vehicles for the sake of the animals.  *See* 2009 Compliance Plan, Pl.'s

6  Ex. 8, at 10 (for example, the creation of "no mow zone" areas as well as golf play suspension when

7  either the Frog or Snake is observed on a green scheduled for maintenance).  More importantly, there

8  have been no reported sightings of the Snake in Sharp Park in 3 years.  Wayne Decl., ¶¶ 7-10.  When

9  there is a significant question as to whether a listed species even exists in an area, the plaintiffs have a

10  high burden of showing that the species will be irreparably harmed absent an injunction.  The plaintiffs

11  have failed to meet that burden here.  Accordingly, the Court DENIES plaintiffs' motion for a

12  preliminary injunction to prohibit use of Golf Carts and Lawn Mowers on Holes 9 through 18 of Sharp

13  Park.

14

15

16

17

18                                                  **CONCLUSION**

19          Plaintiffs have failed to meet their burden of showing irreparable harm to the California Red

20  Legged Frog or the San Francisco Garter Snake absent the issuance of a preliminary injunction on

21  defendants' activities at Sharp Park.  Accordingly, the motion for a preliminary injunction is DENIED.

22

23

24          **IT IS SO ORDERED.**

25  Dated: November 29, 2011                        _____

26                                                  SUSAN ILLSTON
                                                    United States District Judge
27

28

                                                     15