1  DENNIS J. HERRERA, State Bar #139669
City Attorney
2  DANNY CHOU, State Bar #180240
Chief of Complex and Special Litigation
3  OWEN J. CLEMENTS, State Bar #141805
JAMES M. EMERY, State Bar #153630
4  VIRGINIA DARIO ELIZONDO, State Bar #134771
Deputy City Attorneys
5  OFFICE OF THE CITY ATTORNEY
1390 Market Street, 7th Floor
6  San Francisco, California 94102-5408
Telephone:     (415) 554-4261
7  Facsimile:      (415) 554-3985
E-Mail:          jim.emery@sfgov.org
8
NOSSAMAN LLP
9  PAUL S. WEILAND, State Bar # 237058
pweiland@nossaman.com
10  ROBERT C. HORTON, State Bar # 235187
rhorton@nossaman.com
11  18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612-0177
12  Telephone: (949) 833-7800
Facsimile: (949) 833-7878
13
14  Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
15  MAYOR LEE, and RECPARK GENERAL MANAGER
GINSBURG, in their official capacities
16

17                    UNITED STATES DISTRICT COURT

18                  NORTHERN DISTRICT OF CALIFORNIA

19  WILD EQUITY INSTITUTE, et al.              Case No. 3:11-cv-00958 SI

20          Plaintiffs,                        **SAN FRANCISCO'S NOTICE OF MOTION
                                               AND MOTION FOR SUMMARY JUDGMENT;
21          vs.                                MEMORANDUM OF POINTS AND
                                               AUTHORITIES**
22  CITY AND COUNTY OF SAN
FRANCISCO, et al.                              Date:  April 20, 2012
23                                             Time:  9:00 a.m.
         Defendants.                           Courtroom 10, 19th floor
24                                             Judge:  Hon. Susan Illston

25
26  SAN FRANCISCO PUBLIC GOLF
ALLIANCE,
27
         Defendant-Intervenor.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ...................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................2

INTRODUCTION .................................................................................................2

BACKGROUND ..................................................................................................3

    I.      PLAINTIFFS ASSERT AN INTEREST IN ENJOYING THE FROGS AND
            SNAKES IN THEIR NATURAL HABITAT .........................................................3

    II.     THE CALIFORNIA RED-LEGGED FROG IS THRIVING
            AT SHARP PARK........................................................................................4

    III.    GOLF COURSE OPERATIONS DO NOT POSE AN IMMINENT THREAT
            OF HARM TO THE SAN FRANCISCO GARTER SNAKE..............................5

ARGUMENT .......................................................................................................6

    I.      PLAINTIFF ADVOCACY GROUPS LACK STANDING TO PURSUE
            THEIR CLAIMS BECAUSE THEY CANNOT DEMONSTRATE INJURY
            IN FACT, CAUSATION, OR REDRESSABILITY ...............................................7

    II.     PLAINTIFFS CANNOT ESTABLISH REASONABLY CERTAIN
            THREAT OF IMMINENT HARM TO THE SAN FRANCISCO GARTER
            SNAKE AT SHARP PARK .............................................................................9

CONCLUSION...................................................................................................13

# <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986).................................................................................6

*Bennett v. Spear*
  520 U.S. 154 (1997).................................................................................7

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986).................................................................................6

*Ctr. for Biological Diversity v. Marina Point Dev. Co.*
  535 F.3d 1026 (9th Cir. 2008) ................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*
  509 U.S. 579 (1993)...........................................................................10, 11

*Defenders of Wildlife v. Bernal*
  204 F.3d 920 (9th Cir. 1998) ................................................................9

*Fong v. American Airlines, Inc.*
  626 F.2d 759 (9th Cir.1980) ..................................................................7

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*
  528 U.S. 167 (2000).................................................................................7

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*
  484 U.S. 49 (1987)...................................................................................9

*Kennedy v. Allied Mut. Ins. Co.*
  952 F.2d 262 (9th Cir.1991) ..................................................................4

*Kennedy v. Applause, Inc.*
  90 F.3d 1477 (9th Cir.1996) ..................................................................7

*Kumho Tire Co. v. Carmichael*
  526 U.S. 137 (1999).................................................................................10

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992).................................................................................7

*Lust v. Merrell Dow Pharm., Inc.*
  89 F.3d 594 (9th Cir. 1996) ...................................................................10

*Marbled Murrulet v. Babbitt*
  83 F.3d 1060 (9th Cir. 1996) .................................................................9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574 (1986).................................................................................6

*Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.*
23 F.3d at 1512 ..................................................................................9

*Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*
345 F.Supp.2d 1151 (W.D. Wash. 2004)..................................................7

*Sierra Club v. Morton*
405 U.S. 727 (1972)..............................................................................7

*Steel Co. v. Citizens for a Better Env't.*
523 U.S. 83 (1998)................................................................................8

*Thornhill Publ'g Co., Inc. v. GTE Corp.*
94 F.2d 730 (9th Cir.1979) ...................................................................7

**Rules**

Federal Rule of Civil Procedure
Rule 56.............................................................................................1, 6
Rule 56 (c) ............................................................................................6
Rule 56 (e) .........................................................................................6, 7
Rule 702 ..............................................................................................10

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 20, 2012, at 9:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located in Courtroom 10 at 450 Golden Gate Avenue, 19th Floor, San Francisco, California, the City and County of San Francisco, its Mayor Ed Lee and San Francisco Recreation and Park Department General Manager Phil Ginsburg (collectively, "San Francisco") will move for summary judgment of the claims against it.  San Francisco brings this motion because plaintiffs lack standing to pursue their claims, and because plaintiffs cannot establish any reasonably certain threat of imminent harm to the San Francisco garter snake at Sharp Park.

This motion is based on Rule 56 of the Federal Rule of Civil Procedure, this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of James M. Emery, all pleadings and papers on file in this action, and upon such matters as may be presented to the Court at the time of the hearing.

Dated:  March 1, 2012

DENNIS J. HERRERA
City Attorney
DANNY CHOU
Chief of Complex and Special Litigation
OWEN J. CLEMENTS
JAMES M. EMERY
VIRGINIA DARIO ELIZONDO
Deputy City Attorneys


By:_____/s/_____
JAMES M. EMERY


NOSSAMAN LLP
PAUL S. WEILAND
ROBERT C. HORTON

Attorneys for Defendants CITY AND COUNTY OF SAN FRANCISCO, et al.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In this private action under the Endangered Species Act, plaintiff advocacy organizations allege that San Francisco's continued operation and management of Sharp Park golf course harms two listed species, the California red-legged frog and the San Francisco garter snake.

In a private action such as this one, plaintiffs must establish, at all stages of the litigation, their standing to sue. Plaintiffs must show: (1) an imminent risk of injury; (2) caused by the defendant; (3) that can be redressed by the Court. In this case, plaintiff advocacy organizations allege San Francisco has adversely affected their members' interest in observing the California red-legged frog in and around Sharp Park, and in looking for the "elusive" San Francisco garter snake.

The undisputed evidence establishes the frog population in Sharp Park has increased over the past twenty years. There is no evidence of any imminent reversal of the positive trend. Plaintiffs cannot show San Francisco has impaired in any way their members' interest in observing the frogs. Plaintiffs therefore lack standing to enforce the Endangered Species Act with respect to the frogs.

Similarly, plaintiffs present no evidence of ongoing take of the San Francisco garter snake at Sharp Park. Plaintiffs' sole evidence of unauthorized "take" of a San Francisco garter snake is a single event in 2005, seven years ago. Plaintiffs attempt to build on this single event by speculating that additional undetected deaths occur routinely. This speculation depends on the premise that the undetected snake carcasses are *always* scavenged before anyone *ever* sees them. This speculation from plaintiffs' retained experts fails to satisfy the evidentiary requirements for scientific reliability. The complete absence of admissible evidence that San Francisco's continued operation and management of Sharp Park golf course is reasonably certain to cause imminent harm to San Francisco garter snakes defeats plaintiffs' claims on the merits with respect to the snake. This same absence of evidence demonstrates that plaintiffs lack standing to pursue these claims as well. Golf course operations have not impaired the interests of plaintiffs' members in searching for the "elusive" snake in and around Sharp Park.

For the foregoing reasons, set forth more fully below, the Court should enter summary judgment for San Francisco.

# BACKGROUND

## I.   PLAINTIFFS ASSERT AN INTEREST IN ENJOYING THE FROGS AND SNAKES IN THEIR NATURAL HABITAT

Plaintiffs in this action are six advocacy organizations: Wild Equity Institute, Center for Biological Diversity, National Parks Conservation Association, Surfrider Foundation, Sequoia Audubon and Sierra Club.  To support their standing to pursue this action, five of the six plaintiffs (excluding the Sierra Club) allege that their interests "in observing, studying, and otherwise enjoying the California red-legged frog and the San Francisco garter snake at Sharp Park have been, and will continue to be, harmed by Defendants' take of these species through the operation and management of Sharp Park golf course."  Complaint ¶¶8, 10, 12, 14, 16.  The Sierra Club alleges that its "particular interest in this case and the issues which the case concerns stem from the ongoing impacts to the California red-legged frog and the San Francisco garter snake."  *Id.* ¶18.

Plaintiffs' interrogatory responses echo the standing allegations in their complaint.  Intervenor's Interrogatory 25 asked plaintiffs to "describe the specific nature of the adverse effect alleged to have been sustained by" their members.  Declaration of James M. Emery, filed herewith ("Emery Decl."), Exh. A.  Each of the plaintiffs replied that its members enjoy viewing the California red-legged frog in the area and looking for the San Francisco garter snake.  *Id.*[1]  The supposed injury to plaintiffs'

---

[1]  The exact phrasing of each plaintiffs' interrogatory response varies.  Among plaintiff advocacy organizations, only the Center for Biological Diversity asserts that it has any member that actually has visited Sharp Park itself or intends to return.  The remaining plaintiffs allege only that their members visit the general area near to Sharp Park.

The Center for Biological Diversity responded that its member "Jeff Miller regularly hikes near Horse Stable Pond in Sharp Park, and enjoys looking for and seeing the CRLF in its natural habitat in this area, as well as looking for the elusive SFGS."  Emery Decl., Exh. A.  The National Parks Conservation Association responded that its members "Robert Pilgrim and Ron Sundergill *visit the Sharp Park area, including Mori Point*, where he [sic] enjoys taking pictures of wildlife, including the CRLF and looking for the SFGS."  *Id.* (emphasis supplied).  Sequoia Audubon responded that its members "Laurie Graham and Nancy Arbuckle *walk near Sharp Park*, and enjoys [sic] looking for and seeing wildlife in this area, including the CRLF in its natural habitat, as well as looking for the elusive SFGS."  *Id.* (emphasis supplied).  Sierra Club responded that its members "Arthur Feinstein and Casey Allen *enjoy walking near Sharp Park* and looking for and seeing the CRLF in its natural habitat in this area, as well as looking for the elusive SFGS."  *Id.* (emphasis supplied)  Surfrider responded that its members "Angela Howe and Michael Stewart *hikes* [sic] *near Sharp Park*, and enjoy looking for and seeing the CRLF in its natural habitat in this area, as well as looking for the elusive SFGS."  *Id.* (emphasis supplied).  Finally, Wild Equity Institute responded that its members "Laurie Graham and Margaret Goodale *hike near Sharp Park* and enjoy looking for and seeing the CRLF in its natural habitat in this area, as well as looking for the elusive SFGS."  *Id.* (emphasis supplied).

members depends on plaintiffs' assertion that golf course operations have impaired their members' opportunities to observe the frog and to search for the snake. "[T]hese activities [i.e., golf course operation and management] adversely affect [members'] interests in and ability to enjoy the CRLF and the SFGS at and near Sharp Park." *Id.*

## II.   THE CALIFORNIA RED-LEGGED FROG IS THRIVING AT SHARP PARK

The California red-legged frog is abundant in Sharp Park. Its population in and around the golf course has been increasing, not decreasing, over the past twenty years. Plaintiffs' retained expert explicitly acknowledges the increasing frog population. "I do not question that the overall California Red-legged Frog population that populates both Mori Point and Sharp Park has increased [over the past two decades]; egg mass counts seem to show that it has, though some inconsistencies weakens [sic] the notion that this increase has been dramatic." Supplemental Declaration of Marc Hayes, filed Nov. 4, 2011 ("Supp. Hayes Decl."), ¶ 11 (Dkt #79-1). In its order denying plaintiffs' preliminary injunction, the Court recognized that the increasing frog population is undisputed:

> Experts for both sides agree that the overall Frog population has increased over the last 20 years. Hayes Supp. Decl. ¶ 11 (for Plaintiffs); Jennings Decl. at 16 (for Defendants). . . . Neither side disputes that the number of egg masses found last winter in Sharp Park was the highest ever recorded.

Order Denying Plaintiffs' Motion For a Preliminary Injunction, filed Nov. 29, 2011 (Dkt #86), at 8.[2]

Typical of animals at or near the bottom of the food chain, the evolutionary survival strategy of the California red-legged frog is explosive breeding. Declaration of Dennis Murphy, filed Oct. 21, 2011 ("Murphy Decl."), ¶16 (Dkt #66). A single mature female California red-legged frog lays from

---

[2]   In his January 20, 2012 expert disclosure, plaintiffs' retained expert Marc Hayes attempts to "walk back" somewhat on his prior acknowledgement that frog populations have systematically increased over the past two decades at Sharp Park. Dr. Hayes performed a "regression analysis" of egg mass survey data. He excluded from his analysis any data from Laguna Salada, where, in fact, the bulk of egg masses were found in 2011. He justifies ignoring this data by asserting that "there has been inconsistent survey effort by the City at Laguna Salada across time." Emery Decl., Exh. B (Hayes Expert Report ¶62). Even so, using only his hand-picked selective data, Dr. Hayes concluded that egg mass numbers have remained stable at Horse Stable Pond over the past nine years. *Id.* Even according to Dr. Hayes' revised analysis, the frog population in Sharp Park has not declined.

In any event, Dr. Hayes' effort in his expert report to undermine his prior testimony cannot create an issue of fact. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991). If the Court determines that Dr. Hayes' reassessment of frog population trends reflects a "sham," the Court may disregard entirely his new opinion. *Id.* at 267.

1   2000 to 6000 eggs each season, during each of the four to six years that it is mature and fertile.

2   Declaration of Mark Jennings, filed Oct. 21, 2011 ("Jennings Decl."), ¶¶40-41 (Dkt #68).  Simple

3   math demonstrates that a survival rate of about 0.01 percent, or less, to maturity, supports a stable frog

4   population.

5        Plaintiffs have presented evidence that just one egg mass was "stranded" during the 2011

6   breeding season.  Supplemental Declaration of Brent Plater, filed Nov. 4, 2011 ("Supp. Plater Decl."),

7   Exh. B (Dkt #79-3).  Dr. Hayes' assertion that over 100 egg masses were "stranded" during the 2011

8   breeding season, Emery Decl., Exh B (Hayes Expert Report ¶33), is contrary to the evidence.  The

9   evidence Dr. Hayes relies on (Dkt #54-6) clearly states these egg masses were moved not because they

10  were "stranded," but because they were laid in "unsustainable habitat."  As Mr. Campo explained at

11  his deposition, each of these egg masses was fully covered in water, not stranded, when he moved

12  them.  Campo Deposition, at 118:13-119:9; 131:4-132:11 (Dkt #54-5).  He moved them, after the Fish

13  and Wildlife Service authorized him to do so, because they were in isolated pools that might dry up

14  before the resultant tadpoles metamorphosed.  Incidents of egg mass strandings have been reduced to

15  near zero since San Francisco enhanced its pumping protocols after the 2005 breeding seasons and

16  improved implementation of those protocols in 2008.

17       There is no evidence that a single California red-legged frog individual has ever been entrained

18  in the pumps at Horse Stable Pond.  Likewise, there is no evidence that a single California red-legged

19  frog individual has ever been harmed or killed by a golf cart or mowing machine.

20       Even if plaintiffs could raise a disputed issue whether continued golf course operations might

21  pose an imminent risk of death or injury to individual California red-legged frogs, plaintiffs still could

22  not establish standing.  There can be no reasonable dispute that golf course operations have had zero

23  impact on the asserted interest of plaintiffs' members in observing frogs in and around Sharp Park.

24  **III.   GOLF COURSE OPERATIONS DO NOT POSE AN IMMINENT THREAT OF HARM
          TO THE SAN FRANCISCO GARTER SNAKE**

25

26       It has been four years now since anyone has seen a San Francisco garter snake in Sharp Park.

27  In 2008, two individual snakes were observed at the southern boundary of Sharp Park, adjacent to

28  GGNRA lands at Mori Point, well off the golf course itself.  Emery Decl, Exh. B (Hayes Expert

Report ¶23).  Based on photographs of a dead snake, Plaintiffs infer that a mower killed one

San Francisco garter snake in 2005, seven years ago.  *Id.*  (Hayes Expert Report ¶53.)  Plaintiffs have

no other admissible evidence that golf course operations have harmed any other snake.

Intervenor's Interrogatory No. 14 asked plaintiffs to present their evidence regarding any dead

snakes at Sharp Park.  Plaintiffs identified a biologist's report from the 1940s, and cited the 2005

event.  "Plaintiffs further respond that in 2005 a dead SFGS was identified in or near Sharp Park, and

experts who have reviewed the data concerning this Snake have concluded that it was run over by a

vehicle."  Emery Decl., Exh A.  Plaintiffs' expert disclosures, dated January 20, 2012, continue to rely

exclusively on the 2005 event and their speculation that additional undetected deaths occur regularly,

and that those hypothetical undetected deaths remained undetected because the dead snakes are rapidly

scavenged before anyone ever sees them.  Emery Decl., Exh. B (Hayes Expert Report ¶¶53-56), Exh C

(Dexter Expert Report ¶¶36-39).

## ARGUMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56 (c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however,

has no burden to negate or disprove matters on which the non-moving party will have the burden of

proof at trial.  The moving party need only demonstrate to the Court that there is an absence of

evidence to support the non-moving party's case.  *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there

is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed.R.Civ.P. 56 (e)).  To carry this burden, the non-

moving party must "do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on

which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 252 (1986).

On summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id*. The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56 (e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979) (observing that there is no genuine issue of fact "where the only evidence presented is 'uncorroborated and self-serving' testimony" (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir.1996))). Hearsay statements found in affidavits are inadmissible. *Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir.1980).

## I.    PLAINTIFF ADVOCACY GROUPS LACK STANDING TO PURSUE THEIR CLAIMS BECAUSE THEY CANNOT DEMONSTRATE INJURY IN FACT, CAUSATION, OR REDRESSABILITY

Under the Endangered Species Act, prudential standing is coextensive with constitutional, or Article III, standing. *See Bennett v. Spear*, 520 U.S. 154, 162-66 (1997); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F.Supp.2d 1151, 1160 (W.D. Wash. 2004) ("[S]tanding under the ESA has been expanded to the full extent permitted under Article III."). To satisfy Article III's "case" or "controversy" requirement, there must be: (1) injury in fact, (2) a causal connection such that the injury is "fairly traceable" to the defendant's action, and (3) a "likelihood" that the injury will be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury in fact must be (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Id.* Plaintiffs have the burden of proof to establish each element of standing. *Lujan*, 504 U.S. at 560-61.

In this case, plaintiffs' standing depends on their allegations that their members visit Sharp Park and enjoy observing California red-legged frogs, as well as hunting for the "elusive" San Francisco garter snake at Sharp Park. Plaintiffs' standing theory requires them to prove "'the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727,

735 (1972)).  They cannot do so.  It is undisputed that the frog population in Sharp Park has grown, not diminished, over the past decades.  Furthermore, plaintiffs have presented zero evidence (beyond inadmissible speculation) of harm to even a single San Francisco garter snake since 2005.  These undeniable facts repudiate all three essential elements of standing: (1) injury, (2) causation and (3) redressability.

First, plaintiffs' members have suffered no injury in fact.  The increasing frog population has enhanced, not diminished, the opportunities for plaintiffs' members to observe the frogs at Sharp Park and the adjacent Mori Point property.  Likewise, plaintiffs' members can continue to enjoy searching for the "elusive" San Francisco Garter Snake at Sharp Park, even though none has been seen since 2008.

Second, plaintiffs have failed to establish any causal connection linking their alleged injury to golf course operations and management.  Plaintiffs have not even attempted to demonstrate that San Francisco's activity at Sharp Park has reduced the frog population there to the extent it would adversely affect their members' opportunity to observe the frogs in and around Sharp Park.  Having presented zero evidence that any snake has been injured since 2005, plaintiffs cannot demonstrate that San Francisco has in any way impaired plaintiffs' members interest in searching for the snake at Sharp Park.

Finally, neither the injunction nor the declaratory relief plaintiffs seek would redress any cognizable injury.  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  The relief plaintiffs seek would not enhance their opportunities to observe the frogs in and around Sharp Park or their opportunities to continue their searches for the "elusive" snake.[3]

---

[3]  Although they do not allege this interest in their complaint, two member declarations supporting plaintiffs' unsuccessful preliminary injunction motion claim emotional distress at the idea that golf course operations may harm individual frogs.  Goodale Decl. ¶ 20 (Dkt #55-3); Pilgrim Decl., ¶ 10 (Dkt # 55-4).  Given the frog's low position in the food chain and the frog's inevitable high mortality rate resulting directly from the species' evolutionary strategy, the Court may properly dismiss this asserted basis for standing.  Indeed, one member explained she enjoys watching predator species hunt the frogs in Sharp Park.  "In the natural food chain birds I enjoy viewing, like Great Blue Herons, eat the Frogs (who are also eaten by the Snakes)."  Graham Decl., ¶ 7 (Dkt #60-6).

Plaintiffs cannot create a triable issue of fact to support *any* of the three essential elements of standing. Their failure as to any one of these three essential elements would be fatal to their claims. San Francisco is therefore entitled to summary judgment.

## II. PLAINTIFFS CANNOT ESTABLISH REASONABLY CERTAIN THREAT OF IMMINENT HARM TO THE SAN FRANCISCO GARTER SNAKE AT SHARP PARK

To prevail in this action on the merits, plaintiffs must establish that continued golf course operations pose "a reasonably certain threat of imminent harm" to the San Francisco garter snake in Sharp Park. *E.g.*, *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 1998); *Marbled Murrulet v. Babbitt*, 83 F.3d 1060, 1068 (9th Cir. 1996). Photographs of a dead snake from 2005 fall so far short of the necessary showing of a reasonably certain threat of imminent harm that no reasonable trier of fact could find in plaintiffs' favor.

The citizen suit provisions of the Endangered Species Act address only current conduct, not past conduct. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (Clean Water Act citizen suit provisions, which track Endangered Species Act's citizen suit provisions, prohibit a citizen suit for "wholly past violations."). *Cf. Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 535 F.3d 1026, 1035 (9th Cir. 2008) (an injunction under the Endangered Species Act "is forward looking, and is intended to prevent a defendant from taking an endangered or threatened species"). Moreover, evidence of past harm when obsolete policies and practices were in place are irrelevant, because such evidence will not support any inference that *current* policies and practices are likely to harm the snake. *See Nat'l Wildlife Fed'n v. Burlington N.R.R., Inc.,* 23 F.3d at 1512 ("The fact that no bears have been killed by BN trains in three years [since the cleanup] supports an inference that the cleanup was effective."). Likewise, the absence of any evidence that a mowing machine or golf cart has harmed a single San Francisco garter snake at Sharp Park in seven years demonstrates that existing measures to protect the snake have been effective.[4]

---

[4] Plaintiffs argue that because the California red-legged frog is an important prey species for the San Francisco garter snake, that harm to the frog also causes harm to the snake. Emery Decl., Exh. B (Hayes Expert Report ¶ 39); Exh. C (Dexter Expert Report ¶ 40). The undisputed evidence, however, establishes that the frog population at Sharp Park is thriving. *See* Background, Part II, *supra*. Any disputed issues of fact regarding take of individual frog egg masses cannot support plaintiffs' theory that San Francisco has harmed the snake by depriving it of its food supply.

1  The Court must reject plaintiffs' speculation that for the past seven years, scavengers have

2  systematically scoured the golf course and removed the undetected remains of dead snakes.  Rule 702

3  of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

8  Fed. R. Evid. 702.

9  Rule 702 requires a trial court to ensure that scientific evidence admitted is both relevant and

10 reliable.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert*").  In *Daubert*,

11 the Supreme Court held that the subject of the expert testimony must be scientific knowledge.  *Id*. at

12 589-90.  The Court explained that "in order to qualify as 'scientific knowledge,' an inference or

13 assertion must be derived by the scientific method.  Proposed testimony must be supported by

14 appropriate validation – *i.e.*, 'good grounds,' based on what is known."  *Id*. at 590.

15 The purpose of *Daubert*'s gate keeping requirement is "to ensure the reliability and relevancy

16 of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional

17 studies or personal experience, employs in the courtroom the same level of intellectual rigor that

18 characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael,* 526 U.S.

19 137, 152 (1999).  "It is the proponent of the expert who has the burden of proving admissibility."  *Lust*

20 *v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  The party presenting an expert must

21 demonstrate that the expert's findings are based on sound principles and that they are capable of

22 independent validation.  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995), on

23 remand from *Daubert*, 509 U.S. 579 (1993).

24 Both Dr. Hayes and Ms. Dexter assert they believe both Frogs and Snakes are regularly killed

25 by mowers and golf carts at Sharp Park, even though no dead Frogs have *ever* been observed at Sharp

26 Park, and only a single dead snake has been found (and the death is from an uncertain cause at an

27 uncertain location) in 2005.  *See* Declaration of Marc Hayes, filed Sept 23, 2011 ("Hayes Decl").,

28 ¶¶45-49 (Dkt #60-3); Declaration of Wendy Dexter, filed Sept 23, 2011 ("Dexter Decl."), ¶¶22-25

(Dkt #60-4).  Dr. Hayes and Ms. Dexter rely on a scientific article that investigated different species in a different environment, namely, Bald Head Island, a barrier island in North Carolina.  Hayes Decl., Exh F (DeGregorio, 2011) (Dkt # 60-3).  Dr. Hayes and Ms. Dexter cite a second article that investigates scavenging of snake carcasses and dead chicks along Florida's mid-Atlantic Coast. (Antworth 2005)  The Bald Head Island study suggests that golf carts are responsible for killing four species of snakes: Rough Green Snakes, Black Racers, Yellow Rat Snakes and Scarlet Snakes. Plaintiffs have not presented any evidence that the habits of the species on Bald Head Island are comparable to the secretive habits of the "elusive" San Francisco Garter Snake.  Plaintiffs have not produced any evidence that the golf cart use restrictions at Sharp Park are comparable to the golf cart rules on Bald Head Island.

At Bald Head Island, scavengers removed half of the snake carcasses within 8 hours.  The results varied significantly between the dune habitat and forest habitat.  Along Florida's mid-Atlantic Coast, scavengers removed half of the snake carcasses within 4 hours; and two-thirds of the snake carcasses within 8 hours.

Dr. Hayes' and Ms. Dexter's reliance on a publication addressing different snake species in different habitats is "inconsistent with reliable or generally accepted scientific methods."  Murphy Decl., ¶ 33 (Dkt #66).  Dr. Murphy cites to several published, peer-reviewed scientific articles establishing the principle that it is inappropriate to use data regarding behavior of one species in response to a particular environmental factor to predict the behavior of another, distinct species, without first determining whether the two are likely to respond in the same manner.  *Id*.  Dr. Hayes and Ms. Dexter neither refute this well-established principle in conservation biology nor indicate that they have established that the species they are comparing will respond similarly to the relevant environmental factor (here, the operation of golf carts).  Therefore, their testimony is based in reasoning and methods that are not scientifically valid and do not enjoy general acceptance in the scientific community.  As a result, it should be excluded.  *Daubert*, 509 U.S. at 592-594 (describing factors that trial courts may consider when determining whether scientific evidence is relevant and reliable).  Indeed, the authors of the article, on which Dr. Hayes and Ms. Dexter rely, make this very

1   point: "Removal time and scavenging intensity of snake carcasses most likely varies across regions

2   and habitats."  Hayes Decl., Exh. F (Dkt #60-3) (Degregorio 2011.)

3          Because their opinions lack any reliable scientific basis, the Court should disregard the

4   speculation of plaintiffs' retained experts that undetected snake deaths occur regularly at Sharp Park.

5   Even if the Court were to extrapolate from the East Coast studies of other snake species (which it

6   should not because the study itself cautions that data will vary across different habitats and different

7   species), the data from these inapplicable studies show that half of the dead snakes remained for 4-8

8   hours before they were scavenged.  Whenever mowing or golf cart use occurs at Sharp Park, not only

9   are golfers and other members of the public present (including the vigilant members of plaintiff

10  advocacy organizations), but also trained maintenance personnel, golf course staff, and the dedicated

11  wildlife biologists of RecPark's Natural Areas Program.  Given the high volume of human traffic at

12  Sharp Park golf course and the high awareness of the San Francisco garter snake there, the absence of

13  *any* reported "road kill" at Sharp Park for seven years refutes plaintiffs' unsupported speculation that

14  golf carts and mowing machines pose a reasonably certain threat of imminent harm to San Francisco

15  garter snakes at Sharp Park.

16         Because plaintiffs have raised no triable issue of fact that golf course operations pose an

17  imminent risk of harm to the San Francisco garter snake, San Francisco is entitled to summary

18  judgment of plaintiffs' snake claims.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26

27

28

1

**CONCLUSION**

2
    For the foregoing reasons, San Francisco is entitled to judgment.

3
Dated:  March 1, 2012               DENNIS J. HERRERA
                                       City Attorney

4
                                     DANNY CHOU
                                     Chief of Complex and Special Litigation

5
                                     OWEN J. CLEMENTS
                                     JAMES M. EMERY

6
                                     VIRGINIA DARIO ELIZONDO
                                     Deputy City Attorneys

7

8
                          By:_____/s/_____
                                     JAMES M. EMERY

9
                                     NOSSAMAN LLP

10
                                     PAUL S. WEILAND
                                     ROBERT C. HORTON

11
                                     Attorneys for Defendants CITY AND COUNTY
                                     OF SAN FRANCISCO, et al.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28