Brent Plater (CA Bar No. 209555)
WILD EQUITY INSTITUTE
PO Box 191695
San Francisco, CA 94119
Telephone:  (415) 349-5787
bplater@wildequity.org

Eric R. Glitzenstein (D.C. Bar No. 358287)
Howard M. Crystal (D.C. Bar No. 446189)
*Pro Hac Vice*
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C., 20009
Telephone: (202) 588-5206
eric@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| WILD EQUITY INSTITUTE, a non-profit corporation, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>CITY AND COUNTY OF SAN FRANCISCO, *et al.*, )<br><br>Defendants. ) | Case No.: 3:11-CV-00958 SI<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>DATE: APRIL 20, 2012<br>TIME: 9:00 A.M.<br>COURTROOM 10, 19TH FLOOR<br>JUDGE: HON. SUSAN ILLSTON |

April 6, 2012

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

   I.   The Court Should Resolve Plaintiffs' Motion At This Time ............................. 3

   II.  Plaintiffs Have Established A Reasonable Likelihood That RPD Pumping
       Operations At Sharp Park Will Strand And Desiccate CRLF Egg Masses and
       Tadpoles. ................................................................................................ 6

   III.  Plaintiffs Have Also Demonstrated That RPD's Pumping Operations Are Harming
       and Harassing CRLF By Interfering With CRLF Breeding. ........................... 16

CONCLUSION .................................................................................................. 20

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Animal Protection Inst. v. Holston*,
   541 F.Supp.2d 1073 (D. Minn. 2008)............................................... 3, 5, 6, 12

*Arizona Cattle Growers Ass'n v. Fish and Wildlife*,
   Serv., 273 F.3d 1229 (9th Cir. 2001) ................................................... 2, 11

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
   515 U.S. 687 (1995)............................................................................... 19

*Barnes v. Mayfair*,
   759 F.2d 676 (9th Cir. 1985) ................................................................ 14

*Barthelemy v. Air Lines Pilots Ass'n*,
   897 F.2d 999 (9th Cir.1990) .................................................................. 13

*Beard v. Banks*,
   548 U.S. 521 (2006)................................................................................. 6

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................................................. 6

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................. 6

*Chiron Corp. v. Genetech, Inc.*,
   268 F. Supp. 2d 1139 (E.D. Cal. 2002)................................................... 6

*Dependable Highway Exp., Inc. v. Navigators Ins. Co.*,
   498 F.3d 1059 (9th Cir. 2007) ................................................................. 5

*Dept of Land and Nat. Resources*,
   639 F.2d 495 (9th Cir. 1981) .................................................................. 8

*Forest Conservation Council v. Rosboro Lumber Co.*,
   50 F.3d 781 (9th Cir. 1995) ................................................................... 15

*Gaylord v. Nationwide Mut. Ins. Co.*,
   776 F. Supp. 2d 1101 (E.D.Cal. 2011).................................................... 13

*Ka'aini v. Kaua'I Island Utility Coop.*,
   2010 WL 3834999 (D. Haw. Sept. 24, 2010) .......................................... 5

*Kennedy v. Allied Mut. Ins. Co.*,
   952 F.2d 262 (9th Cir. 1991) ................................................................. 10

*Kennedy v. Sila Mason Co.,*
   334 U.S. 249 (1948)..............................................................................5

*Landis v. North Am. Co.,*
   299 U.S. 248 (1936)..............................................................................5

*Loggerhead Turtle v. Volusia County Council,*
   896 F. Supp. 1170 (M.D. Fla. 1995)...........................................5, 13, 16

*Marbled Murrelet v. Babbitt,*
   83 F.3d 1060 (9th Cir. 1996) ......................................4, 13, 14, 15, 22

*National Wildlife Fed. v. Burlington Northern RR.,*
   23 F.3d 1508 (1994)...........................................................................18

*Strahan v. Coxe,*
   127 F.3d 155 (1st Cir. 1997)..............................................................12

*United States v. Town of Plymouth, Mass.,*
   6 F. Supp.2d 81 (D. Mass. 1998).......................................................12

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7, 10 (2008) .......................................................................17

**STATUTES**

16 U.S.C. § 1532(8).................................................................................14

16 U.S.C. § 1536(a)(2)...............................................................................2

**REGULATIONS**

50 C.F.R. § 17.3.................................................................................16, 19

# INTRODUCTION

Although Defendants and Intervenors seek to muddy the water, Plaintiffs' motion for partial summary judgment should be granted based on just a few of the undisputed facts here. *First*, as evidenced by the Egg Mass Datasheets the Recreation and Park Department ("RPD") has attached to its Opposition Brief (which corroborates Plaintiffs' representatives' eyewitness accounts), there is simply no dispute that California red-legged frog ("CRLF" or "Frog") egg masses continued to be stranded and eggs destroyed once again this winter in Sharp Park.  These include Datasheet notations of "stranded" and "desiccated" CRLF egg masses, references to "scattered" and "fragmented" CRLF eggs, and to "embryos decaying."   These notations alone *indicate at least 30 damaged or destroyed CRLF egg masses* this winter alone.  *See infra* at 7.

*Second*, as is evident from accumulated evidence over many years, *each winter* CRLF egg masses are laid in locations where the egg masses or tadpoles will not survive – especially in the absence of the kind of "emergency" relocation efforts on which RPD has relied in the past.  Indeed, according to the RPD's March 14, 2012 Biological Assessment ("March 2012 BA") attached to the City's Opposition Brief, *132 egg masses had to be relocated* in the winter of 2011 alone.  *See* March 2012 BA at 40-41 (San Francisco's Opp. to Pl. Partial Summ. J. Mot. ("City Opp."), Declaration of Lisa Wayne ("Wayne Decl."), Exhibit ("Exh.") C (DN 116-3)). Although RPD previously sought to address its ongoing take by obtaining the U.S. Fish and Wildlife Service's ("FWS") ad-hoc approval to relocate the at-risk CRLF egg masses that staff were able to locate, in a December 8, 2011 letter that Defendants and Intervenors conspicuously ignore, the FWS instructed that RPD may *no longer relocate egg masses in Sharp Park* until such time as RPD finally "obtain[s] incidental take coverage" in the manner contemplated by

the ESA.  *See* Pl. Mot. for Partial Summ. J. ("Pl. Mot."), Declaration of Howard Crystal ("Crystal Decl.") (DN 103), Exh. 1.

      *Third*, as the FWS and RPD itself have recognized for many years, these CRLF egg masses and tadpoles are placed at risk *due to RPD's pumping operations in Sharp Park*, which every year pumps *millions* of gallons of water from the wetlands ecosystem.  In fact, recognizing that these activities take CRLF, RPD has requested initiation of formal consultation under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), *in order to finally obtain FWS authorization for this take*.  Accordingly, although overwhelming evidence (and simple logic) demonstrates that RPD's annual, massive withdrawals of water from a *wetlands ecosystem* are the underlying cause of stranding events and fundamentally alter that ecosystem, the Court need look no further than the March 2012 BA, which provides, among RPD's proposed "*mitigation measures for golf course maintenance and operations*," BA at 21 (emphasis added), a proposal for RPD to institute relocation plans for egg masses laid in areas of Sharp Park "that are not sustainable."  *Id.* at 22-23.  In other words, while disclaiming any liability in this Court, in its dealings with the FWS RPD plainly recognizes that it is the operation of the golf course – *i.e.*, pumping operations – that cause many CRLF egg masses to be put in harm's way.  *See, e.g., Arizona Cattle Growers Ass'n v. Fish and Wildlife Serv.*, 273 F.3d 1229, 1242 (9th Cir. 2001) (holding that mitigation measures in a Section 7 consultation may only be imposed *where incidental take is occurring*).

      In light of this reality, Defendants and Intervenors spend much of their briefs urging the Court to *defer* ruling on the City's liability while the City finally pursues a Section 7 Biological Opinion ("Bi-Op") that *might* authorize these takings.  However, especially because this case is plainly the impetus for RPD's decision to embark on a process it should have undertaken years

2

ago – but which it could abandon at any time – staying a ruling on RPD's liability makes no

legal or practical sense.  Indeed, while RPD says that it is in "active consultation" with the FWS,

City Opp. at 14, and claims it submitted a "Final BA" several weeks ago, Wayne Decl. ¶ 16, the

FWS itself has recently indicated – in response to Plaintiffs' inquiry – that the Service has "*not

yet decided" that the BA will be accepted as "final nor whether formal consultation can now be

initiated*" in light of the information supplied by RPD.  *See* Declaration of Brent Plater ("Plater

Decl."), Exh. 1 (Mar. 29, 2012 email from FWS Solicitor Kerry O'Hara to counsel for Plaintiffs

and RPD) (emphasis added).

    Given the uncertainties as to whether or when RPD will obtain the incidental take

authorization it is now seeking, and its insistence on *continuing activities that take CRLF in the

meantime*, the Court should resolve Plaintiffs' motion at this time – which will both help to

ensure that RPD *completes* the consultation process, and will also greatly streamline remaining

pretrial and trial proceedings by allowing the parties and the Court to focus on the appropriate

*remedy* for RPD's take of the CRLF in light of present circumstances, including the status of

any consultation.  *See, e.g., Animal Protection Inst. v. Holston*, 541 F. Supp. 2d 1073, 1077 (D.

Minn. 2008) (rejecting defendants' argument that Section 9 take claim need not be resolved in

light of request for an Incidental Take Permit).

## ARGUMENT

### I.    The Court Should Resolve Plaintiffs' Motion At This Time.

    The Court should reject Defendants' and Intervenors' arguments seeking to avoid a

ruling on Plaintiffs' motion.  Contrary to the City's claim, City Opp. at 2, resolving the CRLF

liability issue on summary judgment will save significant time and resources at trial.  While this

partial summary judgment motion is based on *undisputed* facts largely set forth in agency

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

documents and depositions of RPD's own employees, placing these facts before the Court at trial will take substantial time.

Moreover, given Defendants' anomalous insistence – in contravention of RPD's own past admissions and present efforts to obtain incidental take authorization – that RPD is not reasonably likely to continue taking *any* CRLF through pumping operations (and that, instead, the CRLF's own "indiscriminate" breeding behavior is somehow responsible for strandings of CRFL egg masses), Plaintiffs would also need to call as fact witnesses RPD's pump engineer and lead biologist, and Plaintiffs' representatives who have personally seen stranded egg masses during the winters of 2010-11 and 2011-12.  In response, Defendants will presumably attempt to call witnesses explaining their view of what happened to each and every egg mass that Plaintiffs' witnesses observed stranded.

This parade of witnesses over the fate of individual CRLF egg masses can be avoided if the Court now rules what Plaintiffs respectfully submit is obvious – *i.e.*, that *some* CRLF egg masses will likely be taken in the future as a consequence of RPD's annual removal of millions of gallons of water from the Sharp Park wetlands ecosystem.  Indeed, it is well established in this Circuit that Plaintiffs need not even prove past take in order to prevail on the merits of a Section 9 claim.  *See Marbled Murrelet v. Babbit*, 83 F.3d 1060, 1064-66 (9th Cir. 1996) (rejecting the argument that a plaintiff must prove past take has occurred).  With this liability issue resolved now – as it should be – at least several days of trial testimony can be avoided, and the *only* testimony the Court will need to hear concerning the effect of pumping operations on CRLF egg masses is expert testimony concerning the appropriate *remedy* to address this form of take until and unless RPD obtains incidental take authorization.

4

As for Defendants' argument that the Court should decline to rule on Plaintiffs' motion because RPD is finally seeking to initiate formal consultation for its take of CRLF (*see* City Opp. at 14-15; Intervenors' Opp. to Pl. Partial Summ. J. Mot. ("Int. Opp.") at 3-5), as another court explained in rejecting this precise argument, "Plaintiffs have a right to seek relief [on a Section 9 claim] *until such time* as the permit [authorizing incidental take] *is issued*."  *Holsten*, 541 F. Supp. 2d at 1077 (emphasis added); *see also Loggerhead Turtle v. Volusia County Council*, 896 F. Supp. 1170, 1177 (M.D. Fla. 1995) ("the pendency of the permit application" is "irrelevant to the question of whether or not the [Defendant's] activities will result in the taking of a protected species").

Moreover, as the Court of Appeals has cautioned, a court considering a stay request must consider whether the stay would be for a *finite duration*.  *E.g.*, *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (citing *Landis v. North Am. Co.*, 299 U.S. 248, 256 (1936)).  Here, since the FWS has still not even agreed that RPD has submitted sufficient information to *initiate* formal consultation, *see* Plater Decl., Exh. 1, there is certainly no basis on which to predict when a Bi-Op may issue, let alone what it will authorize. Accordingly, the one case relied on by Defendants, in which the FWS's authorization was in fact "imminent," is facially distinguishable.  City Opp. at 14 (citing *Ka'aini v. Kaua'I Island*

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

1    *Utility Coop.*, 2010 WL 3834999 (D. Haw. Sept. 24, 2010) (staying case where incidental take

2    authorization would occur in a few months)).[1]

3           Accordingly, there is no basis to stay or defer consideration of Plaintiffs' motion here.[2]

4    **II.    Plaintiffs Have Established A Reasonable Likelihood That RPD Pumping
            Operations At Sharp Park Will Strand And Desiccate CRLF Egg Masses
5           and Tadpoles.**

6           Defendants simply ignore the most crucial facts demonstrating that future take of CRLF

7    through pumping operations is likely to continue.  To begin with, while Defendants try to

8    discount the continuing take of CRLF egg masses at Sharp Park this winter, the Egg Mass

9    Datasheets attached to RPD's brief tell a very different story.  Thus, Jon Campo's Datasheets

10

11   _____

12          [1]      Contrary to the City's suggestion, the fact that the FWS has not brought its own
     enforcement action, see City Opp. at 5, is also legally irrelevant, as the Supreme Court has
13   made clear.  *E.g.*, *Bennett v. Spear*, 520 U.S. 154, 165 (1997) (explaining that the ESA citizen
     suit provision has "the obvious purpose [ ] to encourage enforcement by so-called 'private
14   attorneys general'").

15          [2]      Defendants also request a delay due to an alleged "evolving legal and factual
     landscape."  City Mot. at 3-4 (citing *Kennedy v. Sila Mason Co.*, 334 U.S. 249 (1948)).
16   However, where – as here – there is no genuine issue of material fact "the law *requires entry
     of judgment*" in the movant's favor.  *Beard v. Banks*, 548 U.S. 521, 524 (2006) (emphasis
17   added) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  In any event, all that has
     "evolved" here is the City's changing defense of its ongoing take – first erroneously telling the
18   Court that take of CRLF from pumping operations *has* been authorized by the FWS, *see* Pl.
     Mot. at 18, n.22 (citing earlier briefing), and now (given that the FWS has made it absolutely
19   clear that it has *never* authorized these activities, *see id.*) arguing that a ruling is not necessary
     because that authorization is coming very soon – which the FWS's own recent statement also
20   contradicts.  This is certainly not the kind of "evolution" that warrants the Court declining to
     rule on summary judgment, and defendants' citations do not suggest otherwise.  *See, e.g.*,
21   *Chiron Corp. v. Genetech, Inc.*, 268 F. Supp. 2d 1139, 1148 n.6 (E.D. Cal. 2002) (cited by the
     City, but simply holding that the court would not identify facts as established for trial *after*
22   denying a motion for summary judgment).

23          Similarly, far from establishing a precedent with "nationwide impact," as the City
     asserts, City Opp. at 3, a ruling that RPD's pumping operations contravene Section 9 until and
24   unless appropriately authorized would be entirely consistent with many similar rulings in other
     ESA Section 9 cases, *e.g. Holsten*, 541 F. Supp. 2d 1073, as well as with the entire premise of
25   RPD's Section 7 consultation *seeking authorization for this ongoing incidental take*.

26

27

28
                                                6
                                                        Plaintiffs' Reply In Support
                                                        Of Motion For Partial Summary Judgment

show that on January 31, 2012 RPD staff identified three "stranded" CRLF egg masses (Campo Decl., Exh. B (DN 115-2) at 11 (CCSF97045, indicating with a circled "yes" that egg mass numbers 42, 44, and 46 were stranded)), two CRLF egg masses that were "fragment[s]" (*id.*, numbers 30 and 32), and another *13 egg masses* that had "scattered eggs." *Id.* at 12 (in entry for number 86). A few days later, on February 3, 2012 RPD staff identified another CRLF egg mass that was "stranded/dessicated" on the east side of Laguna Salada. *Id.* at 15 (CCSF97049); *see also id.* at 18 (CCSF097052) (noting egg mass number 98 "stranded" on February 8, 2012); *id.* at 24 (CCSF097058) (noting egg mass numbers 188, 120, and 122 "fragmented"). Similarly, Eric Britt's Datasheets show that on March 7, 2012 he identified a "damaged" CRLF egg mass (Britt Decl. (DN 117), Exh. B. at 17 (CCSF097183)); Cole Paris's Datasheets show that on January 30, 2012 surveyors identified egg mass number 7 stranded (Paris Decl. (DN 119), Exh. B at 8 (CCSF097164)); and Natalie Reeder's Datasheets show that on February 14, 2012 surveyors identified 5 egg masses that were either "separated into individuals, laying on bottom," "scattered," or, in one instance, as egg mass with "embryos decaying in some eggs." Reeder Decl. (DN 120), Exh. B at 10 (CCSF097166). In total, Defendants' own records document at least 30 CRLF egg masses damaged or destroyed in Sharp Park this winter season alone.[3]

　　　　Faced with these facts, RPD tries to shift blame from its pumping activities to nearly anyone else, including the Frog. To RPD, Frogs that lay eggs on the *east* side of Laguna Salada have no one but themselves to blame when their egg masses are killed by water drawdown,

---

[3]　　　　Although Plaintiffs continue to believe that, notwithstanding FWS's instructions, some CRLF egg masses may have been moved this winter, Defendants' submission certainly makes that issue irrelevant here.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

because those areas are not sustainable habitat.  Yet when the Frog lays egg masses on the *west* side of Laguna Salada (as many did this year) the City also blames the Frog for its own demise, because, the City now claims, *those* areas are subject to too much disturbance from off-leash dogs.  City Opp. at 8.[4]

In fact, the overwhelming evidence demonstrates that *RPD is responsible* for the ongoing stranding of CRLF egg masses in Sharp Park.  In particular, Defendants ignore the massive amounts of water that RPD pumps from the Sharp Park wetlands each winter, thus unavoidably impacting habitats and locations in which CRLF breed.  *See* Pl. Mot. at 9.  Thus, as Plaintiffs have explained – and Defendants have not disputed – during the winter of 2010-2011 RPD pumped approximately *195 million gallons* of freshwater from Sharp Park wetlands, Pl. Mot. at 9, and this most recent winter, even with far less rain, RPD was once again pumping large volumes of water from Sharp Park wetlands right when CRLF were laying their eggs – *approximately 7 million gallons from January 3, 2012 to January 23, 2012; another 2.2 million gallons from January 23 to January 28; and another 500,000 gallons in the several days after CRLF egg masses had been detected on January 28th.*[5]  Plainly, had these pumping operations not removed vast amounts of water from the system, as a matter of basic physics, CRLF egg masses laid in wet areas would not have become stranded.  Indeed, if RPD had not operated the pumps in 2012 water levels would have *increased to approximately 8.5 feet NAVD in January*

---

[4]        Indeed, the City has not suggested where in the Laguna Salada wetland complex a "rational" Frog should breed, particularly in light of the overgrowth of vegetation that has removed previous Frog breeding areas – and for which RPD is also responsible.

[5]        These numbers are derived from the updated Pump Log Defendants have submitted, *see* City Opp., Declaration of John Ascariz, Exh. A (DN 133), using the same methodology Plaintiffs used in their opening brief to convert pump hour readings into gallons of water.  Pl. Mot. at 9.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

*2012* – rather than ending that month at 7.3 feet NAVD, as the City acknowledges.  City Opp. at 8.[6]

RPD's claim that it endeavors to maintain constant water levels, City Opp. at 8, is also highly misleading.  As explained in plaintiffs' opening brief and undisputed by defendants, to prepare for the rainy season, RPD significantly *lowers* the water level in the entire wetlands ecosystem in order to prevent flooding of the golf course.  *See* Pl. Mot. at 20. Further, as the City's pump engineer has testified, to avoid rapid oscillation of the pumps the on and off levels are set so that, once off, the pumps do not come back on until the water level has gone 3.6 inches higher, see Pl. Mot. at 8 – which means that, rather than maintaining stable water levels as RPD claims, even its regular operations are *constantly altering water levels in Sharp Park*.[7]

Moreover, even aside from this winter's compelling evidence, myriad other RPD documents recognize that pumping operations strand CRLF egg masses, *see* Pl. Mot. at 16-17, and, most important, the expert federal agency, the FWS, has strenuously and repeatedly

_____

[6]      This is because each 325,851 gallons pumped is equivalent to 1 acre-foot, and thus Defendants' pumping of  9.7 million gallons of water in January 2012 was more than 29 acre-feet (9,700,000 / 325,851).  *See* Supp. Declaration of Greg Kamman (DN 79-4), Exh. E at 1-2 (chart submitted in support of Plaintiffs' Preliminary Injunction Motion, showing that adding 29 acre-feet to the wetlands system beginning at 7.3 feet NAVD (as indicated on Day 91 of the chart, with a total of just under 50 acre-feet of water) would yield a water level of approximately 8.5 feet NAVD (as indicated on Day 45 of the chart, where 78 acre-feet is shown to reflect water levels of 8.49 feet NAVD)).  However, these precise numbers merely corroborate what is dictated by common sense – if one removes a large quantity of water from an area, more of the area will be dried up than otherwise would be the case.  Indeed, that is exactly *why* RPD engages in massive water withdrawals every year.

[7]      This variation alone explains the fate of egg mass number 22, which was identified in 7 cm of water on January 27, 2012 (Campo Decl., at 8 (CCSF097042) (see column on water depth)), and then "desiccated" a week later on February 3, 2012.  *Id.* at 15 (CCSF097049).  Even aside from the fact that the pump in Horse Stable Pond was on for more than eight hours between those dates, *see* Ascariz Decl., Exh. A at 10 (CCSF097030), the mere water fluctuation of over 3 inches (approximately 9 cm.) would have taken this egg mass in and out of the water as the pump turned on and off.

admonished RPD that its pumping operations cause the take CRLF egg masses at Sharp Park. *See* 61 Fed. Reg. 25,825 (identifying this problem in listing the CRLF); Letter of Feb. 1, 2005 (Crystal Decl., Exh. 14) (reiterating problem in 2005); Feb. 18, 2011 FWS email (Crystal Decl., Exh. 15 at 1) (admonishing RPD that "pumping with the current rains" risks "take, such as additional strandings"); Mar. 4, 2011 FWS email (Plater Decl., Exh. 3) ("The water level at Laguna Salada and Horse Stable Pond may be influenced by the requirement to operate pumps" and "need[s] to be addressed in a formal consultation with the FWS"); *see also, e.g.*, Defendants' Response to Plaintiffs' First Set of Interrogatories at 3 (Crystal Decl., Exh. 26) (admitting that "water level variations after heavy rains *have put Frog egg masses at risk*") (emphasis added). Based on this record, there is simply no basis for Defendants' claim that Plaintiffs' have failed to establish a reasonable likelihood that this form of take is likely to continue.[8]

_____

[8]     Defendants' contention that strandings prior to 2009 are not relevant because RPD did not implement its current "water management procedures until after the 2008 breeding season" is also specious. City Opp. at 5 n.1. In response to the letter the FWS sent RPD in 2005, RPD told FWS that it would endeavour to "maintain a relatively stable water level of 5 to 6 inches over" CRLF egg masses. Crystal Decl., Exh. 11. Thus, as Ms. Wayne testified, it was after 2005 that RPD developed the protocol whereby she communicates water levels to the stationary engineer once CRLF egg masses are identified. Wayne Deposition at 44-45 (Crystal Decl., Exh. 6). Yet, as Plaintiffs have demonstrated and RPD has admitted, strandings of CRLF egg masses have continued well after 2005. Pl. Mot. at 15-16.

No new protocol was implemented after that time. Thus, as Ms. Wayne testified, the only change that has occurred since that protocol was first implemented is purportedly "better responsiveness" by the pump engineer to her requests for changes in water levels. Wayne Dep. at 44-45; see also Wayne Decl. ¶ 7. Since, as Defendants have argued, the Court may not rely on a subsequent declaration to contradict a prior deposition, *see* San Francisco's Mot. for Summ. Jud. (DN 98) at 4 n.2 (citing *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)), the Court should certainly disregard Ms. Wayne's new assertion that management of pump operations has "substantially improved" since 2008. Wayne Decl. ¶ 7. In any event, Defendants themselves have conceded that many CRLF egg masses continue to

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

Indeed, RPD's own recognition of its responsibility for this ongoing take is also why – in response to this suit – the agency is now finally seeking a Section 7 Biological Opinion to authorize incidental take from golf course operations, including pumping.  In fact, in response to the FWS's directive that to initiate the consultation process RPD must prepare a BA that includes "detailed conservation measures to *avoid and minimize* effects to listed species," *see* Jan. 18, 2012 letter from FWS (Crystal Decl., Exh. 17) (emphasis added), RPD prepared a BA that, as noted, includes relocating egg masses as a "mitigation measures" for RPD's pumping operations, March 2012 BA at 21-22, and RPD argues here that this and other measures will be incorporated into a "Biological Opinion, which will include an Incidental Take Statement . . . ." City Opp. at 14.  However, particularly since the Ninth Circuit has held that such measures can only be imposed if there is in fact *liability for take*, *Arizona Cattlegrowers*, 273 F.3d at 1242, RPD's actions in the consultation process simply serve to reinforce its ESA liability.[9]

As for Defendants' argument that some CRLF egg masses laid on the *west* side of Laguna Salada this winter were destroyed by dogs allowed to run off-leash in the area, City

be at grave risk, which is why RPD sought the FWS's permission to relocate them as recently as the winter of 2011.

[9]      The earlier draft of the BA had provided that when these at-risk egg masses are detected RPD would simply "apprise USFWS of the situation, and provide USFWS with *an opportunity to request that the City implement protective measures*" including relocation, Draft BA at 23 (Crystal Decl., Exh. 18) (emphasis added).  The most recent BA, by contrast, amends this language to affirmatively require RPD to "propose a relocation plan for the USFWS for review and approval," including details concerning habitat, location and CRLF egg mass numbers, and provides that no relocations will occur "without approval of the USFWS."  Mar. 2012 BA at 23.  This change further demonstrates RPD and FWS's *recognition* that RPD is responsible for these conditions.  *See also* Mar. 29, 2012 FWS email (Plater Decl., Exh. 1) (noting that FWS has recently told RPD that it is inappropriate to characterize its pumping operations "as a benefit to the frog"); *see also* Mar. 2012 BA at 50 ("Operation of the pumps has the potential to harm CRLF by lowering the water level in HSP [Horse Stable Pond] during the breeding season and exposing egg masses to the air causing desiccation").

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

Opp. at 8, even aside from the fact that this concerns only *some* of the stranded egg masses in this area[10], this is no defense to Plaintiffs' claim in any event. As Ms. Wayne explains in her most recent declaration, RPD officials "regularly see" people exercising dogs in this area where CRLF egg masses were laid as a result of RPD's pumping operations, and yet RPD does nothing to stop people from running their dogs there. Wayne Decl. ¶ 11; *see also* City Opp., Declaration of Karen Swaim ("Swaim Decl.") (DN 122), ¶ 12 ("I regularly see people exercising their dogs off-leash along Laguna Salada, with the dogs running through the muddy 'beach' into and out of the water along the western edge of Laguna Salada, chasing and receiving balls and other dog toys"); *id.*, Declaration of Dave Tannaci (DN 123) ¶ 5 ("Each time I have been at Sharp Park this season, I have observed dogs off-leash in the muddy 'beach' area on the west side of Laguna Salada"); *id.*, Britt Decl. (DN 117) ¶ 7 (discussing a "tag right behind the dog [in this area] indicating the presence of a CRLF egg mass").[11]

As many courts have concluded, however, a government entity is responsible for take by a third party where the agency has at least tacitly permitted that activity to occur. *See, e.g., Palila v. Haw. Dept of Land and Nat. Resources*, 639 F.2d 495, 497-98 (9th Cir. 1981) (state liable for allowing feral goats and sheep to impair listed species' habitat); *United States v. Town of Plymouth, Mass.*, 6 F. Supp. 2d 81, 91 (D. Mass. 1998) (city liable for off-road vehicles injuring listed protected birds); *Holston*, 541 F. Supp. 2d at 1080 (rejecting defense that state is not responsible for third party actions); *Strahan v. Coxe*, 127 F.3d 155, 163 (1st Cir. 1997)

---

[10]    Notably, none of the photographs Plaintiffs' representatives took of stranded egg masses in this area this winter show dog prints or other indications of dogs in the area. Declaration of Erica Ely ("Ely Decl."), Exh. B-D; Declaration of Cory Singer ("Singer Decl."), Exh. A.

[11]    Tellingly, in their effort to blame this take on the dogs, RPD has for the first time renamed this area "dog beach." Campo Decl. Ex C.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

(state responsible for take of right whales caused by fisherman); *Loggerhead Turtle*, 896 F. Supp. 1170 (city responsible for lighting causing take of sea turtles).  As these cases demonstrate, an entity cannot place a listed species in harm's way and then insulate itself from Section 9 liability by blaming another party.

Accordingly, in addition to RPD's take through pumping operations, RPD's submissions establish that RPD is also liable for any destruction of CRLF egg masses that is done by off-leash dogs, especially since it is RPD's own pumping operations that result in egg mass vulnerability in the very area that RPD now claims is overrun by dogs.  *See* Wayne Decl. ¶ 11 (explaining that the fence along the seawall, which is open for public use, is "*regularly breached by people and their dogs*") (emphasis added).  Indeed, again, in recognition of precisely this problem and RPD's responsibility for it, another of RPD's proposed "mitigation measures for golf course maintenance and operations" proposed in the March 2012 BA is to "maintain a 3 foot wire-mesh fence along the eastern edge of the seawall, to keep dog walkers" from accessing the wetlands.  March 2012 BA at 27 (item 2.3.26).

In light of all of these undisputed facts, the Court need not rely on *Plaintiffs*' representatives' eyewitness accounts of stranded and destroyed egg masses the past two winter seasons.  Nonetheless, Defendants' arguments concerning sightings of stranded egg masses in 2012 do not withstand scrutiny.  Not only were these individuals certainly capable of identifying CRLF egg masses,[12] but *RPD itself acknowledges at least some of these identifications were*

---

[12]     *See* Ely Decl. ¶¶ 2-3 and Singer Decl. ¶ 1 (detailing their extensive experience); *see also Gaylord v. Nationwide Mut. Ins. Co.*, 776 F. Supp. 2d 1101, 1105 (E.D. Cal. 2011) ("personal knowledge may be inferred from an affidavit based on the nature and position of the affiant's participation in the matters to which he swore") (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir.1990)); *accord* Advisory Committee Note to FRE 701 (layperson may provide evidence based upon a "layperson's personal knowledge" without

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

*valid*.  *See* Swaim Decl. ¶¶ 15-16 (explaining that she also saw the CRLF egg mass Ms. Ely

describes and photographed).[13]

        Defendants' efforts to discount the CRLF egg mass identified as stranded in 2011, City

Opp. at 6, is also unavailing.  RPD does not contest that Plaintiffs' representatives identified a

stranded CRLF egg mass – indeed, RPD *relocated the CRLF egg mass once the agency learned*

*about it*.  *Id*.  Rather, RPD quarrels with whether the egg mass was in fact desiccated.  City Opp.

at 6.  However, since it is undisputed that the egg mass was out of water *for a week*, and RPD

itself has recognized that "[i]f water recedes below the position of the egg masses, eggs will die

after several days," *see* RPD ESA Compliance Plan at 6 (Plater Decl., Exh. 4), this stranding is

also yet further evidence that continued strandings are likely.[14]

---

qualifying as an expert).  Although Intervenors also raise legally irrelevant questions as to
whether particular egg masses were viable, Int. Opp. at 7, the ESA's protective scheme
recognizes no such distinctions, 16 U.S.C. § 1532(8).

[13]       Ms. Swaim's imaginative theory to explain the fate of one particular CRLF egg
mass is of no moment.  Swaim Decl. ¶ 16 (offering "an alternate explanation" for this stranded
egg mass "that during ambiplexus the weight of the pair of CRLF submerged the stiff
normally erect stalk, which served as the attachment site, below the water surface," and once
the two CRLF left, "the stalk elevated the egg mass partially out of the water").  Plaintiffs
need not disprove such unadorned conjecture in order to prevail on summary judgment. *E.g.*,
*Barnes v. Mayfair*, 759 F.2d 676, 681 (9th Cir. 1985) (noting that one opposing summary
judgment is only entitled to "reasonable inferences" that are "based on more than mere
speculation, conjecture, or fantasy").  Indeed, the mere fact that RPD finds it necessary to pose
such speculative scenarios only further serves to highlight that there is no *genuine* dispute on
the relevant legal question here.  Moreover, in an ESA Section 9 case in particular, Plaintiffs
are not required to *prove* that any specific take has occurred in order to prevail, but rather must
simply demonstrate "a reasonably certain threat" of some take in the future.  *E.g.*, *Marbled
Murrelet*, 83 F.3d at 1066.

[14]       It is undisputed that Jewel Snavely identified this egg mass near the water surface
on the edge of Horse Stable Pond on February 21, 21, 2011; that John Bowie saw this egg
mass out of water and exposed to the air on February 22, 2011 and February 23, 2011; and
that Ms. Snavely saw it again exposed to the air and "partially frozen" on March 1, 2011.
Snavely Decl. ¶¶ 2-4; Bowie Decl. ¶¶2-5; *see also* Declaration of Dr. Vance Vredenberg ¶ 23
(DN 60) (expert declaration submitted in support of preliminary injunction motion, discussing

                                        Plaintiffs' Reply In Support
                                        Of Motion For Partial Summary Judgment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Finally, contrary to Defendants' arguments, City Opp. at 1, Plaintiffs need not demonstrate that the pumping operations are causing "any harm to the species" at Sharp Park. City Opp. at 1. Although Plaintiffs' experts believe that such harms to the Sharp Park/Mori Point population are occurring, and will address those issues at trial if necessary, and Defendants' own documents continue to show large numbers of CRLF egg masses dying, to prevail on *this* motion Plaintiffs need merely establish that RPD's pumping operations are reasonably likely to take at least some CRLF egg masses and/or tadpoles in the future. *Murrelet*, 83 F.3d at 1064-66.

Nor would finding RPD liable under Section 9 produce an "absurd result" or push the ESA "past its breaking point," as Intervenors claim. Int. Opp. at 5-6. While it is evident in this case that *large numbers* of CRLF egg masses are being taken at Sharp Park due to RPD's pumping operations, courts in this and other circuits have had no difficulty finding defendants liable under ESA Section 9 based on the take of even a *small number* of a protected species. *E.g.*, *Murrelet*, 83 F.3d 1060; *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995). As the Court of Appeals has emphasized, Congress defined "take" in the "*broadest possible manner* to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife," and finding liability for *any take* of imperiled species is vital because "[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Id.* at 784-85 (emphasis added).

---

observation of this same CRLF egg mass). It is similarly undisputed that between February 20, 2011 and March 2, 2011, RPD operated the large pump for approximately 68 hours and the small pump for approximately 140 hours. *See* RPD Pump Log (Crystal Decl. Exh. 13) at 85-87 (showing large pump had run for 68 hours between these dates (218.1 - 150.3) and the small pump for 200 hours (680.2 – 539.4)).

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

Accordingly, while the question of species or population-level impacts is relevant to the FWS'

decision as to whether and on what terms to *authorize* take to occur, and even perhaps to the

Court's crafting of an appropriate remedy, those issues have no legal relevance to whether there

is a violation of Section 9 in the first instance. *See, e.g., Loggerhead*, 896 F. Supp. at 1177

(explaining that in considering a Section 9 claim "[t]he Court shall not have to determine

whether [Defendants' activities] effectively minimize harm to the species, or determine to what

degree the County's activities will affect the ability of the sea turtles to recover in population.

Instead, the Court is called upon to ascertain whether the County's activities will likely result in

future takings of protected sea turtles").

### III.   Plaintiffs Have Also Demonstrated That RPD's Pumping Operations Are Harming And Harassing CRLF By Interfering With CRLF Breeding.

Defendants' efforts to avoid their responsibility for fundamentally altering CRLF

breeding habitat in Sharp Park, thus "harming" and harassing" the species within the meaning of

the ESA, 50 C.F.R. § 17.3, also do not withstand scrutiny.  City Opp. at 1-14.  Again, just a few

of the undisputed facts here demonstrate this form of take is also occurring.[15]

---

[15]     RPD's liability for its habitat modifications is not somehow avoided by the existence of the seawall, as the City suggests (City Opp. at 1).  The seawall destroyed the natural dune like environment that historically allowed freshwater to flow to the ocean while also maintaining wetlands in the Park area.  Nonetheless, that issue is irrelevant because RPD is responsible for its current operations under current conditions.  Indeed, the FWS created a "safe harbors" program precisely because it recognized that, absent FWS authorization, landowners would be responsible for take even if their affirmative actions created beneficial conditions for species.  64 Fed. Reg. 32717 (1999) (explaining that, absent FWS approval, "[l]andowners whose properties support endangered or threatened species as a result of their positive, voluntary conservation efforts might violate section 9 of the Act *if they significantly develop, modify, or manage those properties in a way that subsequently causes incidental take of those species*") (emphasis added).

Similarly, Defendants' discussion of the likely effect of a pumping moratorium, *see, e.g.,* Swaim Decl. ¶¶ 6-9, is entirely irrelevant to this motion, which simply seeks a declaration that

*First*, Defendants do not dispute their efforts to pump down Sharp Park wetlands to low levels before the rainy season begins in order to increase flood storage capacity.  *See* Pl. Mot. at 20.  Indeed, shortly before this winter's rains in late January 2012, RPD pumped the water levels down to *1.2 feet on RPD's gauge*.  *See* Ascariz Decl., Exh. A (DN 133) at CCSF97029 (Pump Log entry for January 11, 2012: "readjusted floats to pump water down to 1.2").

*Second*, Defendants also do not dispute that lower water levels encourage the growth of dense vegetation that *removes aquatic areas from use for CRLF breeding*.  *See* Pl. Mot. at 21.  Indeed, RPD acknowledges that "bulrush and cattails are less likely to proliferate in deep waters," City Opp. at 12, and Lisa Wayne has explained that "with the loss of open water habitat due to the spread of emergent vegetation, CRLF have begun to preferentially deposit egg masses in shallow seasonally wet areas adjacent to the golf course."  May 10, 2011 RPD letter to the FWS (Plater Decl., Exh. 2).

*Finally*, it is undisputed that RPD seeks to address this form of take by obtaining authorization from the FWS to *remove* this dense vegetation.  *See* March 2012 BA at 12 (explaining that removal of vegetation would "benefit the CRLF by re-establishing open water habitat amongst the emergent vegetation at the wetland margins where CRLF have been known to breed"); *see also* Crystal Decl., Exh. 1 (rejecting RPD's application for a Section 10 recovery

_____

pumping operations violate the ESA.  *Cf. Winter v. Natural Res. Def. Council*, 555 U.S. 7, 10 (2008) (noting a court's flexibility in crafting injunctive relief).  Indeed, Defendants' suggestion that the only appropriate remedy would be additional surveys for CRLF egg masses, City Opp. at 10, simply highlights that it is premature to consider appropriate remedies and that at this juncture the Court should simply focus on whether further take is likely.  Nonetheless, Defendants' argument that current survey efforts are all that is necessary is contradicted by Karen Swaim, who recognizes that "[d]etectability of egg masses is dependant on lighting conditions, turbidity of the water, and age of the egg mass."  Swaim Decl. ¶ 13.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

permit to conduct "habitat restoration activities" by removing this vegetation). However, again, unless and until RPD actually obtains this authorization, its ongoing management of pumping operations that encourage the growth of this vegetation harms and harasses CRLF.

Moreover, contrary to Defendants' claims to the Court here, City Opp. at 13, in its correspondence with the FWS RPD has frankly acknowledged that this vegetation growth *is* impairing CRLF recovery. Thus, in its August, 2011 application to the FWS to remove this vegetation (which was rejected in the FWS's December 8, 2011 letter), RPD represented that removal of this vegetation is necessary because bulrushes and cattails "can grow densely on shallow water shelves and adjacent uplands where the CRLF has historically deposited eggs," which "appears to preclude egg mass laying making the habitat *incompatible with species recovery and preservation*." Aug. 25, 2011 RPD Application at CCSF 44,222 (Crystal Decl., Exh. 16) (emphasis added). This is consistent with the views of *Defendants'* expert, who has explained that "most of the former patches of open water in and around Laguna Salada are choked with a thick and overgrown mat of tules and cattails, displacing optimal frog breeding ground and resulting *in less favorable habitat for the Frog*" over the long term. Mark Jennings Expert Report (Plaintiffs' Rule 56(d) Declaration (DN 111), Exh. E) at 21, ll.21-24 (emphasis added); *see also* Dennis Murphy Expert Report (*id.*, Exh. G (emphasis added) at 8 (explaining that former approach of emergency relocations of egg masses laid in unsustainable habitats due to changes in wetlands vegetation, and which may no longer continue, have "likely contribut[ed] to *many thousands of frogs surviving into later life stages*") (emphasis added).[16]

---

[16]     Accordingly, the case relied on by Defendants, explaining that the "harm" standard is met with habitat modifications that are retarding a species recovery, fully supports Plaintiffs' position here. *See* City Opp. at 11 (citing *National Wildlife Fed. v. Burlington Northern RR.*, 23 F.3d 1508, 1513 (9th Cir. 1994)). Moreover, in that case it was clear that

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

In any event, because these habitat modifications are *causing* CRLF to lay their eggs in unsustainable habitats – be they unsustainable habitats *east* of Laguna Salada, where egg masses were identified as desiccated or destroyed this winter and over 125 were relocated last winter; unsafe habitats *west* of Laguna Salada where they are being pumped dry and destroyed, including, according to RPD, by people being permitted to exercise off-leash dogs in the habitat of a federally listed species; or on the edge of Horse Stable Pond, where desiccated egg masses were also identified the past two winters – this is a textbook example of "harm" under the ESA. 50 C.F.R. § 17.3 (defining "harm" to include "significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering"); *cf. Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 709-10 (1995) (explaining that impairing breeding constitutes harm) (O'Connor, J., concurring).  Defendants' promotion of this harmful vegetation also clearly constitutes "harassment" within the meaning of the Act.  50 C.F.R. § 17.3 (defining harassment to include any "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."); *see also Sweet Home,* 515 U.S. at 705 (explaining that the "activities of birdwatchers where the effect of those activities . . . .make[s] it difficult for [birds] to hatch or raise their young"  is harassment) (other citations omitted).

_____

future take of the species was *no longer likely* because of remedial actions undertaken by the defendant, which is plainly not the case here.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the foregoing reasons, Plaintiffs therefore respectfully request that the Court grant their motion for partial summary judgment at this time.[17]

Dated: April 6, 2012                              Respectfully submitted,

_Brent Plater_

Brent Plater (CA Bar No. 209555)
WILD EQUITY INSTITUTE
PO  Box 191695
San Francisco, CA 94119
Telephone:  (415) 349-5787
bplater@wildequity.org

Howard M. Crystal (D.C. Bar No. 446189)
Eric R. Glitzenstein (D.C. Bar No. 358287)
*Pro Hac Vice*

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C., 20009
Telephone: (202) 588-5206
Facsimile: (202) 588-5049
eglitzenstein@meyerglitz.com
hcrystal@meyerglitz.com

Attorneys for Plaintiffs

---

[17]     In electing to move for summary judgment on this narrow issue, Plaintiffs are certainly not conceding that ongoing take of the San Francisco garter snake is not also occurring, as Intervenors suggest.  Int. Opp. at 2 n.1.   Indeed, while one of Defendants' principal arguments against this take allegation has been that SFGS no longer occupy Sharp Park, in her most recent declaration Karen Swaim discusses her ongoing study of "the SFGS population *that relies in part on Sharp Park.*"  Swaim Decl. ¶ 4 (emphasis added); *see also* March 2012 BA at 50 ("it is assumed that all the wetland habitat area is potentially occupied by the SFGS").  Rather, plaintiffs have simply opted to move for summary judgment on the threshold liability issue as to which they believe there is clearly no genuine factual dispute, and the resolution of which should significantly streamline remaining pretrial and trial proceedings.

Plaintiffs' Reply In Support
Of Motion For Partial Summary Judgment