1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILD EQUITY INSTITUTE, *et al.*,

        Plaintiffs,

  v.

 CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

        Defendants.

_____/

No. C 11-00958 SI

**ORDER DENYING DEFENDANT'S AND DEFENDANT-INTERVENOR'S MOTIONS FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; ISSUING STAY**

     Before the Court are the parties' cross motions for summary judgment. Defendant City and County of San Francisco (the "City") and defendant-intervenor San Francisco Public Golf Alliance ("SFPGA") have filed separate motions for summary judgment on the grounds that plaintiffs do not have standing to pursue their claims, or, in the alternative, seeking a stay while the City begins consultation with the Fish and Wildlife Service. The City also seeks a judgment on the merits that plaintiffs cannot establish reasonably certain threat of imminent harm to the San Francisco Garter Snake (the "Snake"). Plaintiffs, a collection of non-profit conservation grounds, filed a motion seeking partial summary judgment on one issue of liability - whether the City's water pumping activities cause "take" of the California red legged frog (the "Frog").

     A hearing was held on the motions on April 20, 2012. Having considered the papers submitted and the arguments of counsel, the Court hereby DENIES both parties' motions and STAYS plaintiffs' case.

United States District Court
For the Northern District of California

**BACKGROUND**

Plaintiffs filed suit against the City and its officials for violation of the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531-1544.  Plaintiffs allege that defendants' operations and activities at Sharp Park Golf Course have caused the "taking" of the threatened Frog and the endangered Snake, and that therefore defendants must halt their activities or obtain an Incidental Take Permit ("ITP") pursuant to Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B).  Compl. at ¶ 1.  Specifically, plaintiffs contend that defendants' water management at Sharp Park has exposed frog egg masses to the air, causing fatal desiccation of the egg masses, thereby reducing the frog population.  *Id.* at ¶¶ 54-60.  Plaintiffs also claim that other golf course operation  activities -- lawn mowing and golf cart usage among them -- harm the Snake and Frog by running them over or otherwise "harassing" them within the meaning of the ESA.  *Id.* at ¶¶ 54-62.  Along with other relief, plaintiffs seek a declaration that defendants are violating the ESA by illegally taking the Frog and the Snake without an ITP, and an injunction against defendants to prevent ongoing activities allegedly causing take.  *Id.* at 16.  Defendant City owns and operates the park; the Court allowed the SFPGA to intervene as a defendant in this action as well.  Doc. 44.

**1.      The Endangered Species Act**

The Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531, contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened.  *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690 (1995).  Section 9 of the Act makes it unlawful for any person to "take" any endangered or threatened species.  16 U.S.C. § 1538(a)(1)(B).  "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct."  16 U.S.C. § 1532(19).  The U.S. Fish and Wildlife Service's ("FWS") regulations further define "harm" to include any "significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3; see also *Sweet Home*, 515 U.S 687 (upholding FWS' definition of "harm").  The prohibition on take extends to both endangered and threatened species, and includes any "egg or

offspring" thereof.   16 U.S.C.   § 1532(8); *see also* 50 C.F.R. § 17.31(a).   The Ninth Circuit has interpreted the take prohibition to make unlawful "[a] reasonably certain threat of imminent harm to a protected species."  *Marbeled Murrelet v. Pacific Lumber Co*., 83 F.3d 1060 (9th Cir. 1996).

The fact that an activity is likely to "take" a listed species does not necessarily proscribe that activity altogether.   Instead, the ESA allows the FWS to authorize certain types of incidental take. Section 7(a)(2) requires each Federal agency, in consultation with FWS, to insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any listed species; such action requires consultation with the FWS.   16 U.S.C. § 1536(a)(2).   Non-federal entities can pursue a Section 10(a)(1)(B) Incidental Take Permit ("ITP"), which requires the submission of a conservation plan to the FWS.   16 U.S.C. § 1539(a)(1)(B).   The conservation plan requires, *inter alia*, a description of the impact resulting from any take, the reasons why alternatives are not being utilized, and what steps the applicant will take to minimize and mitigate impacts of its actions. *Id.*

**2.    The Protected Animals**

**A.    The California Red-Legged Frog**

The California Red-Legged Frog, *Rana draytonii*, the largest frog native to the western United States, has been lost from over 70% of its historic range, and has suffered a population decline of 90%. See Recovery Plan for the Frog (FWS 2002) (Pl. Mot. for Prelim. Inj. Ex. 17 at 1).   According to one of plaintiffs' experts, the Frog is one of many amphibian species that have endured massive declines in recent decades, and is "currently only found in select coastal drainages from Marin County south to Baja California, with a few isolated populations in the Sierra Nevada and the Transverse ranges." *See* Order Denying Prelim. Inj.   ("Order") at 3 (citing Vrendenberg Decl. ¶ 9).   In 1996, the FWS listed the Frog as a "threatened" species -- i.e., "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20); *see* 61 Fed. Reg. 25,813 (1996).

The Frog breeds in aquatic habitats from November to April.   Vrendenberg Decl. ¶ 8.   "In recent years, the egg masses have been found in Sharp Park beginning in late December." Pl.'s Mot. for Prelim

Inj. at 6; *see, e.g.*, Dec., 2010 Data Sheets (Pl. Ex. 18). The Frog's breeding involves females laying eggs while being fertilized by males, and attaching the eggs to emergent vegetation near the water surface. *Id.*; Vrendenberg Dec. ¶ 8. The egg masses can contain between 2,000-5,000 eggs. The Frogs lay their eggs near the water surface to "maximiz[e] growth potential [through] high water temperatures" and to "minimize[e] exposure to aquatic predators." If left undisturbed, the Frog's eggs hatch within 6 to 14 days, and the tadpoles typically metamorphose into Frogs between July and September. Order at 4 (citing Vredenberg Dec. ¶ 8). According to plaintiffs, "there is a significant breeding population of the Frog at Sharp Park, part of a larger population that includes the Frog in the adjacent Mori Point National Park." *Id.*

### B. The San Francisco Garter Snake

The Snake, *Thamnophis sirtalis tetrataenia*, "is a harmless and fantastically colored serpent identified by its reddish-orange head with red, black, and turquoise blue racing stripes on its sides and back." Order at 4 (*citing* Pl.'s Mot. for Prelim. Inj. at 7). Unlike the threatened Frog, the Snake is listed as endangered, and, according to plaintiffs, is the most endangered serpent in North America; Snake populations remain in only a few fragmented locations. *Id.* The Snake typically eats frogs, including the California red-legged Frog. *Id.* In 2004, four Snakes were captured and released at Horse Stable Pond in Sharp Park. Order at 4 (*citing* Sharp Park Conceptual Restoration Alternatives Report, App. C. 10 (Nov. 2009)). In 2008, two Snakes were observed in Sharp Park near Horse Stable Pond. *Id.* Since that time, there have been no reported sightings of the Snake in Sharp Park. *Id.*

### 3.    Sharp Park

The City owns and operates Sharp Park, which is a public park located in the City of Pacifica in San Mateo County. The Park is approximately 417 acres, and it contains an 18-hole golf course constructed in 1930. The western border of the Park is the Pacific Ocean. A seawall constructed between 1941 and 1952 eliminated the hydrologic connection between the Pacific Ocean and the principal surface water body in Sharp Park, Laguna Salada. The parties dispute whether the water in Laguna Salada was fresh or brackish prior to the construction of the seawall, a pertinent question as to

**United States District Court**
For the Northern District of California

1  whether the protected animals (which cannot live in brackish water) inhabited the area prior to the

2  construction of the golf course.

3        Sharp Park and its golf course are divided by Highway 1.   Residential development abuts

4  portions of the north and south boundaries of the park.  Two portions of the National Park Service's

5  Golden Gate National Recreation Area ("GGNRA") -- Mori Point and Sweeney Ridge -- border Sharp

6  Park to the South and East.  Pl.'s Mot. at 8.  The park includes a wetlands complex, made up of Laguna

7  Salada, Horse Stable Pond, a channel that connects the two water bodies, and adjacent wetlands.

8

9  **4.        Defendant's Allegedly Harmful Activities**

10       **A.        Water Pumping**

11       During winter rains, large volumes of water drain into Sharp Park, raising the water levels in

12  Park water bodies and flooding portions of the golf course.  Order at 5 (*citing* Kamman Hydrology

13  Report, Pl. Ex. 25).  In 1941, a pump system was installed to control the water level in Horse Stable

14  Pond.  Decl. Virginia Elizondo, Ex. 1 (Laguna Salada Resource Enhancement Plan).  Currently, two

15  pumps exist in the pond, a primary pump with the capacity of 1,500 gallons per minute, and a backup

16  pump with a capacity of 10,000 gallons per minute.  The pumped water leaves the Park in pipes through

17  the seawall to an outfall on the beach.  The primary issue in this case is whether the pumping of water

18  lowers water levels from Horse Stable Pond such that it "strands" egg masses laid by the Frog, leaving

19  them to dessicate and die.   A secondary issue with respect to the pumps is whether Frog tadpoles

20  become "entrained" in the pumps and die.

21       Concerns over the effect of the water pumping at Horse Stable Pond on the Frog egg masses

22  have existed for years.  A 1992 letter from an Earth Island Institute  biologist encouraging listing the

23  Frog as "threatened" warned, "Present water management practices at Sharp Park to reduce flooding of

24  the golf course is killing the red-legged frog eggs, probably in violation of the Endangered Species Act."

25  Order at 6 (citing Pl.'s Mot. for Prelim. Inj. Ex. 27 at 1).  The biologist concluded that pumping led to

26  the desiccation of 50 egg masses in Sharp Park.  *Id.*  In the Federal Regulation listing the Frog as

27  threatened, the FWS specifically relied on the 1992 letter, noting that "poorly timed releases of storm

28

5

water from Horse Stable Pond at Sharp Park in February 1992 resulted in exposure and desiccation of 62 California red-legged frog egg masses." 61 Fed. Reg. at 25,825.

In 2005, FWS sent a letter to San Francisco Recreation and Parks Department ("RPD") regarding the effects of the pump operation at Horse Stable Pond. The letter stated that:

> It is our understanding that beginning in early 2003 through 2004 and presently, the operation of a water pump that is controlled by the City and County of San Francisco Recreation and Parks Department (during the winter rainfall events) lowered the water level at Horse Stable Pond and resulted in the stranding and exposure of a number of egg masses of the California red-legged frog. This action apparently caused the death of an unknown quantity of embryonic tadpoles of the completely aquatic early stage of this animal's lifecycle.

Crystal Decl., Ex. 14 (February 1, 2005 Letter from FWS) at 1. The letter went on to describe the definition of take under the ESA, stating that the Frog is protected from actions that damage or destroy its habitat. The FWS then recommended that "in order to avoid further potential violations of the [ESA], we recommend that you obtain authorization for incidental take through either Section 7 or 10(a)(1)(B), as appropriate for the California red legged frog, and also the San Francisco garter snake which also has been documented to inhabit the area." *Id.*

Following the 2005 FWS letter, the City implemented a number of measures designed to mitigate harm to the Frog. One such measure was the creation of a monitoring protocol whereby a staff member would survey the Laguna Salada wetlands complex following any significant rainfall for vulnerable egg masses. Order at 7 (citing Wayne Decl. ¶ 21). Another measure was the creation of the 2009 "Endangered Species Compliance Plan for Sharp Park Golf Course," which enumerated a number of self-imposed regulations, including requiring that "once egg masses are detected [by qualified staff], water levels will not be manipulated by Department personnel such that egg masses would be exposed to air by active water management actions." Order at 7 (*citing* Pl.'s Mot. for Prelim. Inj. Ex. 7 ("Compliance Plan")). Another solution implemented by the City was to physically move vulnerable egg masses with FWS's permission, a process known as translocation. During the winter of 2010-2011, the City found 159 egg masses, and, with authorization, moved 128 of them. However, on December 8, 2011, the FWS informed the City that they no longer had authorization to move the vulnerable egg masses. Crystal Decl., Ex. 1 (Dec. 8, 2011 Letter).

The parties dispute the population trend of the Frog.  While the population has increased over the last 20 years, *see* Order at 8, plaintiffs argue that the population may now be decreasing.  Pl.'s Opp. to Defs.' MSJ at 13 (*citing* Hayes Decl. ¶¶ 60-71).  Plaintiffs point out that the City's translocation efforts, which may have salvaged many of the egg masses, are no longer authorized. *Id.* (citing Murphy Report at 8).

### B.        Mowing and Golf Cart Use

The presence of the golf course in Sharp Park necessarily brings the use of lawn mowers and golf carts.  Plaintiffs argue that the City mows the course near Park water bodies that are "particularly important habitat for the Frog and Snake."  Order at 8 (citing Pl.'s Mot. for Prelim. Inj. at 12).  Plaintiff also provides evidence that golf carts are used both on cart paths and off of them, in violation of the City's own 2009 Compliance Plan. Id. (citing Pl.'s Mot. for Prelim. Inj. Ex. 11).  Plaintiffs argue that use of the vehicles causes ongoing take of the Frog and the Snake.  In support, it provides evidence that in 2005, a Snake was found "after it had been run over by a lawn mower."  Defendants contend that the cause of death of that snake is inconclusive, and, more generally, that neither mowing nor golf cart usage causes take of the Snake or Frog.

### 5.      November 29, 2011 Order Denying Plaintiffs' Motion for Preliminary Injunction

On September 23, 2011, plaintiffs filed a motion requesting a preliminary injunction to halt defendants' water pumping activities, as well as its lawn mower and golf cart usage on holes 9 through 18 of the Golf Course.  On November 29, 2011, the Court denied plaintiffs' motion.  The Court found that plaintiffs failed to establish irreparable injury in the absence of an injunction, one of the necessary requirements to receive a preliminary injunction.  The Court relied on testimony that the Frog population had been increasing, and also found persuasive "defendants' assertions that they will continue careful monitoring of water levels, and continue to seek authorization from FWS for the movement of any vulnerable egg masses." *See* Order at 14.  The Court concluded that irreparable harm was unlikely in consideration of the expansion of the Frog population, coupled with defendants' authorized and careful movement of vulnerable egg masses. *Id.*

**6.      The City's Section 7 Permit Process**

Following the denial of the preliminary injunction, the City sought initiation of formal Section 7 consultation with the FWS.[1]  The consultation the City seeks is for the Sharp Park Pump House Safety and Infrastructure Improvement Project (the "Project"), in conjunction with the U.S. Army Corps of Engineers (the "Army Corps").  The purpose of the project "is to protect the safety of personnel responsible for operating and maintaining the pumps and cleaning the existing screen at the pump house intake."  Crystal Decl., Ex. 17 (Jan. 18, 2012 FWS Letter).  A January 18, 2012 letter from the FWS notes that, "[a]t issue are effects to the threatened California red-legged frog and the San Francisco garter snake."  *Id.*  The letter describes a recent meeting that had occurred between the City and the FWS about the proposed project, and states that the City "will be submitting a biological assessment that provides more details about the pump house project and how it relates to other water management on the Sharp Park Golf Course.  The biological assessment will also include detailed conservation measures to avoid and minimize effects to listed species."  *Id.*  The letter concluded that consultation could not begin until the FWS received the biological assessment.

The City developed a Biological Assessment ("BA"), and submitted a draft version on February 7, 2012.  The BA describes the project as including two parts: (1) the construction action and (2) golf course maintenance and operations.  The BA describes the construction action as "intended to 1) ensure the ongoing operation of the flood control pumps and worker safety when operating and maintaining the pumps 2) to replace minor infrastructure (pathways) and 3) to enhance existing habitat for [the Frog] and [the Snake]."  Crystal Decl., Ex. 18.  At a subsequent March 5, 2012  meeting regarding the draft BA, the FWS suggested that the City provide further information about, *inter alia,* "the operation of the

---

[1]Section 7(a)(2) provides that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency  is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

pumps within the context of golf course operations rather than as a benefit to the frog" and to "describe whether any of the frog's lifestages are entrained by pump operations." Plater Decl., Ex. 1 (Mar. 29, 2012 FWS E-Mail). The City then submitted a revised version of the BA on March 20, 2012. After plaintiffs inquired as to whether formal consultation had then initiated, an FWS official sent an email to the parties on March 29, 2012, stating that "the Service has not yet reviewed the revised BA, and thus has not yet decided whether it is final nor whether formal consultation can now be initiated." *Id.* At oral argument on April 20, 2012, the City's attorneys represented to the Court that consultation may begin within 7 days, at which time the 135-day clock on Section 7 consultation will begin. *See* 50 C.F.R. § 402.14.

**7.      The Instant Motions**

The parties have filed cross-motions for summary judgment. Plaintiffs seek partial summary judgment on one issue of liability - whether the City's water pumping activities causes "take" of the Frog. The City and the SFPGA seek a determination that the plaintiffs' lack standing to bring this suit. In the alternative, defendants seek a stay of this litigation until the FWS completes the Section 7 consultation regarding the Project in Sharp Park. The City also seek summary judgment on the merits that plaintiffs cannot establish reasonably certain threat of imminent harm to the Snake.

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To

carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

## DISCUSSION

The Court first addresses defendants' motions for summary judgment on the issue of standing. The Court will then turn to defendants' request for a stay.

## 1.     Standing

Defendants argue that plaintiffs lack standing to pursue their claims under the ESA. The "irreducible constitutional minimum" of Article III standing in environmental cases requires (1) that the plaintiff have suffered an "injury in fact" - an invasion of a cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and conduct complained of - the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Defendants argue that plaintiffs have not established an injury in fact, causation, or redressability. Regarding injury in fact, the City argues that "the increasing frog population has

United States District Court
For the Northern District of California

enhanced, not diminished, the opportunities for plaintiffs' members to observe the frogs at Sharp park and the adjacent Mori Point property." City MSJ at 8.  The SFPGA, in its separate motion, argues that because the Frog lays a large number of eggs, which suffer a 99% mortality rate from egg to adult, "the annual loss of some Frog eggs or even masses has no impact on Plaintiffs' ability to observe or study Frogs in the area.  This is especially so because . . . the Frog population at Sharp Park Golf Course has been increasing, and the number of Frog egg masses found at Sharp Park last winter was the highest ever recorded."  SFPGA MSJ at 5.  The SFPGA further argues that plaintiffs cannot claim "psychic" injury from seeing the take of the Frog or Snake, because plaintiffs have not alleged a "direct sensory impact of a change in the plaintiff's physical environment."  *Id.* at 8 (citing *Fund for Animals v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1996) (finding cognizable psychic injury where plaintiff witnessed bison being shot).

The Supreme Court, in *Laidlaw*, stated that the relevant inquiry for purposes of Article III standing "is not injury to the environment but injury to the plaintiff."  528 U.S. at 181.  "We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Id.* (*citing Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Defenders of Wildlife*, 504 U.S. at 562–563 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.").

The Court finds that plaintiffs have adequately demonstrated injury in fact here.  Plaintiffs have attached numerous declarations from their members illustrating the harm they face due to the City's activities.[2]  Wild Equity Institute member Laurie Graham states that she lives six miles from Sharp Park and Mori Point, and has visited the area twenty times since July 2006.  Graham Decl., ¶ 2.  She avers that while there, she typically spends about four hours observing wildlife, and  enjoys searching for the Frog and Snake.  *Id.* at ¶ 3.  She states that she was there on February 27, 2012, and while at Mori Point

---

[2]An organization has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1146 (9th Cir. 2000).  It is undisputed that those requirements are met here.

she could observe the Frog, but when she went to Laguna Salada and Horse Stable Pond to search for the species, her experience was "negatively impacted by the habitat altering actions the golf course conducts." *Id.* at ¶ 4. She expresses concern that Sharp Park's killing of individual eggs, tadpoles, or adult Frogs and Snakes will degrade her ability to observe large numbers of the species. *Id.* at ¶ 5.

Center for Biological Diversity member Jeff Miller avers that he has visited Sharp Park and Mori Point on numerous occasions to observe the Frog and Snake in the wild. Miller Decl., ¶ 1. He states that he is an expert birder and avid wildlife watcher, and, that on March 11, 2012, October 14, 2011, July 28, 2011, January 8, 2011, November 8, 2010, May 7, 2010, and October 2, 2009, he visited Mori Point and Sharp Park to observe the Frog and Snake. *Id.* at ¶ 6. On March 11, 2012, while at Mori Point, he learned that other wildlife observers had recently seen a Snake, which gave him hope that he might also see one. However, when he went to Sharp Park to search for the Frog and Snake around Horse Stable Pond and Laguna Salada, his enjoyment was "degraded by the pumps used to drain the species' habitats." *Id.* at 6. He states that unlike at the restored Mori Point, he has recently observed fewer or no Frogs recently at Sharp Park. *Id.* at 7. Both Graham and Miller state that they plan on returning to Sharp Park throughout the year to participate in the Golden Gate National Parks Endangered Species Big Year competition. *See* Graham Decl. ¶ 9; Miller Decl. ¶ 11.

Surfrider Foundation member Michael Stewart states that he enjoys surfing at Sharp Park beach, and typically ends up walking around both Sharp Park and Mori Point, where he enjoys searching for the Frog and Snake. Stewart Decl. ¶ 1. He states that his ability to observe the Frog and Snake is "very much dependent on the total aquatic habitat area that persists at Sharp Park, and the total number of individuals that exist in the population." *Id.* at ¶ 3. He states that because mowing and pumping negatively impact the populations of the Frog and Snake, his interests in observing them is injured "because the probability of observing the species is decreased." *Id.* at ¶ 4. He also states that he intends to return to Sharp Park regularly. *Id.*

Finally, National Parks Conservation Association member Robert Pilgrim avers that he lives one mile from Sharp Park. Pilgrim Decl. ¶ 1. He states that he is a frequent visitor to Sharp park, and that he always brings his camera to take photos of the Frog and the Snake. *Id.* at ¶ 6. He states that he has never seen a Snake in the wild, but always looks when he goes. *Id.* at ¶ 7. He believes that ongoing

1   threats to the Snake from the golf course impair his enjoyment of his recreational hikes and activities.

2   *Id.*

3          Plaintiffs have claimed impaired enjoyment of seeing animals in and around a specific pond in

4   a park they live near and visit frequently.  They have pinpointed specific dates at which they've visited

5   the Park, seen or otherwise searched for the Frog and Snake, and expressed not only their intention but

6   specific plans to return.  *See* Graham Decl. ¶ 9; Miller Decl. ¶ 11.  They have fully described

7   defendant's activities that they characterize as harmful, provided evidence of them, and alleged how

8   those activities specifically impact their enjoyment of the park.  This is sufficient for the purposes of

9   standing.  *See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2001) ("We

10  have held that environmental groups had standing to bring an ESA claim where the groups' members

11  regularly used and enjoyed an area inhabited by the imperilled species."); *Laidlaw*, 528 U.S. at 182

12  (plaintiffs had standing where they averred that they lived near the complained-of facility, were

13  concerned about pollutants discharged into a river, and refrained from certain activities like swimming

14  due to the pollutants); *Pacific Lumber*, 230 F.3d at 1150 (plaintiffs had standing where its members

15  stated longstanding recreational and aesthetic interests in a creek, and alleged defendants' conduct

16  impaired their enjoyment of recreational activities therein); *Cf. Lujan v. Defenders of Wildlife*, 504 U.S.

17  555, 564 (1992) (plaintiffs lacked standing where the two affidavits presented only "'some day'

18  intentions without any description of concrete plans" to return to international locations).

19         Defendants essentially argue that plaintiffs have not, and cannot, suffer an injury in fact because

20  the Frog population is growing.  Defendants' argument is flawed for two reasons.  First, defendants have

21  not established at the summary judgment stage that the Frog population is, in fact, growing.  Second,

22  even were defendants to establish that fact, it is not clear that population growth necessarily proscribes

23  a showing of injury in ESA cases.

24         Regarding the population trend of the Frog, the Court stated in its Order Denying a Preliminary

25  Injunction that "experts for both sides agree that the overall frog population has increased over the last

26  20 years."  Order at 8 (*citing* Hayes Supp. Decl. ¶ 11 (for plaintiffs); Jennings Decl. at 16 (for

27  defendants)).  Both the City and SFPGA rely on this finding throughout their motions.  However, a

28  district court's findings at the preliminary injunction stage are not binding at the summary judgment

United States District Court<br>For the Northern District of California

United States District Court
For the Northern District of California

1   stage.  *See, e.g., Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (noting that

2   such findings are made before discovery).  Here, the question is whether there is no genuine issue of

3   material fact as to the population trend of the Frog.

4         New evidence and recent FWS activity have called into question the growth of the Frog

5   population at Sharp Park.  In its denial of a preliminary injunction, the Court relied heavily on the City's

6   ability to carefully move the stranded egg masses.  *See* Order at 14-15.  The Court noted that during the

7   winter of 2010-11, the City found 159 egg masses; it then requested and received permission to move

8   128 of them.  *See* Order at 8 (citing Campo Dep. at 104)).  However, the FWS has since revoked the

9   City's authorization to move the stranded egg masses.  *See* Crystal Decl., Ex. 1 (Dec. 8, 2001 FWS

10  letter).  It is unclear what effect the revocation will have on the Frog's population.

11        Plaintiffs have also pointed to testimony that calls into question whether the Frog population is

12  increasing.  They cite defendants' expert Lisa Wayne, Sharp Park's Natural Areas Program Manager,

13  who testified at deposition that she could not say whether the population trend of the Frog at Sharp Park

14  was increasing or decreasing, and that while the 2010-2011 rainy season was the highest she had seen,

15  the egg mass population fluctuates from year to year.  Wayne Dep. at 249:15-250:9.  Plaintiffs also

16  provide a new declaration from their expert, Dr. Marc Hayes, one of the scientists to originally petition

17  the FWS to list the Frog.  *See* Emery Decl., Ex. B (Hayes Rep. III)).  Dr. Hayes now states that rather

18  than increasing, recent analysis shows that egg mass numbers at Horse Stable Pond are merely stable.

19  *Id.* at ¶ 62.  The Court finds that the City has not established that there is no genuine issue as to the

20  growth of the Frog population.

21        Moreover, there is no caselaw to support defendants' proposition that a growing population,

22  were it to exist, necessarily proscribes injury in a standing inquiry.  Population-level impact has never

23  been included in the standing inquiry in ESA cases.  *See, e.g., Forest Conservation Council v. Rosboro*

24  *Lumber Co.*, 50 F.3d 781, 783 (9th Cir. 1995) (threat to a single pair of listed owls sufficient to warrant

25  an injunction).  This necessarily follows from the fact that the standing inquiry focuses on injury to the

26  person,  not the environment.  *Laidlaw*, 528 U.S. at 181; *see also Pacific Lumber*, 230 F.3d at 1150

27  ("aesthetic perceptions are necessarily personal and subjective [and] the constitutional law of standing

28  . . . does not prescribe any particular formula for establishing a sufficiently concrete and particularized

United States District Court
For the Northern District of California

aesthetic or recreational injury in fact.")  The question at the standing inquiry is whether the plaintiff is a person "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.  *Laidlaw*, 528 U.S. at 181.  One can easily imagine a scenario where the aesthetic value of an area may be lessened by stymied population growth even in the absence of population loss.[3] Here, for example, Graham avers that as compared to Mori Point, where no water pumping occurs, her viewing of Frogs at Horse Stable Pond was negatively impacted by the habitat altering actions the golf course conducts.  Graham Decl., ¶ 4.  Miller, who describes himself as "an expert birder and avid wildlife watcher," often notes specific locations where he has seen Frogs and egg masses during his visits, but states that the City's activities reduce the total number of places where  he might observe the Frog.  Miller Decl., ¶ 8.  The Court therefore finds that plaintiffs have sufficiently alleged injury in fact with respect to the Frog.

The SFPGA argues separately that plaintiffs cannot establish standing with respect to the Snake, because any threat of injury to the plaintiffs would not be "actual and imminent" as required, but "conjectural or hypothetical."  SFPGA Mot. at 6 (*citing Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  The SFPGA points out that the only evidence plaintiffs have of harm to the Snake is a single dead Snake, allegedly killed by mowing operations, in 2005.  *Id.*  They argue that plaintiffs have provided only conjecture that the City is taking the Snake, and that "even if the Snake is present in Sharp Park, its elusive nature only makes it less perceptible (and perhaps even imperceptible) to plaintiffs." *Id.* at 7, n. 7.

The Court disagrees.  First, for the purposes of standing, the Court may assume that plaintiff will prevail on the merits that the City is taking the Snake.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor

---

[3]The SFPGA characterizes plaintiffs' claim as one seeking "enhancement," or a request that the City "voluntarily enhance the Frog population," and states that a plaintiff cannot base injury on "non-enhancement" rather than "diminishment."  SFPGA, however, mischaracterizes plaintiffs' claim: plaintiffs are not seeking acceleration of species growth by requiring that defendant engage in affirmative activity, like constructing a Frog habitat; instead, they seek restoration of natural population growth by ceasing pumping activity.  Thus, even if the population is growing, plaintiffs do complain of "diminishment" - diminishment of natural rates of growth.

United States District Court
For the Northern District of California

of the complaining party."); *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) ("In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."). Second, the scarcity and elusiveness of the Snake cannot, by themselves, proscribe a finding of standing. It would be incongruous with the purposes of the ESA to hold, as a matter of law, that a private citizen cannot bring suit simply because an animal is difficult to see, or worse, that because there are so few of the animal left, a person cannot be harmed by continued take.[4] Numerous plaintiffs have stated that they enjoy looking for the Snake, and, as noted above, they set forth their harm with sufficient specificity and plausibility to establish injury. *See* Graham Decl. ¶¶ 5-10; Miller Decl. ¶¶ 4-10. Here, because of the severely endangered nature of the Snake, the take of even a single Snake could have significantly harmful effects on the plaintiffs and their ability to ever see one. The Court finds that plaintiffs have established injury in fact with respect to the Snake.

The City and the SFPGA also argue that plaintiffs have failed to establish causation and redressability. Regarding causation, the City argues that "plaintiffs have not even attempted to demonstrate that San Francisco's activity at Sharp Park has reduced the frog population there to the extent it would adversely affect their members' opportunity to observe the frogs in and around Sharp Park." City Mot. at 8. This argument essentially repeats the City's argument regarding injury in fact - that because the Frog population is not reduced, the members cannot be adversely affected. The Court rejects this argument for the same reasons set forth above.

Regarding redressability, the City argues that neither an injunction nor declaratory relief would redress any cognizable injury. "The relief plaintiffs seek would not enhance their opportunities to observe the Frogs in and around Sharp Park or their opportunities to continue their searches for the 'elusive' snake." City's Mot. at 8. The SFPGA adds that "it is by no means clear that the halting of [] activities at Sharp Park, including pumping, will have a salutary effect on the Frog population - in fact, pumping benefits Frogs by maintaining stable water levels . . ." SFPGA Mot. at 8. This argument also sounds in defendants' other arguments regarding population level impacts, which the Court has already

---

[4]The Snake is the most endangered serpent in North America. Hayes Decl. ¶ 14.

United States District Court
For the Northern District of California

1  rejected.  Moreover, for the purpose of standing, the Court will assume that plaintiff's remedial theories

2  are correct - that halting pumping will cease the dessication of Frog egg masses and halting mowing will

3  prevent the death of Snakes.  *See, e.g., Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655

4  (9th Cir. 2011) (a plaintiff "need not show a favorable decision will relieve his *every* injury) (emphasis

5  in original).  At the remedy stage, if plaintiffs prevail, the Court has discretion to fashion an equitable

6  remedy to resolve its injuries.  *See Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 51

7  (2008) (emphasizing a court's flexibility in moulding relief with respect to environmental laws.).

8      In sum, the Court finds that plaintiffs have standing to pursue their claims.  The City and the

9  SFPGA's motions for summary judgment on this issue are DENIED.

10

11  **2 .     Defendants' Request to Stay Case**

12      The Court finds, however, that this case is appropriate for a stay pending the outcome of FWS

13  consultation.[5]  The FWS has had knowledge of the Frog population and its relationship to the City's

14  pumping activities at Sharp Park since at least 2005.  *See* Crystal Decl., Ex. 14 (Feb. 1, 2005 FWS letter

15  to City expressing the FWS' concerns that the water pump at Horse Stable Pond is stranding Frog egg

16  masses, and recommending that the City apply for a Section 7 permit).  In 2008 and 2010, the City

17  received permits from the FWS for localized improvements to the pump system and removal of

18  accumulated sediment from the pump house.  *See* Order at 7.  As noted above, during the winter of

19  2010-11, the City communicated with the FWS on a consistent basis in order to receive authorization

20  to move individual egg masses.  *Id.* at 8.

21      In late fall of 2011, the City began the process of initiating formal Section 7 consultation with

22  the FWS.  A number of meetings have occurred between the City and the FWS.  The City has completed

23  a revised Biological Assessment - the first step in beginning consultation - and the FWS has

24  acknowledged receiving it, although it has not, as of the date of this Order, accepted it.  Plater Decl., Ex.

25  1 (March 29, 2012 FWS E-mail, stating, "The [FWS] has not yet reviewed the revised BA, and thus not

26

27      [5]This stay implicates the rest of the cross-motions: the City and SFPGA's motions for summary
judgment on the merits of the plaintiffs' claims regarding take of the Snake, as well as plaintiffs' motion
28  for summary judgment on whether pumping is causing take of the Frog.

yet decided whether it is final nor whether formal consultation can now be initiated.") The SFPGA, in requesting a stay, represents to the Court that the consultation process "is expected to culminate with the release of a Biological Opinion and Incidental Take Statement within the next few months, which will moot this case." SFPGA Reply at 11 (*citing Ka'aina v. Kaua'i Island Util. Coop.,* 2010 WL 3834999, at *8 (D. Haw. Sept. 24, 2010) (exercising the court's inherent authority to issue a stay in ESA case where "the regulatory process regarding a permit for Defendant's incidental take is progressing and could be completed" within a few months)). At oral argument on April 20, 2012, defendants represented to the Court that consultation may begin within 7 days, at which time the 135-day clock on Section 7 consultation will begin. *See* 50 C.F.R. § 402.14.

The Frog breeds from November to April. Vrendenberg Decl. ¶ 8. Plaintiffs have previously stated that in recent years, "the egg masses have been found in Sharp Park in late December." Pl.'s Mot. for Prelim. Inj. at 6 (*citing* Pl. Ex. 18 (Dec. 2010 Data Sheets)). This case presents unique circumstances where, even taking plaintiffs' claims as true, no take of the egg masses can occur until, at the earliest, late winter 2012. As the FWS may issue a Biological Opinion within months that can at least inform, if not entirely moot, this case, and because the breeding season for the Frog will not occur again until late Winter, the Court finds this to be an appropriate case in which to exercise its inherent authority for a stay. The stay will allow for the expert agency to review the City's plan and evaluate the golf course's activities on the Frog and Snake. Plaintiffs argue that stay requests should only be considered when the stay would last for a "finite duration." Pls.' Reply at 5 (*citing Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007)). The Court considers this stay to be for a finite duration. The Court will review updates on the progress of the FWS consultation and, if by October 2012 a Biological Opinion has not issued or plaintiffs' claims are not otherwise mooted or resolved, plaintiffs may move to lift the stay. Until that time, plaintiffs' case is STAYED.

## CONCLUSION

Defendant's and Defendant-Intervenor's motions for summary judgment on the issue of standing are DENIED. The City's request for a stay is GRANTED. Plaintiff's motion for summary judgment is DENIED. The case is STAYED pending the FWS consultation with the City. The parties are ordered

to file a Joint Status Report as soon as any action is taken by FWS, but in no event later than September 7, 2012.

     **IT IS SO ORDERED.**

Dated: April 26, 2012

_Susan Illston_
_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California