1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILD EQUITY INSTITUTE, *et al.*,

             Plaintiffs,

   v.

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

             Defendants.

                        /

No. C 11-00958 SI

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS AND VACATING
HEARING**

Currently before the Court is defendants' motion to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants argue that when the United States Fish and Wildlife Service issued its final Biological Opinion and Incidental Take Statement on October 2, 2012, the case became moot. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter suitable for disposition without oral argument and therefore VACATES the hearing currently scheduled for December 14, 2012. Having carefully considered the papers submitted, the Court GRANTS defendants' motion to dismiss, for the reasons set forth below.

**BACKGROUND**

Plaintiffs, various non-profit conservation groups, filed suit against the City and its officials for violating the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531-1544. Plaintiffs allege that defendants' operations and activities at Sharp Park Golf Course have caused the "taking" of the threatened Californian red-legged frog (the "Frog") and the endangered San Francisco garter snake (the "Snake"), and that therefore, defendants should have obtained an Incidental Take Permit pursuant to

Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B). Compl. at ¶ 1. Specifically, plaintiffs contend that defendants' water management at Sharp Park has exposed frog egg masses to the air, causing fatal desiccation of the egg masses, thereby reducing the frog population. *Id.* at ¶¶ 54-60. Plaintiffs also claim that other golf course operation activities – lawn mowing and golf cart usage – harm the Snake and Frog by running them over. *Id.* at ¶¶ 54-62. Defendant City owns and operates Sharp Park, which is a public park located in the City of Pacifica and contains an 18-hole golf course constructed in 1930. The Court allowed the San Francisco Public Golf Alliance ("SFPGA") to intervene as a defendant in this action as well. Docket No. 44.

The lawsuit was filed in March, 2011. In May 2011, the City asked the U.S. Army Corps of Engineers (the "Corps") to initiate formal Section 7 consultation with the United States Fish and Wildlife Service ("FWS"). In August 2011, the City submitted a section 404 permit application to the Corps for the Sharp Park Pump House Safety and Infrastructure Improvement Project (the "Project"), and in October the Corps requested that the FWS provide a formal consultation on the City's section 404 permit application for the Project. Over the next several months, the City developed multiple drafts of a Biological Assessment, and the FWS began its formal consultation process. On April 26, 2012, this Court issued a stay pending the FWS's formal consultation and the issuance of its final Biological Opinion ("BiOp"). Docket No. 141.

On October 2, 2012, the FWS issued its final BiOp. Docket No. 146. In the BiOp, the FWS made a jeopardy determination, in accordance with regulation, based on the status of the species, the environmental baseline, the effects of the proposed action, and cumulative effects. BiOp 19-20. In its report on the effects of the proposed action, the FWS analyzed the effects of the construction, the ongoing golf course maintenance and operations, and the restoration actions. *Id.* at 30-38. The FWS concluded that the "Project, as proposed, is not likely to jeopardize the continued existence of the California red-legged frog or San Francisco garter snake." *Id.* at 38.

As part of the BiOp, the FWS also issued an Incidental Take Statement ("ITS"). As explained in the ITS, Section 9 of the ESA makes it unlawful for any person to "take" any endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in such conduct." BiOp 39; 16 U.S.C.

**United States District Court**
For the Northern District of California

§ 1532(19). The ESA allows the FWS to authorize certain types of incidental take. "Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement." BiOp 39.

The ITS states that the FWS anticipates that, as a result of the construction activities, all Frogs and Snakes within the Horse Stable Pond construction site will be subject to incidental take in the form of harassment or capture, and anticipates that, in total, one Frog will be killed or injured. *Id.* at 39-40. The FWS further anticipates that, due to golf course maintenance and operations, all Frogs and Snakes will be subject to incidental take in the form of harassment, and one Frog and one Snake will be killed or injured. *Id.* at 40. Furthermore, the FWS anticipates that 130 Frog egg masses each year will be subject to incidental take in the form of harm, harassment, capture, injury, or death as a result of pumping activities for the next 10 years. *Id.* Finally, the FWS found that all Frogs and Snakes in the restoration area will be subject to incidental take in the form of harassment. *Id.*

In the "Terms and Conditions" section, the ITS states that "to be exempt from the prohibitions of Section 9 of the Act, the Corps and the City shall ensure compliance with the following terms and conditions . . . . These terms and conditions are nondiscretionary." *Id.* at 41. The ITS outlines 31 requirements or sub-requirements that the City and Corps must follow; if they fail to comply, "the protective coverage of section 7(o)(2) may lapse." *Id.* at 39, 41-45.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint. Fed. R. Civ. Pro. 12(b)(1). As the party invoking the jurisdiction of the federal court, the plaintiffs bear the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (citation omitted).

The jurisdiction of federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *See PUC v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim is moot if it has lost its character as a present, live controversy, and if no effective relief can be granted:

1   "Where the question sought to be adjudicated has been mooted by developments subsequent to filing

2   of the complaint, no justiciable controversy is presented." *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  A

3   claim also may be considered moot if interim relief or events have completely and irrevocably

4   eradicated the effects of the alleged violation.  *See Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135

5   F.3d 1260, 1274 (9th Cir. 1998).  It does not matter if the controversy was "live" when the complaint

6   was filed.  *SW. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 82 F. Supp. 2d 1070, 1079 (D. Ariz.

7   2000) (citing *Humboldt Cnty. v. United States*, 684 F.2d 1276, 1283-84 (9th Cir. 1982)).  Accordingly,

8   "Article III of the Constitution prohibits federal courts from taking further action on the merits in moot

9   cases," and the  moot case must be dismissed due to the court's lack of subject matter jurisdiction.

10  *Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1076 (9th Cir. 2001) (citations omitted).

11

12                                          **DISCUSSION**

13          Defendants argue that plaintiffs' case must be dismissed because the ITS renders the case moot.

14  The ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties

15  for takings committed during activities that are otherwise lawful and in compliance with its terms and

16  conditions."  *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d

17  1229, 1239 (9th Cir. 2001) (citing 16 U.S.C. § 1536(o)).  Other cases in this circuit agree that the ITS

18  shields plaintiffs from liability under the ESA as long as they comply with its terms.  *See e.g.*, *Center

19  for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012) ("Take that complies with the

20  terms and conditions of an ITS is not a prohibited take under Section 9.") (citing 16 U.S.C. § 1536(o)(2);

21  50 C.F.R. § 402.14(i)(5)); *Oregon Wild v. Connor*, No. 6:09-CV-00185-AA, 2012 WL 3756327, at *2

22  (D. Or. Aug. 27, 2012) ("A 'take' occurring under an ITS is exempt from ESA Section 9 liability"

23  (citing *Ramsey v. Kantor*, 96 F.3d 434, 441 (9th Cir. 1996) ("Section 7(o) 'indicates that any taking –

24  whether by a federal agency, private applicant, or other party – that complies with the conditions set

25  forth in the incidental take statement is permitted'")).

26          Furthermore, "case law confirms that issuance of a Biological Opinion, with an ITS, moots ESA

27  Section 9 claims." *Oregon Wild*, 2012 WL 3756327, at *2 (citing *S. Utah Wilderness Alliance v.

28  Medigan*, No. 92-cv-1094, 1993 WL 19650, at *1 (D.D.C. Jan. 6, 1993); *Or. Natural Res. Council v.*

4

United States District Court
For the Northern District of California

*Bureau of Reclamation*, No. 91-cv-6284, 1993 U.S. Dist. LEXIS 7418, at *24-*25 (D. Or. Apr. 5, 1993)).  In the instant case, plaintiffs alleged that the City's operation and maintenance of the Sharp Park results in an unauthorized take of the Frog and the Snake, and "[b]y taking these species without obtaining an Incidental Take Permit . . . the City is violating the ESA."  Compl. ¶ 1.  The ITS now authorizes take of the Frog and the Snake by golf course operation and maintenance activities, and the construction and restoration projects.  If the City fails to abide by the terms of the ITS, then plaintiffs will have a new cause of action, but until then the City is shielded from liability.  Therefore, the Court finds that plaintiffs' claims are rendered moot by the ITS.

Plaintiffs argue that, although generally an ITS might render a Section 9 claim moot, in this case it does not because of the particular requirements of this ITS.  Plaintiffs point to the ITS statement that, "[t]he measures described below are non-discretionary, and must be implemented by the Corps of Engineers and the City so that they become binding conditions of any grant or permit issued to the City, as appropriate, in order for the exemption in section 7(o)(2) to apply."  BiOp 39.  Plaintiffs argue that this clause shows that the ITS is not self-effectuating, but requires to Corps to incorporate the terms of the ITS into a grant or permit to effectuate the ITS.  Therefore, they argue, only after a grant is issued incorporating these terms will the case become moot.

The Court disagrees with this interpretation of the ITS.  Other language in the ITS clearly contemplates that the document is self-effectuating:  "to be exempt from the prohibitions of Section 9 of the Act, the Corps and the City *shall ensure compliance* with the following terms and conditions . . . . These terms and conditions are nondiscretionary."  *Id.* at 41 (emphasis added).  Thus, the language contemplates that the City and Corps must immediately comply with all of terms of the ITS for Section 9 immunity, and the cannot wait for a permit that incorporates the terms of the ITS.  Furthermore, many of the terms relate to the activities at the Park which would not necessarily be covered by the Project permit (for example, ongoing activities having nothing to do with construction, like mowing, gopher control, and golf cart driving, or future conservation activities not related to construction, like development of a water quality monitoring plan and future reporting requirements).  *Id.* at 41-46.  Moreover, the ESA implementing regulations clearly state that the ITS does not need a separate grant or permit to be effectuated.  50 C.F.R. § 402.14(i)(5) (stating that any taking that is "in compliance with

the terms and conditions of that [ITS] statement is not a prohibited taking under the Act, and *no other authorization or permit under the Act is required.*") (emphasis added).

Plaintiffs are concerned that unauthorized take of the Frogs and the Snakes will continue to occur until a permit is issued, and that the Corps might deny the permit, grant a permit without incorporating the ITS conditions, or delay a decision on the permit indefinitely. However, because the ITS is self-effectuating, even if the Project permit is denied for other reasons, the Corps and the City are required to follow each of the terms and conditions in the ITS. If they fail to do so, their take of the Frog and the Snake will no longer be immune from liability, and plaintiffs will have a new cause of action against them. Similarly, if the Corps issues a permit that fails to incorporate the conditions of the ITS, the ITS will have been violated and plaintiffs can renew their suit. Finally, even if the Corps delays its decision on the permit, the other requirements in the ITS that have nothing to do with the Project (e.g., mowing and golf cart requirements) must still be followed, or defendants will loose their immunity from suit.

## CONCLUSION

For the foregoing reasons, the Court finds that the ITS renders plaintiffs' claims moot. Accordingly, Defendants' motion to dismiss is GRANTED. The case is DISMISSED WITHOUT PREJUDICE. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: December 6, 2012

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

6