IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILD EQUITY INSTITUTE, *et al.*, | No. C 11-00958 SI |
| Plaintiffs, | **ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS** |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, *et al.*, | |
| Defendants. | |

On May 10, 2013, the Court heard argument on plaintiffs' motion for an award of attorneys' fees and costs. Having carefully considered the arguments of counsel and the papers submitted, the Court GRANTS IN PART plaintiffs' motion, and awards $385,809 in attorneys' fees and costs, for the reasons set forth below.

**BACKGROUND**

On March 2, 2011, plaintiffs, a collection of non-profit conservation groups, filed suit against the City and County of San Francisco and its officials for violation of the Endangered Species Act (the "ESA"), 16 U.S.C. §§ 1531-1544. Plaintiffs alleged that defendants' operations and activities at Sharp Park Golf Course have caused the "taking" (i.e., killing, wounding, harming, or harassing) of the threatened Californian red-legged frog (the "Frog") and the endangered San Francisco garter snake (the "Snake"). Complaint at 1. The complaint alleged that "[b]y taking these species without obtaining an Incidental Take Permit ('ITP') pursuant to Section 10 of the ESA, 16 U.S.C. § 1539(a)(1)(B), the City is violating the ESA and the United States Fish and Wildlife Service's ('FWS') implementing regulations." *Id.* Initially, defendants denied that they were causing any take of the Frogs or Snakes at Sharp Park. *See* Docket No. 15, ¶¶ 10, 12, 14.

On September 23, 2011, plaintiffs filed a motion for a preliminary injunction, presenting evidence of ongoing take of the Frogs and Snakes. Docket No. 53. In response, defendants continued to deny take of the Frogs or Snakes. Docket No. 63, at 10-18. They also asserted that if there was take, it was covered under existing authorization from the FWS. The FWS had issued Biological Opinions authorizing take during two construction projects, but there was no authorization for take during the regular operations and maintenance of Sharp Park. *Id.* at 16-17.

Following the Court's denial of plaintiffs' motion for a preliminary injunction on November 29, 2011, defendants initiated formal Section 7 consultation with the FWS. *See* Docket No. 91. In March 2012, the parties filed cross-motions for summary judgment. The Court denied both parties' motions, and issued a stay of the case pending the outcome of the FWS consultation. Docket No. 141.

On October 2, 2012, the FWS issued its final Biological Opinion and Incidental Take Statement (the "BiOp" and the "ITS"). Docket No. 146. The ITS states that the FWS anticipates that, as a result of the construction activities and golf course maintenance operations, all Frogs, all Snakes, and 130 Frog egg masses will be subject to incidental take, and two Frogs and one Snake will be killed each year. In the "Terms and Conditions" section, the ITS stated that "to be exempt from the prohibitions of Section 9 of the Act, the [Army] Corps and the City shall ensure compliance with the following terms and conditions . . . . These terms and conditions are nondiscretionary." *Id.* at 41. The ITS outlines 31 requirements that San Francisco and the Army Corps must follow; if they fail to comply, "the protective coverage of section 7(o)(2) may lapse." *Id.* at 39, 41-45.

On December 6, 2012, the Court granted defendants' motion to dismiss, finding that the issuance of the BiOp and ITS rendered plaintiffs' claims moot. Docket No. 153. Plaintiffs appealed that order.

**LEGAL STANDARD**

The Endangered Species Act ("ESA") provides that in a citizen suit, a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court *determines such award is appropriate*." 16 U.S.C. § 1540(g)(4) (emphasis added). This language "was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties – parties achieving *some success*, even if not major success." *Ruckelshaus v. Sierra Club*, 463

2

U.S. 680, 688 (1983) (emphasis in original).

Under the ESA, when parties achieve their desired results because the lawsuit brought about a voluntary change, courts should apply the "catalyst theory" to determine if an award of fees and costs is "appropriate." *Assn of Cal. Water Agencies v. Evans*, 386 F.3d 879, 884-85 (9th Cir. 2004).[1] The catalyst theory has a two part test: (1) whether there is a causal relationship between the desired outcome and the suit, and (2) whether the outcome is required by law or merely gratuitous. *Id.* at 886 (quoting *Greater L.A. Council on Deafness v. Cmty. Television*, 813 F.2d 217, 219 (9th Cir.1987)).

## DISCUSSION

### I. Entitlement to Fees and Costs

#### A. Desired Outcome and Causal Relationship

Plaintiffs argue that they are entitled to attorneys' fees and costs under the catalyst theory. The first part of the two-part test is whether there is a causal relationship between the desired outcome and the suit. Plaintiffs argue that the very outcome that they desired – that defendants cease taking the Frogs and Snakes without authorization from the FWS – occurred because defendants began the application process for the BiOp as a result of pressure from plaintiffs' lawsuit.

Defendants make two main rebuttals. First, they argue that plaintiffs' main goal was actually to enjoin defendants from operating Sharp Park as a golf course, not to effectuate the ESA through a BiOp and ITS. They point to statements made by plaintiff Wild Equity, and to the fact that plaintiffs are appealing the Court's dismissal, as proof that the true litigation objective was to prohibit golf at Sharp Park. *See* San Francisco's Opp'n 10-12.

However, to determine plaintiffs' litigation objective, the Court looks to the complaint, not to other statements of a single plaintiff. *See Idaho Watersheds Project v. Jones*, 253 F. App'x 684, 686

---

[1] *Evans* held that "although *Buckhannon* [*Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001)] does preclude use of the catalyst theory for suits brought under statutes providing for fee shifting for a 'prevailing party,' the decision does not preclude use of the catalyst theory for suits brought under statutes like the ESA, which allow the court to award costs of litigation 'whenever the court determines such award is appropriate.'" *Ass'n of California Water Agencies v. Evans*, 386 F.3d 879, 885 (9th Cir. 2004)

1  (9th Cir. 2007). Here, the complaint alleges: "[b]y taking these species without obtaining an Incidental
2  Take Permit ('ITP') pursuant to Section 10 of the ESA,16 U.S.C. § 1539(a)(1)(B), the City is violating
3  the ESA and the United States Fish and Wildlife Service's ('FWS') implementing regulations."
4  Therefore, the Court finds that plaintiffs' litigation goal was the halt defendants' taking of the Frogs and
5  Snakes without first obtaining authorization pursuant to the ESA.

6  The Court also finds that this objective was met. The BiOp and ITS found, as plaintiffs had
7  alleged and defendants had denied, that incidental take of the Frogs and Snakes was occurring due to
8  golf course operations. The ITS authorized the incidental take, so long as defendants complied with the
9  list of requirements it set forth. Additionally, it is not relevant that the take authorized under the ESA
10 was pursuant to Section 7, as opposed to Section 10; there is little material difference between an ITP
11 and an ITS, and plaintiffs are only required to achieve *some success*, not perfect success.

12 Second, defendants argue that they acted independently, and that plaintiffs' lawsuit was not the
13 cause of their BiOp application. Defendants had previously sought authorization on an emergency basis
14 for the removal of Frog egg masses. However, in March 2011, the FWS told defendants that the agency
15 would no longer continue to grant authorization on an "emergency" basis. Defendants claim that they
16 independently sought authorization when the FWS recommended that defendants seek a BiOp under
17 Section 7.

18 However, it was not until after the preliminary injunction motion that defendants sought take
19 authorization, almost a year after the FWS encouraged them to. Moreover, the authorization was for
20 take pursuant to the pumping and golf course activities, as opposed to authorization just for moving Frog
21 egg masses. *See* Docket No. 91. The timing and scope of the authorization indicate that plaintiffs'
22 lawsuit was at least a substantial causative factor. Finally, an August 2012 letter from defendants to the
23 FWS requested that the agency "ensure we have the final [BiOp] by September 7th" because "it is
24 extremely important to be able to dispose of the litigation at long last." Supp. Platter Decl., Ex. E. This
25 indicates that a motivating force behind defendants' pursuit of the BiOp was to dispose of plaintiffs'
26 lawsuit.

27 Because defendants generally will be reluctant to concede that a lawsuit suit caused their change
28 in behavior, courts must look for clues, such as the chronology of events. *See Klamath Siskiyou*

4

*Wildlands Ctr. v. Babbitt*, 105 F. Supp. 2d 1132, 1135-36 (D. Or. 2000); *see also Wilderness Soc. v. Babbitt*, 5 F.3d 383, 386 (9th Cir. 1993). Here, the chronology and scope of the authorization, the continued denial, and defendants' own words demonstrate that plaintiffs' lawsuit was a material factor in causing defendants to seek authorization from the FWS for take occurring from the regular activities at Sharp Park.

### B. Outcome Required By Law

The second part of the catalyst theory is whether the outcome is a gratuitous action by defendants or is required by law. As explained in the BiOp, under the ESA, "taking that is incidental and not intended as part of the agency action is not considered to be prohibited taking under the Act *provided that such taking is in compliance* with this Incidental Take Statement." BiOp 39 (emphasis added). The ITS outlines 31 requirements or sub-requirements that defendants must follow; if they fail to comply, "the protective coverage of section 7(o)(2) may lapse." *Id.* at 39, 41-45. Thus, as the Court found in its Dismissal Order, the ITS legally binds defendants, and is self-effectuating. *See* Docket No. 153.

Even if defendants previously were voluntarily undertaking all 31 requirements (which plaintiffs argue they were not), the ITS creates a legal requirement to continue these actions or they will be subject to FWS enforcement measures. Thus, defendants' actions to mitigate take of the Frogs and Snakes are no longer gratuitous. They are now legally required by the ITS. Therefore, the Court finds that the outcome is required by law, and the second requirement of the catalyst theory is met.

Accordingly, the Court finds that an award of attorneys' fees and costs to plaintiffs is appropriate.

## II. Amount of Fees and Costs

A district court begins its calculation of fees by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The resulting number is frequently called the "lodestar" amount. *City of Riverside v. Rivera*, 477 U.S. 561, 568 (1986). "It is plaintiffs' burden to 'document the appropriate hours expended in the litigation by submitting evidence in support of those hours worked.'" *Lucas v. White*, 63 F. Supp. 2d 1046, 1057

5

(N.D. Cal. 1999) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992)). The appropriate number of hours includes all time "reasonably expended in pursuit of the ultimate result achieved, in the same manner that an attorney traditionally is compensated by a fee-paying client for all time reasonably expended on a matter." *Hensley*, 461 U.S. at 431. Fee applicants, and the Court, should exclude hours that are "excessive, redundant, or otherwise unnecessary." *Id*. at 434.

The party opposing the fee application "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994). "Conclusory and unsubstantiated objections are not sufficient to warrant a reduction in fees." *Lucas*, 63 F. Supp. 2d at 1057-58.

### A. Plaintiffs' Requested Attorneys' Fees

Plaintiffs' requested recovery for attorneys's fees can be broken down as follows:

Eric Glitzenstein (32 years experience): 282.75 hours at $750 per hour
Howard Crystal (20 years experience): 844 hours at $700 per hour
Brent Plater (13 years experience): 857.7 hours at $550 per hour
Shawna Casabier (3 years experience): 47.15 hours at $295 per hour
Kelli Shields (1 year experience): 217 hours at $250 per hour
Paralegals: 691 hours at $160 per hour

The sum total for attorneys' fees amounts to $1,451,556, but, "to account for any billing discrepancies," plaintiffs are reducing that request by 10%, to $1,306,400. Pls.' Mot. at 25 (citing *South Yuba River Citizens League v. NMFS*, No. S-06-2845 LKK, 2012 WL 1038131, at *2 (E.D. Cal. Mar. 27, 2012)).

Defendants argue that plaintiffs' billing rates should be substantially reduced, and the compensable hours should be diminished because of extensive prefiling activity, non-compensable time spent in lobbying and advocacy activities, duplicative and inefficient efforts, non-compensable time spent on administrative and secretarial tasks, time spent on unsuccessful and unreasonable endeavors, unnecessary travel time, and continued litigation after issuance of the BiOp.

A district court "is not required to set forth an hour-by-hour analysis of the fee request. Rather, . . . the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee

application." *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (citations and quotations omitted).

The Court finds that an across-the-board adjustment in this case is appropriate. First, although the Court has found that they gained their desired outcome, plaintiffs did not prevail on a *single* substantive motion before the Court. The Court denied their motion for preliminary injunction. Both parties filed cross motions for summary judgment, and the Court denied both motions. Then finally, defendants filed a motion to dismiss the case, which plaintiffs opposed but which the Court granted. Although the Court cannot determine with precision which of the hours spent were duplicative or unnecessary to achieving plaintiff's goal, the fact that plaintiffs lost every single motion leads the Court to believe that a large majority of the time spent was "excessive, redundant, or otherwise unnecessary," and therefore should not be compensated.

Second, plaintiffs failed to satisfactorily explain why Glitzenstein and Crystal, at $700 an hour or greater, spent so much time on this case. Most of the issues in this case were not complex. Yet the Washington, D.C. attorneys account for half of the attorney hours spent on this case. In contrast, the two junior associates, at less than $300 per hour, accounted for less than 12% of the attorney hours in this case; this grossly inefficient allocation of resources seems unwarranted by this simple ESA action. Plaintiffs fail to justify this excess.

Finally, as the Supreme Court explained, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry. . . . [The court must ask] did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley*, 461 U.S. at 434. The Court finds that the answer to that question requires significantly decreasing the fee award. Although the Court finds that plaintiffs' lawsuit spurred defendants into obtaining the necessary authorization for their take of the Frogs and Snakes, little else has substantively changed in the management of Sharp Park. Defendants' current mitigation efforts are now required by law, instead of voluntary, but only a few new restrictions have been added. At oral argument, plaintiffs conceded that defendants' FWS authorization would likely have happened eventually, but plaintiffs' suit caused it to happen sooner. Thus, when looking at the larger picture, little seems to have been gained by plaintiffs, except this extra time. Moreover, plaintiffs do not seem satisfied with the outcome of the suit. Plaintiffs

are appealing the Court's order dismissing the case. At oral argument, plaintiffs indicated that they were also considering challenging the BiOp. For all of these reasons, the Court finds a substantial downward adjustment is appropriate.

Accordingly, plaintiffs' initial requested amount of $1,306,400 for attorneys' fees shall be reduced by three-quarters, to $326,600.

### B. Plaintiffs' Requested Costs

Additionally, plaintiffs request $59,409 in costs. Defendants make three objections to plaintiffs' requested $59,409 in costs. First, they argue that the Court should disallow travel-related expenses, like hotels and airfare. They argue that plaintiffs have not justified why local counsel, instead of counsel based in Washington, D.C., could not have been procured. In response, plaintiffs submitted a supplemental declaration, which described the search for counsel in this case beginning with local counsel, and only finding counsel with the requisite expertise and experience in Washington, D.C. *See* Second Decl. of Brent Plater ¶ 7. Additionally, plaintiffs describe the use of local counsel when possible to ameliorate travel costs. The Court finds that travel expenses are recoverable.

Second, defendants object to a $200 fee incurred for a cancelled deposition. Plaintiffs have withdrawn their request for this deposition fee.

Third, defendants object to the recovery of expert witness fees for two expert witnesses, because those witnesses stated they would not bill for all or part of their time on the case, and plaintiffs failed to provide invoices for these witnesses. In response, plaintiffs submitted the invoices from its expert witnesses. *See id.*, Exs. G-K. The Court is satisfied with these invoices, and finds that the award for expert fees is appropriate. The Court also finds that plaintiffs provided ample support for all other costs.

Accordingly, the Court finds an award of $59,209 in costs is appropriate (the originally requested $59,409 minus the $200 cancellation fee).

///

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART plaintiffs' motion for attorneys' fees and costs and awards $385,809. The order resolves Docket No. 164.

**IT IS SO ORDERED.**

Dated: July 1, 2013

SUSAN ILLSTON
United States District Judge